IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 05-0167 WHA |
| v. | |
| EDGAR DIAZ, RICKEY ROLLINS, DON JOHNSON, ROBERT CALLOWAY, DORNELL ELLIS, EMILE FORT, CHRISTOPHER BYES, PARIS RAGLAND, RONNIE CALLOWAY, ALLEN CALLOWAY, and REDACTED DEFENDANTS Nos. ONE & TWO, | **MEMORANDUM OPINION RE PROTECTIVE ORDER FOR WITNESS SECURITY** |
| Defendants. | |

In this RICO gang prosecution, this memorandum opinion and the accompanying protective order are the culmination of exhaustive proceedings directed at balancing the need to protect civilian witnesses from retaliation against the need of the defense to prepare for trial.

By no means is this the first discovery order in the case. Extensive discovery issues have been previously addressed. Issues concerning the Jencks Act, *Brady*, Rule 16, non-Jencks/*Brady* material, the absence of discovery in aid of death-penalty authorization proceedings, and witness safety were addressed in an order dated August 26, 2005. Other orders regarding discovery were issued on September 8, October 6, December 2, December 8 (all in 2005) and April 6, May 18 and May 21 (all in 2006). This order addresses the extent to which otherwise discoverable materials may (or may not) be redacted to keep defense teams

from learning of civilian witness identities and locations. This order does not require any materials to be produced that are beyond the reach of Rule 16 or *Brady*.

Contrary to its usual open-file practice, the government in this case has redacted the names and other identifying information of *all* possible civilian witnesses from materials otherwise provided in discovery. Many gang task-force and other local police reports have been produced with such redactions (but no Form 302s have been produced). A typical page in such a police report has anywhere from one to a dozen blackouts, some up to several lines long. The substance of the comment by the redacted witness is discernible or not depending on the extent it would help identify the witness, which leads to more blot-outs. At numerous hearings, defense counsel have protested the redactions, complaining that their ability to prepare for trial has been frustrated. To reconcile the competing needs, the Court has required the government to submit (*ex parte* and under seal) detailed justifications for the redactions. The Court has twice circulated for comment draft protective orders under which some redacted information would be disclosed to counsel and investigators under strict conditions. The instant order and the accompanying final protective order take all of the evidence and commentary into account.

In federal prosecutions, of course, the defense has no right to a *list* of prospective witnesses, except in death-penalty cases — and even then only three days before trial and subject to security restrictions of 18 U.S.C. 3432. Likewise, under the Jencks Act, 18 U.S.C. 3500, "witness statements" (as statutorily defined) may be withheld until after the direct testimony, although this may result in mid-trial continuances.[1] This Court has been steadfast in enforcing these rights of the government to secrecy. The defense, however, *does* have a right to receive Rule 16 discovery *before* trial, subject only to protective orders under Rule 16(d)(1). And, the defense has a right to receive *Brady* material no later than the point in the case when there is a reasonable probability that if the evidence is not disclosed to the defense, the result of

---

[1] The redacted police reports produced in this case often reveal witness comments, as summarized by various officers. No one seriously contends, however, that the summaries constitute Jencks Act "statements" under the definition at 18 U.S.C. 3500(e).

2

the proceeding will be different. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).[2] If such disclosures include names of civilian witnesses, those names must be part-and-parcel of the mandated disclosure unless a protective order under Rule 16(d)(1) restricts or delays such disclosures.

In the present case, a persistent government theme has been that, even as to Rule 16 and *Brady* disclosures, the defense should learn the names of potential witnesses only at trial. Put differently, *even as to discoverable materials*, the government insists on blotting out all civilian witness-identifying information.[3] The asserted reasons are: (i) the gang defendants live by a code of silence that calls for death or retribution against witnesses; (ii) some gang confederates are at large; and (iii) when defense teams scour the neighborhood looking for the witnesses, their identities will become generally known and they and their families will be put at risk.

As with prior orders, the Court again finds that the government has made a substantial showing of danger to inculpatory witnesses. The danger arises out of the substantial showings that: (i) the ten defendants are and have been at all relevant times members of the "Down Below Gang" (DBG) in the Sunnydale district of San Francisco; (ii) the gang has carried out numerous murders and other acts of violence (for which members are under indictment in this case); (iii) the gang and its confederates, some of whom are at large, abide by a code of silence that encourages revenge on snitches; (iv) some DBG threats have already been made against witnesses; and (v) if the location and identity of key government witnesses were known, their safety (and their families' safety) would be at risk. As with prior orders, these considerations warrant restrictions on witness-identifying information.

