IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>EDGAR DIAZ, RICKEY ROLLINS,<br>DON JOHNSON, ROBERT CALLOWAY,<br>DORNELL ELLIS, EMILE FORT,<br>CHRISTOPHER BYES, PARIS<br>RAGLAND, RONNIE CALLOWAY,<br>ALLEN CALLOWAY, and REDACTED<br>DEFENDANTS Nos. ONE & TWO,<br><br>    Defendants.<br>                                              / | No. CR 05-0167 WHA<br><br>**TESTIMONY-PRECLUSION<br>ORDER AS SANCTION<br>FOR NONCOMPLIANCE<br>WITH RULE 16 ORDERS** |

**INTRODUCTION**

In this RICO gang prosecution against ten accuseds, this order imposes a testimony-preclusion sanction on the government for its deliberate, substantial and unjustified violation of Rule 16 discovery orders. The essence of the matter is this: Rule 16 requires the government to disclose certain documents, photographs and other items to the defense. The government has no more unilateral right to redact names of potential witnesses from Rule 16 documents than it does to blot out faces of potential witnesses in Rule 16 photographs. Only the district court can authorize such redactions in discoverable information. Rule 16(d) so provides. Contrary to the government, it does not have an inalienable right under a separation-of-powers theory (or otherwise) to remove names from discoverable materials. The

1  government's deliberate, substantial and unjustified violation of direct orders to provide
2  discovery owed under Rule 16 warrants the sanction imposed below.

**STATEMENT**

The case was commenced on March 10, 2005, and is set for trial on January 22, 2007. The effect of three recent orders has been to require the government to allow defense inspection of redacted names of potential leads in Rule 16 material so long as the defense teams requesting the inspection sign onto a comprehensive protective order aimed at safeguarding witness security. The recent orders are: (i) the "Protective Order for Witness Security," (ii) a "Memorandum Opinion Re Protective Order for Witness Security," and (iii) a "Concluding Order Re Local Police Reports and Rule 16 Discovery," all dated June 16, 2006. These followed an earlier "Order Re Discoverability of Local Police Reports Under Rule 16 and Schedule for Further Submissions" dated May 18, 2006. Those orders set forth the history.

In brief, the federal prosecutors obtained and voluntarily turned over to the defense many thousands of pages of local police documents but redacted therefrom *all* names and other identifying information on *all* civilians providing any information whatsoever to local law enforcement, whether exculpatory or inculpatory, significant or insignificant. These local documents, some many years old, bear on the gang activities at issue, including the homicides and other racketeering acts involved in this case. The redactions range from a half dozen blot-outs per page to removal of entire paragraphs, even some whole pages, that the prosecutors fear will allow the defense to guess a source's name. Defense counsel have protested these erasures for over a year. This has culminated in the rulings at issue.[1]

The rulings held that: (i) the local police reports, once obtained by the federal prosecutors, were "documents" under Rule 16(a)(1)(E); (ii) such documents fell within the federal work-product exemption from discovery in Rule 16(a)(2) *only* if prepared in connection

---

[1] No Form 302s have been produced. No order has required their production. The issue concerns local police reports gathered by the federal prosecutors. The redactions have been made by the federal prosecutors, not by the local police.

2

with investigating or prosecuting the subject case by police officers having a relationship to the federal prosecutors substantially equivalent to that of federal investigative agents (such as a joint task force); (iii) the federal prosecutors herein had failed, despite multiple invitations, to establish any such relationship; and, alternatively, (iv) assuming for the sake of argument that they might once have been federalized work product under Rule 16(a)(2), such protection was waived by the voluntary disclosure of most of their content.

The rulings further held, however, that the government could continue to redact identifying information (in order to safeguard potential witnesses) but had to allow inspection of the originals (except for addresses and other locator data) by defense teams subjecting themselves to a protective order tailored to specific witness-security demands of this case. The defense teams for defendants Robert Calloway, Edgar Diaz, and Emile Fort have executed the required commitments. They have formally requested inspection. Nonetheless, the government refuses to allow the inspection, having filed a "notice of noncompliance" stating that it will not honor the orders in question. Said defendants now move for sanctions.