The Court, however, is convinced that the accompanying protective order will *improve* witness security yet allow greater access by defense teams to discoverable materials. Witness

---

[2] If the material constitutes true Jencks Act "statements," *Brady* disclosure need not be until after the direct testimony. The *Brady* problem then must be dealt with via continuances. *United States v. Alvarez*, 358 F.3d 1194, 1211 (9th Cir. 2004).

[3] Government's Response to Second Draft Protective Order at 1, 2 (June 7, 2006). Earlier, the government stated that it would turn over such materials a few days *before* trial. Its latest submissions have retreated to "at trial."

3

names will now be released to defense teams in stages before trial. They will, however, be substantially restricted in its use and dissemination. The protective order will facilitate witness interviews at the federal building rather than in the field. The order will prevent protected information that defense teams might otherwise learn on their own from falling into the wrong hands. The protective order will bar defense teams from suggesting to third parties that certain persons are cooperating with law enforcement. Defendants themselves will be barred from access to identifying information until twenty-one days before trial and will never have access to (specific) locator information. These are only some of the ways in which witness security will be improved. It bears repeating that the protective order only pertains to materials otherwise discoverable. It does not require production of anything not already discoverable.

To the Court's disappointment, the government has been of very little assistance in fashioning a protective order, refusing to even participate in a process of perfecting a form of order. The government has merely folded its arms and said no, a thousand times no. It reluctantly acknowledges the witness-security risks already created by the status quo. In this regard, four points deserve emphasis.

*First*, defense investigators are *already* free to scour the neighborhood in question inquiring about who saw what in the various homicides and crimes alleged. Such inquiries *already* pose the risk of community speculation about witnesses. Such inquiries *already* pose a risk of consequent harm to witnesses, even to those incorrectly suspected of cooperating with authorities. Under the protective order, while defense counsel and their investigators will have access to redacted data, they will be restricted in its use and dissemination. Defense investigations will be conducted with lower profiles. There will be less speculation and attention in the neighborhood. The order, among other things, will facilitate interviews at the federal building and reduce the need for criss-crossing the neighborhood. The order will limit counsel in divulging protected information while still allowing them to solicit information.

*Second*, even the government has stated that it intends to release all witness information shortly before trial or, as it now states, at trial. Either way, that course would lead to motions to continue on the eve of trial or during trial. Justice would require that continuances be

4

seriously entertained. If continuances cascaded, we might lose jurors. A mistrial might result. A "train wreck" is the way the Court has described this scenario in prior proceedings. Getting the trial back on track would inject a hiatus. During the hiatus, witnesses would be known and at risk without the security of any protective order, if the government has its way. In contrast, the protective order would relieve pressure on the trial date, avoid continuances and thereby enhance witness security.

*Third*, severance of this case into two trials is a distinct possibility. All non-death eligible defendants will likely ask for a trial separate from the death-eligible defendants. Sheer manageability, decorum, and courtroom physical limitations arguably favor two trials of four, five or six defendants each rather than one trial of ten. Our marshal staff is already strained to its limits in dealing with security for all ten defendants at the same time; when a jury is present, the defendants' hands will not be shackled; the pressures on the marshal service will be even greater. These factors may militate in favor of two trials, not one. The point is that discovery finally given over for the first trial would be public. The government has presented no plan for meeting this problem, at least as to witnesses who do not actually testify. In contrast, the protective order builds in security to meet that problem.

*Fourth*, under Rule 16, the government has acknowledged that it must turn over all materials on which its experts rely. The turn-over date (May 31, 2006) has passed. These materials include a large number of the very police reports in question. For example, the "gang" experts will, government counsel have said, rely on at least 4500 pages of gang task-force reports (authored by the expert witnesses and others), among other local police reports. Our scheduling order now contemplates that *Daubert* motions and other motions *in limine* will be filed shortly after the expert summaries are provided later this summer, so that the many expert issues can be sorted out by the final pretrial conference later this year. To evaluate this information and to prepare those motions, defense counsel have a legitimate need to go behind the redactions. The government has no solution to meet this need. In contrast, a protective order will promote witness security.

5

As stated, the government has chosen studied silence in addressing these problems. It has refused even to comment on multiple rounds of protective-order proposals. Nonetheless, the Court has drawn on its own experience and fashioned an order that will protect witnesses while allowing the defense to see the Rule 16/*Brady* materials.