**ANALYSIS**

For the reasons stated in the order dated August 26, 2005 (at page 5), the references to information sources in the police documents at issue are not Jencks Act statements. The Act covers statements that are signed or substantially verbatim recordings or otherwise adopted by the witness. 18 U.S.C. 3500(e). The items in question do not come close to being true Jencks Act statements. This correction must be emphasized because the government often lapses into calling the affected passages "Jencks Act material" (Br. 7–8).

The government is also fond of saying that the rulings require it to disclose its trial witnesses. This is also misleading. All that the orders do is restrict the ability of the government to remove names of information sources from discoverable material. As stated, the government has no more right to blot out names in Rule 16 "documents" than it has to blot out faces or license plates in Rule 16 "photographs." Once material is discoverable under Rule 16, it is axiomatic that the Court may require *all* of it to be produced without any redactions. Instead, the orders in question allow the redactions to continue but allow

3

defense teams submitting to a severe protective order to visit the prosecutor's office and to inspect the originals (except for locator data). If Rule 16 allows the greater, it surely allows the lesser. Again, the rulings at issue allow access only to documents discoverable under Rule 16.

Providing Rule 16 material, which happens to include names of information sources, is not the same as providing a government trial-witness list. Such information sources may be called or *not* be called as trial witnesses. They may wind up being defense witnesses. They may wind up being prosecution witnesses. Or neither. Conversely, the names at issue almost surely will miss altogether some who will testify.

Under a separation-of-powers argument newly advanced, the government maintains that it, not a court, decides what is and is not disclosable by way of "witness information." The short answer to this is Rule 16 itself. Under Rule 16(d) concerning protective orders, the judge — not the government — has the power to allow redactions from otherwise discoverable material. The intent of the discovery orders at issue has been to allow access only to what Rule 16 authorizes and, even then, to allow redactions to continue but with a corresponding right of inspection under stringent conditions. That the orders in question have recently and more precisely calibrated the risk level to various witnesses in no way affects the main point. All it means is that the orders will allow the government to delay inspection of Rule 16 documents even longer as to "primary witnesses" than for "secondary witnesses." The main point — that the local police documents held by the federal prosecutors are discoverable under Rule 16 — remains true for both categories of witnesses.

An earlier order found that the Down Below Gang, the alleged RICO enterprise in question, had a practice of intimidating and threatening witnesses against them. The government is correct to remind us of this finding. This order stands by this finding. As the Court has become more familiar with the materials, however, it has become clear that a more particularized witness-by-witness risk assessment is necessary. To take one type of recurring example, the indictment itself already names publicly various victims of car jacking, assaults and other predicate acts. *By virtue of the government's own pleading, therefore, the Down Below Gang has already obtained the names of these probable witnesses*. What, then,

4

is the government's point in redacting these already-known names from discovery on the details of these specific incidents? None. What is important is to protect the address and other locator data. Locator data will not be furnished — even to counsel — under the protective order. Even names exposed in the inspection process, moreover, must be kept from the accuseds until 21 days before trial.

On the other hand, some eyewitnesses still live in the vicinity and may or may not be known to the Down Below Gang. Their names (as well as locator data) deserve even greater protection. Such witnesses were, therefore, ruled to be "primary witnesses" and subject to more stringent safeguards. The recent memorandum opinion listed ten factors used by the Court to classify primary versus secondary witnesses (see pages 6 and 7 thereof). Both types were accorded protection. Primary witnesses were accorded more. (The classification was made based upon a witness-by-witness risk assessment filed by the government under seal and *ex parte*.)