*   *   *

A different issue concerns prioritizing witnesses by risk levels. The government, as stated, desires to continue to conceal the names of *all* civilian witnesses — even those at lower risk. This is based on the fear that anyone who has provided any information to the police, whether exculpatory or inculpatory, has broken a "code of silence" and is therefore at risk. Based on the Court's witness-by-witness evaluation of security issues, however, this order finds that the level of risk varies from witness to witness. As to some potential witnesses, such as witnesses alleged in the indictment itself, the government has failed to justify a full blackout of all identifying information.

Therefore, the protective order provides for two levels of access to identifying information concerning materials covered by the government's Rule 16 and/or *Brady* obligations. Those witnesses most in need of protection are "primary witnesses." All other potential trial witnesses are "secondary witnesses." As to both types, the order imposes restrictions. They are more stringent as to primary witnesses.

The Court has carefully reviewed the government's *ex parte* submissions setting forth security concerns, including its *ex parte* witness-by-witness submission. In assessing the strength of the government's showing, the Court has considered the following factors, among others:

    (a) Whether the witness and/or relatives are in a witness-protection program (in connection with this case);

    (b) Whether the witness has agreed to cooperate in connection with this case;

    (c) Whether the person is a relative of a critical and at-risk witness (even though the person himself has little evidence to offer);

6

      (d)      Whether the testimony of the witness is likely to be highly inculpatory, so as to increase an incentive to harm the witness;

      (e)      Whether the witness has refused to cooperate with law enforcement and thus has little to fear if the extent of his or her non-cooperation is known;

      (f)      Whether the testimony is largely exculpatory or of little consequence, such that there should be little fear of retaliation;

      (g)      The extent to which the name of the witness is already known to the DBG as a likely government witness, such as if the name is already expressly called out in the superseding indictment as a victim;

      (h)      Whether the likelihood of cooperation with law enforcement is already known to the DBG, such as where the witness has already testified against a defendant in state court or where multiple DBG threats have already been made in connection with this case due to the role of the witness in the case;

      (i)      Whether the witness is in federal or state custody and thus shielded from the DBG; and

      (j)      Whether the witness resides now in a distant location.

      \*      \*      \*

In reviewing the details of the witnesses, a distinction deserves to be made between two types of high-risk witnesses: those high-risk witnesses whose identity — but not location — is probably known to DBG versus those whose identity and location are still confidential. For example, one witness has been referenced by several defendants in tape-recorded calls threatening to kill the witness (and he has received such threats himself) so he is now in a witness-protection program. Since the DBG already knows his identity, there is little point in redacting his name from the reports but there is a genuine need to maintain the secrecy of his relocation and new identity. As the accompanying order states, locator data shall remain redacted on *all* potential witnesses (unless the Court rules otherwise in individual cases).

7

1  Classifying him as a secondary witness will allow defense counsel to link him to his comments
2  as recorded in the redacted reports without compromising the secrecy of his whereabouts.
3                                    *          *          *
4     Based on the foregoing, this order finds that the government has demonstrated the
5  following security levels for the witnesses in its witness-by-witness submissions:

| **PRIMARY WITNESSES** | **SECONDARY WITNESSES** |
|---|---|
| A1 | A2 |
|  | B1–16 |
| C2–4, 9–10, 12 | C1, 5–8, 11, 13–16 |
| D3, 5, 6, 8 | D1–2, 4, 7, 9–10 |
|  | E1–3 |
| F2–6, 8, 9, 12–17 | F1, 7 |
| G2 | G1 |
|  | H1–3 |
| I1 | I2 |
| J2 | J1, 3–4 |
|  | K1 |
| L1 | L2–6 |
|  | M1–2, 5–10 |
|  | N1–3 |
|  | O1–2 |
|  | P1–2 |
| Q6–7 | Q1–5, 8 |
|  | R1 |

A close observer will see gaps in the numbering sequence above (*e.g.*, F10, F11, M3 and M4). These, the government says, were glitches in its numbering and do not represent missing persons. Moreover, the government states that the redactions to date include a large number of additional names *beyond those* included in its witness-by-witness security submission.

This indicates that the government has little or no basis for particularized risk as to the omissions. All such omitted persons shall be deemed to be secondary witnesses.

**IT IS SO ORDERED.**

Dated: June 16, 2006.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9