Another government theme is that we are still six months before trial. This is repeated over and again, as if the government were prepared to accept half or a quarter of that time as a milestone for disclosure. In fact, the prosecutors' plan is to release the redacted information, if at all, only *during* trial. More than that, the six months are already spoken for. The work we will do before trial will fill volumes. There are ten defendants, 86 counts, seven homicides, and thirty racketeering acts charged. There are 28 primary and more than 67 secondary witnesses. The government wishes to call 23 experts. Time and again, the government has missed deadlines — expert disclosure snafus being the most recent — increasing pressure on the overall schedule. Stage 2 motion practice is upon us now, including *Daubert* hearings. The final pretrial conference will take days, not hours. Special proceedings concerning the jury will be needed. In light of the work before us, it is important for defense teams to begin their potential witness investigations promptly.

The government's refusal to honor the Rule 16 orders is most problematic. The government's professed reason for turning over the many thousands of pages of local police documents was to help defense counsel prepare for trial and for motion practice. By blotting

5

out all identifier information, however, defense counsel still remain in the dark — *and are intended by the government to remain in the dark* — as to the source of the potential evidence. The prosecutors thus want it both ways. They want discovery credit for turning over many thousands of pages. Yet, they want the same pages to be useless in revealing leads.

The orders at issue will mend this disconnect. As well they will maintain, indeed, *improve* civilian witness security. Significantly, during all proceedings leading to the rulings at issue, the government never identified any security flaw in the proposed protective order.[2] The government never supplied any information that any lawyer or investigator on this case cannot be trusted to obey the order. Its sole objection was to the generic concept of any name disclosure whatsoever under any protective order whatsoever, no matter how tightly drawn. The Court, however, worked quite hard to fashion a muscular order, one that will better protect civilian sources than will the status quo. It was not drawn from civil practice, as suggested by the government, but tailored carefully to the specific needs and risks in this criminal prosecution. Given the security built into the protective order, the government's reason for disobeying the orders at issue is not justified.

Of course, it is true that the government has no general duty to provide trial-witness lists and has a limited privilege to keep secret the names of confidential informants under *Rovario v. United States*, 353 U.S. 53, 59 (1957). These lines of authority are inapposite. We are not dealing with confidential informants. We are not dealing with trial-witness lists. No decision cited by the government holds that it has a unilateral right to blot out names of leads in Rule 16 documents. While judges may differ from case to case in the exercise of discretion in fashioning protective orders appropriate to the facts and circumstances, no decision cited by the

---

[2] In its opposition to this motion, the government has raised for the first time an "unacceptable" feature of the protective order, complaining that potential witness names may be disclosed to the accused 21 days before trial. This is the first time any such supposed concern has been raised by any prosecutor. The government was invited *twice* before to identify any security weaknesses, but elected to remain silent — simply objecting to any protective order at all. For purposes of this motion, the 21-day point is untimely. This ruling, however, is without prejudice to a motion to modify the protective order, as contemplated by the last sentence of the protective order itself.

6

1  government even suggests that the orders in question fall outside the discretion conferred by
2  Rule 16.[3]

3                          *         *         *

4  Rule 16(d)(2) provides:

5      If a party fails to comply with this rule, the court may:

6      (A)    order that party to permit the discovery or inspection;
7             specify its time, place and manner; and prescribe other just
           terms and conditions;

8      (B)    grant a continuance;

9      (C)    prohibit that party from introducing the undisclosed
           evidence; or

10      (D)    enter any other order that is just under the circumstances.

11  In fashioning an appropriate sanction, we must select a sanction that is proportionate to
12  the wrong as well as no more drastic than reasonably necessary to effect the purposes of the
13  Rule 16 discovery at issue; *see generally United States v. Gee*, 695 F.2d 1165, 1169 (9th Cir.
14  1983); *United States v. Aceves-Rosales*, 832 F.2d 1155, 1157 (9th Cir. 1987); *Taylor v. Illinois*,
15  484 U.S. 400, 426–34 (1988). With these criteria in mind, "the appropriate sanction for a
16  failure to comply with a discovery rule should rest in the district judge's sound discretion."
17  *United States v. Valencia*, 656 F.2d 412, 415 (9th Cir.), *cert. denied sub nom. Valencia v.
18  United States*, 454 U.S. 877 (1981), and *sub nom. Duarte v. United States*, 454 U.S. 903 (1981);
19  *United States v. Spillone*, 879 F.2d 514, 522 (9th Cir. 1989), *cert. denied sub nom. Citro v.
20  United States*, 498 U.S. 864 (1990), and *sub nom. Spillone v. United States*, 498 U.S. 878
21  (1990).

22  An objective of the discovery orders at issue was, of course, to provide the Rule 16
23  material to which the defense was entitled. More than that, however, a key objective was to

---

[3] In this connection, it is disappointing that the government's summaries of decisions have proven to be misleading. Contrary to the government (Br. 6), for example, *United States v. Storey*, 956 F. Supp. 934, 939 (D. Kan. 1997), did *not* hold that a capital defendant was "not entitled to disclosure of all co-conspirator statements 90 days before trial where safety of inmate witnesses was a real concern." Rather, the government there stated that it had no such statements and the motion was denied on that ground — with the further order to give notice of the existence of such statements should circumstances change, so that the judge could then rule on when a disclosure must be made.

7

1  facilitate trial preparation and thus avoid the cascade of mid-trial and eleventh-hour
2  continuances that would result from the government's unilateral plan to disclose the
3  information, if at all, during trial. The importance of this consideration is paramount,
4  especially in a case of this magnitude (ten defendants, thirty predicate acts, seven homicides
5  and 86 counts). Mid-trial continuances will be most disruptive. They will break up the flow of
6  evidence, inviting mistake, confusion and attempts at repetition of testimony. They will
7  introduce unexpected gaps in the trial schedule, such that jurors' expectations and plans for
8  carrying on with the rest of their lives will be frustrated. They will prolong the trial, creating
9  the danger that jurors will ask to be excused before verdict due to unforeseen delays and
10 hardships — risking mistrials. Mid-trial continuances will force witnesses to stand down.
11 The delay will be propagated down the chain of waiting witnesses.

12 Continuances on the eve of trial will also be disruptive. Counsel will have blocked out
13 the expected trial dates. They will have built their calendars around it. Trying to slip a trial by
14 even a few weeks will almost always founder on at least one counsel with a firm scheduling
15 conflict. This will lead to a hiatus. Continuances on the eve of trial will also moot all work
16 done via questionnaires in pre-clearing a jury pool for extended service. They will also
17 inconvenience witnesses, especially experts, who have committed their calendars to be
18 available, including hotel and flight reservations and nonrefundable fees.

19 The prosecution evidently hopes that the Court will refuse such postponements to avoid
20 a "train wreck," as the undersigned has called it. But fairness to both sides may well require
21 trial continuances and mid-trial recesses. To obviate this problem — and to grant access to
22 Rule 16 materials already owed to the defense — the discovery orders required access to the
23 redacted names of secondary witnesses beginning *now*. For these reasons, a sanction
24 contemplating a program of continuances would defeat the purpose of the Rule 16 discovery
25 orders at issue. The Court might later excuse one or more minor violations curable by a short
26 delay or where a postponement might otherwise occur anyway. But continuances ought not
27 to be viewed by the government as a programmatic cure for its recalcitrance. Doing so would
28 re-introduce the very evil the orders were meant to eliminate.

8

1  After careful consideration, this order finds that the most appropriate sanction is to
2  preclude the government from using the testimony of any civilian witness (i) whose name has
3  been redacted from the discoverable materials (ii) against any movant whose defense team
4  has become qualified to receive the redacted information under the protective order and has
5  formally requested access — *unless* the government first demonstrates that, as to that testimony
6  and movant, the refusal to allow access was substantially harmless.  The Court anticipates that
7  such proffer-by-proffer rulings may be made while the jury is away from the courthouse, as for
8  example, in the afternoon after the jury has left for the day.  The pace of the trial will not be
9  affected.  We will try to rule on any given proffer at the final pretrial conference if the
10 government wishes.

11  Testimony preclusion is the least drastic remedy reasonably consistent with the purposes
12 of the disobeyed orders.  Testimony preclusion is also the most fitting remedy in proportion to
13 the wrong.  It will allow a witness to testify as to matters unaffected by the violation while
14 excluding those passages prejudiced by the violation.  Although preclusion is strong medicine,
15 it is a sanction expressly authorized by Rule 16 and one approved by the Ninth Circuit as within
16 the Court's discretion.  *United States v. Burgess*, 791 F.2d 676, 681 (9th Cir. 1986).  When the
17 ninety-day mark (before trial) passes, the same sanction shall apply as to primary witnesses,
18 assuming the government stands by its notice of noncompliance.[4]

19  To implement this sanction, the following procedure shall be used.  No civilian witness
20 may be called by the government against any movant unless it first demonstrates that the
21 witness name was unaffected by the redactions.  If it was redacted, then the government may
22 still call the witness by demonstrating that the redaction(s) were substantially harmless as to the
23 particular testimony sought to be elicited.  In making this showing, the government must, at the
24 time of its proffer, reveal all relevant Rule 16 material to counsel and the Court — *without*

---

[4] Although the Court has stated that other defense teams need not qualify themselves immediately to receive protected information pursuant to the protective order, it does not follow that other defense teams will be entitled, if they so qualify eventually, to the same preclusion remedy.  Depending on *when* they qualify and request access, the period and degree of prejudice may vary.

9

1  *redactions*. After hearing, an assessment of harm due to the redactions will be made. In
2  evaluating this issue, the following factors shall be considered:

3  • The importance (or not) of the Rule 16 material with which the
4  redacted witness's name turns out to have been associated;

5  • Even if the Rule 16 material was important, the extent to which the
6  government seeks to offer testimony unrelated to the Rule 16
7  material;

8  • The likelihood (or not) that having timely known the redacted
9  name (but not the locator data) would have materially improved
10  defense counsel's ability to examine the witness;

11  • The extent to which defense counsel, despite the discovery
12  violation, would normally have been expected to prepare for the
13  testimony through other avenues;

14  • The extent to which the civilian was in a witness-protection
15  program or otherwise would likely have refused an interview to
16  defense counsel; and

17  • Any other factor reasonably bearing on harmlessness.

18                    *       *       *

19  The government suggests that the appropriate sanction is to bar the death penalty. That
20 sanction would not fit the wrong. The government would be free, under its proposal, to use all
21 testimony of the redacted witnesses during the guilt phase. That would be unfair. And, we
22 would be excluding the possibility of a capital sentence which might be provable and justifiable
23 despite testimony preclusion. The government should remain free to seek the death penalty so
24 long as it can make its case with evidence unbarred by this order. If, however, the record at any
25 penalty phase eventually warrants such a sanction, then it might then (and only then) be
26 adopted.[5]

27
28      [5] The movants desire this sanction but also insist on witness preclusion.

10

Death-penalty preclusion is evidently the government's preferred sanction because it would facilitate appellate intervention. To build in error, however, simply to increase the chances of appellate review seems topsy-turvy. In this connection, it must also be said that the Court is convinced that this order (and the related orders) are sound. While the Court has, in the past, invited both sides to seek writs — but to do so promptly — if they disliked various rulings, it has no doubt concerning the rulings at issue. It would be wrong to say to the Ninth Circuit that the undersigned desires interlocutory review.

\*   \*   \*

With respect to *exculpatory* material, a different remedy is necessary. We must pause here to remind ourselves that, even as to exculpatory matter, the government seeks to blot out the witness identities from all Rule 16 documents (Br. at 7 n.2). Testimony preclusion would, as to exculpatory material, reward the government for its recalcitrance. That would be perverse. Mid-trial continuances are the remedy preferred by the defense, to be requested once the government, if ever, unveils the names of those who gave exculpatory information to police. For the reasons stated, however, such continuances would undermine the coherence of the trial, among many other trial-management negatives. While recesses may prove essential in some instances, the more appropriate sanction, best tailored to the objectives of the discovery orders at issue, will be to deem overruled any government objection to simply reading the exculpatory material to the jury, receiving the read portion in evidence, and instructing the jury that the Court has dispensed with the usual need to subpoena the witness and has allowed this substitute procedure. If, however, the government can demonstrate that a given redaction and corresponding violation are harmless, taking into account factors similar to those listed above, then this sanction will not apply as to that item. This ruling, moreover, is without prejudice to the assertion by the government of Rule 403 or any evidentiary objection other than hearsay and foundation. It is also, of course, without prejudice to any objection made by a co-defendant.

11

The government must avoid treating this sanction as a substitute for its *Brady* obligations. Put differently, this sanction addresses only its violation of the Rule 16 orders. *Brady* imposes its own separate obligation. The government must still honor its *Brady* obligation.[6]

\*   \*   \*

The government argues (Br. 4):

> In deciding which sanction is appropriate, the Court should consider the following factors: (1) the reasons for the failure to comply with the discovery order including whether or not the government acted in bad faith; (2) the extent of prejudice to the defendant as a result of the violation; and (3) the feasibility of curing the prejudice with a continuance. *United States v. Wicker*, 848 F.2d 1059, 1060 (10th Cir. 1988) (citing *United States v. Euceda-Hernandez*, 768 F.2d 1307, 1312 (11th Cir. 1985)).

Even on these terms, based on out-of-circuit authority, the result is the same. As stated, a program of continuances is not feasible, a central objective being to avoid the massive doses of continuances that would be needed under the government's plan. As for prejudice, it is self-evident. But if a redaction proves harmless, then there will be no penalty. Finally, the reason given for the refusal — witness protection — does not justify its omnibus refusal. *First*, the government refuses even to disclose names of individuals providing *exculpatory* information (*see* Br. at 7 n.2). *Second*, the protective order will *better* serve witness security than the status quo, for reasons set forth in the memorandum opinion in detail. Sadly, this order finds that the true motive is far less concerned with witness security than with tactical advantage. Despite the Court's considerable respect for government counsel herein, this order must find that they have acted willfully to abridge Rule 16 rights to gain a trial advantage over the defense.

\*   \*   \*

---

[6] In this connection, a clarification is in order to correct a misapprehension by government counsel, who have indicated previously that material cannot be exculpatory under *Brady* if it is at least partially inculpatory. This is not so. For example, an eyewitness who cannot place Defendant X at a homicide is exculpatory as to Defendant X even if the eyewitness can place Defendant Y at the scene. An eyewitness who says that Defendant X was only a bystander while Defendant Y actually pulled the trigger is exculpatory as to Defendant X. Testimony that places all defendants at the scene but materially conflicts with the government's theory of what happened is exculpatory. The government should not be making its disclosure decisions based on a crabbed view of *Brady*. These examples, of course, are not all that *Brady* requires.

12

1    In addition, the government's "notice of noncompliance" reaches back almost a year to
2 complain about an order dated August 26, 2005. It states that it will not comply with certain
3 provisions of that order either. The "notice of noncompliance" repeatedly characterizes the
4 earlier order as requiring the government to "provide a witness list 21 days before trial." This is
5 misleading. Actually, the order stated that "[t]he witness list *required by Section 3432* shall
6 also be provided 21 days before trial under the same protective terms" (Order at 11).
7 Section 3432 requires that any defendant facing a possible death penalty be furnished with a
8 witness list "at least three entire days" before trial except that the list need not be furnished if
9 the court finds that doing so may jeopardize the life or safety of any person. Except for the
10 Section 3432 list, the Court has *never* ordered the government to produce a witness list.

11    Under Section 3432, it is up to the judge, not the prosecutor, to determine when the
12 statutory list will be furnished. The phrase "at least" implies that the judge should set a due
13 date tailored to the needs of the case. *Cf. United States v. Egorov*, 222 F. Supp. 862, 864
14 (E.D.N.Y. 1963) (ten days); *United States v. Willis*, 33 F.R.D. 510, 512 (S.D.N.Y. 1963) (at
15 least thirty days). Here, twenty-one days before trial was selected by the Court, given the pace,
16 scope and scale of the case. Since the government has not yet violated the order on this point,
17 however, it is premature to consider any sanction concerning it.

18                    *         *         *

19    The government's notice further states that it will not "provide Jencks material 90 days
20 before trial to guarantee that the Court will not grant multiple continuances during trial" (Br. 4).
21 The undersigned has been rock solid in enforcing the Jencks Act in this case — over vehement
22 defense protest (see order dated Aug. 26, 2005, at 2–5). The government may withhold
23 "witness statements" (as defined in 18 U.S.C. 3500(e)) until after the direct testimony of the
24 witness; no order by the undersigned has ever ruled otherwise. As the Jencks Act itself
25 expressly provides, however, this may lead to court-ordered mid-trial continuances, depending
26 on the calculus of fairness at the time (18 U.S.C. 3500(c)).[7]

---

[7] To repeat, the witness summaries in the police reports at issue are not Jencks Act statements.
*See* 18 U.S.C. 3500(e) (*see* Order dated Aug. 26, 2005, at 5).

13

1    Seeking to avoid a string of trial continuances, the government suggested early on that it
2    would voluntarily turn over the Jencks Act statements shortly before trial.[8] The Court,
3    however, refused to bless any short fuse, as sought by the government, as a prospective
4    guarantee against mid-trial continuances. If the government wanted a date by which the Court
5    could predict with confidence on a blanket basis that no mid-trial continuances would be
6    necessary, the Court stated that ninety days before trial would do.

7    If, however, the government elects instead to unilaterally produce a given Jencks Act
8    statement ten or twenty or thirty days or any other period before any given witness testifies,
9    then such lead time might (or might not) prove to be fair as to that particular witness and as to
10   the particular defendants on trial. We will have to assess Jencks Act continuances as events
11   unfold. The Court is disappointed that the government continues to mischaracterize this point.
12   The order dated December 2, 2005, accurately recites the actual ruling.

                            *          *          *

14   In a similar vein, the government's notice states that it will not "disclose non-Jencks
15   *Brady* material 90 days before trial" (Br. 4–5). Again, to avoid a series of mid-trial disruptions,
16   the government was required to produce such material 90 days before trial if it wished a blanket
17   guarantee against a string of mid-trial continuances. The order, however, recognized that the
18   government has the responsibility in the first instance for determining when the critical point
19   has been reached necessitating disclosure under *Brady*. If it turns out that the government tries
20   to tack too close to the wind, then it will only have itself to blame if its sail collapses due to a
21   series of mid-trial postponements. This, too, is premature as to any appropriate sanction.

## CONCLUSION

23   The government has indicated that it will seek interlocutory review of the rulings
24   in question. If the Ninth Circuit allows review, then a postponement of the trial may be
25   appropriate, depending on the time needed by the Ninth Circuit to decide. Meanwhile, we must
26   all continue to prepare for trial set for January 22, 2007. In that connection, now that the

---

[8] Since then, the government has retracted this plan and now says it will disclose only during trial.

14

sanction has been determined, the undersigned wishes to give the prosecutors a two-week period to come into compliance. For that reason, the effectiveness of this order shall be **STAYED UNTIL AUGUST 3, 2006,** at noon, after which this preclusion order shall be operative. Please do not ask to extend the deadline.

**IT IS SO ORDERED.**

Dated: July 20, 2006.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE