1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   UNITED STATES OF AMERICA,                     No. CR 05-00167 WHA

11                Plaintiff,

12        v.                                        **ORDER RE DEFENSE**
                                                    **MOTIONS TO SUPPRESS**
13   EDGAR DIAZ, RICKEY ROLLINS,                    **EVIDENCE (DOCUMENT**
     DON JOHNSON, ROBERT CALLOWAY,                  **NOS. 586, 588, 589, 597, 604,**
14   DORNELL ELLIS, EMILE FORT,                     **605, 606, 608, 611 AND 613)**
     CHRISTOPHER BYES, PARIS
15   RAGLAND, RONNIE CALLOWAY,
     ALLEN CALLOWAY, and REDACTED
16   DEFENDANTS NOS. ONE & TWO,

17                Defendants.

18   _____/

19                          **INTRODUCTION**

20        As a threshold issue, this order must determine the extent to which various defense motions

21   to suppress require evidentiary hearings, rather than being resolved on the papers.  "Whether an

22   evidentiary hearing is appropriate rests in the reasoned discretion of the district court."  *United*

23   *States v. Wardlow*, 951 F.2d 1115, 1116 (9th Cir. 1991) (quoting *United States v. Walczak*, 783 F.2d

24   852, 857 (9th Cir.1986)).  A recurring omission in the suppression motions is a failure to submit

25   supporting declarations by the defendants themselves.  Our Criminal Local Rule 47-2(b) requires

26   that motions presenting issues of fact be supported by sworn declarations.  In *Wardlow*, the Ninth

27   Circuit explained that failure to comply with a similar procedural rule justified denial of an

28   evidentiary hearing on a motion to suppress.  951 F.2d at 1116; *see also United States v. Bennett*,

1   219 F.3d 1117, 1126 (9th Cir. 2000).  The government asks that all motions be denied on this

2   ground.[1]

3          Certain applications of this rule, however, would be unfair.  The most obvious cases where

4   rigid application of the rule would yield unduly harsh results are those instances where defendants

5   could not be expected to declare to the contested facts.  These instances include motions challenging

6   the conduct of officers where defendants were not present or could not be expected to know the key

7   facts, and motions challenging civilian witness identifications.  In such circumstances, defense

8   counsel will find it virtually impossible to obtain voluntary sworn statements from the officers

9   involved, or from witnesses whose names they do not know (because the names have been redacted

10  by the government).  To deal with such situations, counsel have (in some instances) submitted police

11  reports.  While not technically complying with Rule 47-2(b), this order holds that submission of

12  these reports constitutes a valid proffer of evidence of what the officers would state if subpoenaed

13  for an evidentiary hearing.

14         With that said, the proffer must still justify the relief sought or at least present a reasonable

15  likelihood that an evidentiary hearing would develop facts warranting the relief sought.  Where, in

16  contrast, the proffer merely raises speculative possibilities, relief should be denied without further

17  hearing.  In the absence of this threshold showing, an evidentiary hearing would be nothing more

18  than a fishing expedition.  *See Walczak*, 783 F.2d at 857 ("An evidentiary hearing on a motion to

19  suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and

20  nonconjectural to enable the court to conclude that contested issues of fact going to the validity of

21  the search are in issue").

22                                      **ANALYSIS**

23         With the foregoing principles in mind, this order rules on defendants' motions as follows.

24

25

26

27

28         [1] It is important to keep in mind that declarations by defendants in support of motions to suppress *cannot* be used against them at trial.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1

2     **1.     DOCUMENT NO. 586 — MOTION TO SUPPRESS BY DEFENDANTS ROLLINS AND DIAZ.**

3          Defendants Rollins and Diaz are not entitled to suppression of any evidence seized or

4     statements taken during an incident on a bus on October 10, 2001 (Doc. No. 586).[2]  Neither

5     defendant submitted a declaration in support of this suppression motion.  The following facts can be

6     gleaned from the record submitted.

7          On October 8, 2001, several witnesses identified Rickey Rollins as being involved in a

8     battery and in the brandishing of a semi-automatic handgun in the Bayview District of San

9     Francisco.  Two days later, a police bulletin was issued identifying Rollins' whereabouts.  Rollins

10    was described as a black male wearing a black and white t-shirt and having gold teeth.  The bulletin

11    stated that Rollins possibly had a gun and listed two possible bus lines that he and several

12    acquaintances were then on, traveling down 3rd Street.  Following up, two SFPD officers trailed a

13    bus meeting the description, in which they saw a male meeting Rollins' description.  According to

14    the officers, the individual they suspected to be Rollins kept looking back nervously at the patrol car

15    from the bus.  The officers then stopped the bus, entered, and approached a group of males in the

16    rear of the bus.  Rickey Rollins was carrying a basketball and a backpack.  Rollins identified himself

17    in response to questioning.  The officers asked Rollins to exit the bus.  Rollins did so and then

18    attempted to flee before being apprehended and handcuffed.

19         The officers saw Rollins discard the backpack under a seat before leaving the bus.  After

20    Rollins was apprehended, the officers searched the backpack.  The backpack contained guns and

21    papers, some of which indicated that they were written by defendant Diaz.  In addition, the officers

22    questioned the other individuals who were accompanying Rollins.  Defendant Diaz responded to

23    questioning on the bus that he was a "partner" of one of the other individuals on the bus, defendant

24    Robert Calloway.

25         There are no grounds to suppress the evidence or statements from either Rollins or Diaz.

26    The officers had at least a reasonable suspicion to make an investigative stop of the bus in order to

27    _____

28         [2] Defendant Diaz's omnibus motion (Doc. No. 605) also included a challenge to this incident.  This
      ruling, therefore, also applies to that portion of Diaz's motion.  The other incidents challenged in Diaz's
      omnibus motion are discussed below.

United States District Court
For the Northern District of California

1  question Rollins, given the clear identification of his role in the battery only two days before.  The

2  bulletin issued on October 10 was extremely specific, identifying Rollins' dress in detail and

3  identifying his mode and direction of travel.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("That

4  level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.

5  We have held that probable cause means 'a fair probability that contraband or evidence of a crime

6  will be found,' and the level of suspicion required for a *Terry* stop is obviously less demanding than

7  that for probable cause") (internal citations omitted).  Rollins heightened this suspicion by

8  repeatedly looking back at the patrol car in a nervous manner.  *Illinois v. Wardlow*, 528 U.S. 119,

9  124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in

10  determining reasonable suspicion").  The circumstances provided ample suspicion to stop Rollins.

11  Once Rollins was stopped, he attempted to flee.  His attempt to flee coupled with the other

12  suspicious circumstances identified above gave the officers probable cause to arrest Rollins.  *United*

13  *States v. Fuentes*, 105 F.3d 487, 490 (9th Cir. 1997) ("[W]e have held in other circumstances that

14  when a suspect 'sped off' from an automobile stop, his flight together with other evidence gave rise

15  to probable cause.").

16  After the proper arrest, the police then had cause to search Rollins' backpack as a search

17  incident to a lawful arrest.  *See, e.g.*, *New York v. Belton*, 453 U.S. 454, 461–63 (1981).  So too, the

18  officers had at least reasonable suspicion to stop and question Rollins' acquaintances.  While

19  stopped, defendant Diaz volunteered that he was defendant Robert Calloway's "partner."  That

20  statement was voluntarily given and, in any event, was incident to a lawful stop.  In sum, there are

21  no grounds to suppress the evidence or statements taken from either Rollins or Diaz during the

22  October 2001 bus incident.  Again, neither Rollins nor Diaz submitted declarations contradicting the

23  above events despite the fact that they were first-hand witnesses to the key events.  The motion is

24  denied.

25     **2.     DOCUMENT NO. 588 — MOTION TO SUPPRESS BY EMILE FORT.**

26  Defendant Emile Fort moves to suppress a statement he gave at a San Francisco Police

27  Department station on October 3, 2003 (Doc. No. 588).  Fort filed a declaration in support of his

28  motion.  The government filed two declarations of police officers in support of its opposition.

4

1   Because the essential facts are not in dispute, this order finds that no evidentiary hearing is necessary

2   to resolve Fort's motion.

3          On September 28, 2003, a seven-week-old baby was shot and killed during an alleged gang-

4   related shooting.  Officers believed that defendant Fort had been involved in the shooting.  On

5   October 3, 2003, SFPD Officer James Arnswald was at the SFPD station at the Hall of Justice at 850

6   Bryant Street in San Francisco.  The Hall of Justice houses other governmental offices.  While at the

7   station, Officer Arnswald received a teletype message that Fort was wanted for questioning in

8   connection with the baby's murder.  Officer Arnswald knew Fort from Arnswald's prior assignment

9   to the Bayview District of San Francisco (Johnson Decl. ¶ 2; Arnswald Decl. ¶¶ 1-2).

10          At approximately 11:29 a.m., a security guard from the Hall of Justice entered the station and

11   informed the officers that Fort was at the Hall of Justice.  Officer Arnswald and other officers spread

12   out through the building looking for Fort.  Officer Arnswald found Fort on the second floor, sitting

13   in a traffic-court room (Arnswald Decl. ¶¶ 2-3).

14          There are slightly different views regarding what happened next.  Officer Arnswald alleges

15   that he was by himself when he approached Fort.  According to Officer Arnswald, Fort dropped his

16   head when he saw the officer.  Arnswald approached Fort, asked him to stand up, and handcuffed

17   him (*id.* at ¶ 3).  Defendant Fort, on the other hand, claims that approximately ten uniformed police

18   officers approached him.  According to Fort, one officer ordered him to turn around and put his

19   hands behind his back.  Fort complied (Fort Decl. at 1).

20          Officer Arnswald informed Fort that he was being detained for questioning.  The officers

21   took Fort to the Homicide Unit of the police station, on the fourth floor of the Hall of Justice.

22   Officer Arnswald left Fort with the officers there.  According to Fort, the handcuffs were taken off

23   and he was left alone in an interrogation room for twenty minutes (Arnswald Decl. ¶ 3; Fort Decl. at

24   1).

25          At some point, Homicide Inspector Michael Johnson, who was out in the field, returned to

26   the Homicide Unit at the Hall of Justice.  Inspector Johnson's declaration explained that he found

27   Fort handcuffed in the room.  Inspector Johnson removed the handcuffs and told Fort several times

28   that he was not under arrest.  Because Inspector Johnson did not believe that Fort was under arrest or

United States District Court

For the Northern District of California

5

United States District Court

For the Northern District of California

1   in custody, he did not read Fort his *Miranda* warnings.  According to Fort's brief, Inspector Johnson

2   then interviewed Fort for thirty-five to forty minutes.  After the questioning, Fort was permitted to

3   leave the police department (Johnson Decl. ¶¶ 3-4; Br. 3).

4          Defendant's principal contention is that the officers subjected him to an unlawful arrest when

5   they handcuffed him, escorted him from the traffic-court room to the police station, and left him

6   alone in an interrogation room.  He claims that because his subsequent statement was a fruit of the

7   unlawful arrest, that statement should be suppressed.

8          This order focuses on the officers' conduct before the questioning and considers whether that

9   conduct constituted an unlawful arrest without probable cause.  The Ninth Circuit has succinctly

10   stated:

11          There is no bright-line rule to determine when an investigatory stop
             becomes an arrest.  Rather, in determining whether stops have
12          turned into arrests, courts consider the "totality of the
             circumstances."  As might be expected, the ultimate decision in
13          such cases is fact-specific.

14          In looking at the totality of the circumstances, we consider both the
             intrusiveness of the stop, *i.e.*, the aggressiveness of the police
15          methods and how much the plaintiff's liberty was restricted, and the
             justification for the use of such tactics, *i.e.*, whether the officer had
16          sufficient basis to fear for his safety to warrant the intrusiveness of
             the action taken.  In short, we decide whether the police action
17          constitutes a *Terry* stop or an arrest by evaluating not only how
             intrusive the stop was, but also whether the methods used were
18          reasonable *given the specific circumstances*. . . . The relevant
             inquiry is always one of reasonableness under the circumstances.
19

20   *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citations omitted).  "[W]hether an arrest

21   has occurred depends upon an objective, not subjective, evaluation of what a person innocent of a

22   crime would have thought of the situation, given all of the factors involved."  *United States v.*

     *Johnson*, 626 F.2d 753, 756 (9th Cir. 1980).

23          The parties agree that the officers had reasonable suspicion to suspect Fort's involvement

24   with the murder.  They also agree that the officers lacked probable cause necessary to arrest Fort

25   without a warrant (Opp. 6; Reply Br. 2).  The government contends that Officer Arnswald at most

26   subjected Fort to a permissible investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  This

27

28

United States District Court

For the Northern District of California

1  order finds that, under the totality of the circumstances, the officers' conduct constituted an unlawful

2  arrest of Fort, but that suppression of the statement is not warranted.[3]

3         Under ordinary circumstances, when the police have only reasonable suspicion to make an

4  investigatory stop, "drawing weapons and using handcuffs and other restraints will violate the

5  Fourth Amendment." *Washington*, 98 F.3d at 1187.  The Ninth Circuit has held, however, that

> we allow intrusive and aggressive police conduct without deeming
> it an arrest in those circumstances when it is a *reasonable* response
> to legitimate safety concerns on the part of the investigating
> officers. . . . This doctrinal flexibility allows officers to take the
> steps necessary to protect themselves when they have adequate
> reason to believe that stopping and questioning the suspect will
> pose particular risks to their safety.

10  *Id.* at 1186.  The officers' use of "handcuffing substantially aggravates the intrusiveness of an

11  otherwise routine investigatory detention and is not part of a typical *Terry* stop." *United States v.*

12  *Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).  Moreover, even though the officers only transported

13  Fort two floors from where they originally found him, Fort was moved against his will to a police

14  station.  As the Ninth Circuit has mentioned, "a distinction between investigatory stops and arrests

15  may be drawn at the point of transporting the defendant to the police station." *United States v. Parr*,

16  843 F.2d 1228, 1231 (9th Cir. 1988).  Finally, the officers left Fort alone in a police interrogation

17  room for more than twenty minutes.  The Ninth Circuit has "recognized that a detention becomes

18  significantly more coercive when the police move a suspect from an area open to the public to an

19

20         [3] The parties dispute the similarity (or not) of *Dunaway v. New York*, 442 U.S. 200 (1979).  In
21  *Dunaway*, police had information that implicated the defendant in a murder, but the information was not enough
    to create probable cause.  Three detectives located the defendant at his home, took him into custody, drove him
22  to police headquarters, and placed him in an interrogation room.  Although he was not told he was under arrest,
    he would have been phsyically restrained if he had attempted to leave.  *Id.* at 202-03.  The Supreme Court held
23  that "in contrast to the brief and narrowly circumscribed intrusions involved in [*Terry*-stop] cases, the detention
    of [the defendant] was in important respects indistinguishable from a traditional arrest."  The government
24  attempts to distinguish *Dunaway* based on the Supreme Court's subsequent explanation that the "pertinent facts
    relied on by the Court in *Dunaway* were that (1) the defendant was taken from a private dwelling; (2) he was
    transported unwillingly to the police station; and (3) he there was subjected to custodial interrogation resulting
25  in a confession."  *United States v. Sharpe*, 470 U.S. 675, 684 n.4 (1985).  The government correctly points out
    that at most one of the "pertinent facts" present in *Dunaway* was present here: Fort was arguably "transported
26  unwillingly" to the police station, two floors away.  Notwithstanding the explanation of the "pertinent factors"
    of *Dunaway* in *Sharpe*, the Ninth Circuit has explained that there is *no* bright-line rule or a specific set of facts
27  that transform an investigatory stop into an arrest.  *Washington*, 98 F.3d at 1189.  The disagreement over this
    case's similarity to *Dunaway* and a discussion about the factors identified in *Sharpe* are not necessary to a
28  determination of the lawfulness of the arrest in *this* case.

enclosed room used for police interrogation." *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988). The officers' conduct here had many attributes of an arrest. The interaction between the officers and Fort, lasting just over twenty minutes, was clearly more intrusive than a typical *Terry* stop, which is usually a "*brief* but complete restriction of liberty." *Bautista*, 684 F.2d at 1289 (emphasis added).

The government's principal justification for the officers' aggressive and intrusive conduct is that Fort was a possible suspect in a violent murder, and that Officer Arnswald was "justified in believing that [Fort] posed a real risk of assault or flight, either of which could endanger him or any bystanders in the area" (Opp. 7). Under *Washington*, handcuffing Fort, transporting him to the police station, and leaving him alone in an interrogation room would only be justified if those were reasonable responses to the officers' legitimate safety concerns.

In light of the totality of the circumstances and relevant precedent, the government's justification is weak. "The test [for an illegal arrest] is an objective one, and stressing the officers' motivation of self-protection does not speak to how their actions would reasonably be understood." *Kaupp v. Texas*, 538 U.S. 626, 632 (2003). The possibility that Fort was armed was severely diminished — he had entered through metal detectors to enter the Hall of Justice. Indeed, it was a guard at the building's metal-detector station who told Officer Arnswald that Fort was in the building (Arnswald Decl. ¶ 2). According to Officer Arnswald, all Fort did when he saw the officer was "put his head down" (Arnswald Decl. ¶ 3). Officer Arnswald's police report and declaration only indicate that the officer knew about Fort from his prior work in the Bayview District. Nothing indicates that, except for the murder being investigated, Arnswald believed that Fort had a history of violent criminal behavior. This order finds that the officers were unreasonable when they used overly intrusive methods to detain Fort.[4]

---

[4] Here even the most minor aggravating circumstances that in previous decisions have justified officers' use of handcuffs are lacking. Handcuffing has been justified in circumstances where a suspect (1) had "repeatedly attempted to reach for his inside coat pocket, despite the officers' repeated warnings not to," or (2) had "turned and pulled away" when the officer placed an arm on him. *Bautista*, 684 F.2d at 1289. All Fort did when the officer approached him was "put his head down" (Arnswald Decl. ¶ 3).

8

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Absent here are the factors that typically justify the use of "especially intrusive means."  Fort

2    was not uncooperative, nor did he take action at the scene that raised a reasonable possibility of

3    danger or flight.  The police did not have any information that Fort was currently armed.  The stop

4    did not closely follow a violent crime — it came nearly five days after the alleged crime occurred.

5    The police did not have information that a crime that might involve violence was about to occur.

6    *See Washington*, 98 F.3d at 1189.  Considering what a "person innocent of a crime would have

7    thought," when Officer Arnswald handcuffed Fort, escorted him to the police station, and left him

8    alone in an interrogation room for twenty minutes, one can only conclude that Arnswald arrested

9    Fort without probable cause.[5]

10    Because Fort was subjected to an unlawful arrest, this order next considers whether

11    suppression of his subsequent statement is warranted.  The question "is whether, granting

12    establishment of the primary illegality, the evidence to which [the] instant objection is made has

13    been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be

14    purged of the primary taint."  *Wong Sun v. United States*, 371 U.S. 471, 486, 488 (1963).  The

15    statement must be suppressed unless it was given as "an act of free will [sufficient] to purge the

16    primary taint of the unlawful invasion."  As the Supreme Court has instructed, "[r]elevant

17    considerations include observance of *Miranda*, the temporal proximity of the arrest and the

18    confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy

19    of the official misconduct."  *Kaupp*, 538 U.S. at 633 (internal quotations omitted).

20    This order finds several factors here favor admitting the statement against defendant Fort.

21    Inspector Johnson clearly communicated to Fort several times at the beginning of the conversation

22    that Fort was not under arrest.  Fort acknowledged that he believed he was not under arrest (Exh. B

23    at 3).  Moreover, the transcript of the conversation clearly shows that Fort viewed the interview as a

24    casual conversation with Johnson rather than a custodial interrogation.  Early in the conversation,

25    Fort asked, "Is it all right if I call a lawyer though?"  Fort then clarified, "it depends on how quick

26

27        [5]  This order finds that even resolving the disputed facts the government's favor would not alter the
28    result.  Even if Fort was approached *only* by Officer Arnswald and was *not* handcuffed while he was in the
      interrogation room, the officers' conduct before the interview was still unreasonable in light of the
      circumstances discussed above.

**United States District Court**
For the Northern District of California

1   it's going to be.  If this is going to take hella long, then I don't want to go through all that.  But if it's

2   going to be short and brief, then . . . ."  Johnson indicated that the conversation would be "short and

3   brief," and Fort said, "Okay" (Exh. B at 4).  Fort did not make reference to an attorney again.  At

4   one point during the conversation, Fort answered a call on his cell phone.  Fort then asked Inspector

5   Johnson, "How much longer do you think this will be, sir?"  Johnson told Fort, "You can go

6   whenever you want, but I'd appreciate it if you'd answer some questions" (Exh. B at 21).  Fort

7   continued to answer Johnson's questions, and even answered his cell phone one more time during

8   the conversation (Exh. B at 26).  From the transcript, the tone of the conversation was not

9   contentious.  Fort was told he was not under arrest, answered his cell phone several times, and was

10  allowed to leave.  This strongly suggests that the conversation was an "act of free will" that purged

11  the taint of the illegal arrest.  Fort's declaration does not dispute any of these important facts.

12          While Fort's statement was in close temporal proximity to the unlawful arrest, the "lack of a

13  significant intervening period of time does not, in itself, require that the evidence be suppressed for

14  want of sufficient attenuation."  *United States v. Wellins*, 654 F.2d 550, 555 (9th Cir. 1981).

15  *Miranda* warnings were not necessary because "although the suspect was the target of a police

16  investigation, had been escorted by police, and was ultimately questioned at the station house . . .

17  these factors do not lead to the conclusion that a suspect is in custody" for *Miranda* purposes.

18  *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc).  It is important that Fort

19  was told many times that he was not under arrest and behaved like a person who did not think he

20  was under arrest.  *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005).

21          It is also necessary to examine the "purpose and flagrancy of the official misconduct."

22  *Wellins*, 654 F.2d at 555.  The Ninth Circuit has recognized that "[c]ourts favor suppression if law

23  enforcement officials conducted the illegal search with the purpose of extracting evidence against

24  the defendant or if they flagrantly broke the law in conducting the search."  *United States v.*

25  *Washington*, 387 F.3d 1060, 1075 (9th Cir. 2004).  The Ninth Circuit has recognized that "courts

26  frequently hesitate to find that an officer's violation of the law was 'purposeful' or 'flagrant' when

27  the officer broke the law acting in good faith."  It cannot be said that the officers' arrest here, though

28  illegal, was in bad faith.  Nothing in the record suggests that the officers intentionally violated Fort's

10

United States District Court

For the Northern District of California

1    Fourth Amendment rights when they stopped him.  During the interview, he was allowed to talk on

2    his cell phone and was told numerous times that he was not under arrest.  Moreover, Fort concedes

3    that the officers reasonably suspected that he was involved with a murder they were investigating.

4    Like the defendant in *Wellins*, Fort was not "subjected to threats, a show of force . . . , and did not

5    appear to have been otherwise intimidated."  *Wellins*, 654 F.2d at 556-57.  "The absence of such

6    facts weighs against the defendant."  Though this order holds that the officers acted unreasonably

7    when they arrested Fort, there is no suggestion that the officers "embarked upon this expedition for

8    evidence in the hope that something might turn up."  *Brown v. Illinois*, 422 U.S. 590, 605 (1975).

9    This order finds Fort's statement sufficiently attenuated from the illegal arrest so as not to require its

10   suppression.

11        For the foregoing reasons, Fort's motion to suppress his October 3rd statement is denied.

12        **3.    DOCUMENT NO. 597 — MOTION TO SUPPRESS BY ALLEN CALLOWAY.**

13        Defendant Allen Calloway moves to suppress evidence obtained from three separate searches

14   and arrests conducted by SFPD officers.  Calloway did not submit any declarations in support of his

15   motion.  The government filed declarations from four SFPD officers.  This order finds that an

16   evidentiary hearing is not necessary to resolve Calloway's motion.  For the reasons stated below,

17   Calloway's motion is denied.

18        **A.    August 30, 2002 — Arrest and Search.**

19        On August 30, 2002, SFPD Officers Martinez and Liu were in plain clothes in an unmarked

20   car traveling on Sunnydale Avenue in San Francisco.  They were investigating a series of armed

21   robbery incidents at bus stops in the area.  The officers saw Calloway, with whom officer Martinez

22   was "very familiar."  Martinez knew that Calloway was a member of the Down Below Gang.  In

23   Martinez's experience, Calloway would willingly talk to Martinez and other officers if he was not

24   carrying any drugs or weapons.  Calloway would, however, always run away from the police if he

25   was carrying contraband.

26        Calloway matched the description of a suspect who, eight days earlier, had followed an

27   elderly Asian woman from a bus stop.  The victim stated that she had been followed home by a

28   "black male in his twenties, wearing a black jacket, blue jeans, [and a] black hat."  When Calloway

11

saw the officers, he walked quickly across the street and then ran into a grocery store called the Little Village Market. It was Martinez's experience that individuals often walk into that particular store as soon as they see police, and pretend they are going to buy something. Martinez suspected that Calloway was engaging in the same conduct, and that Calloway was likely carrying drugs or weapons. The fact that Calloway was wearing a big black puffy jacket in August also contributed to Martinez's suspicion that he was carrying contraband.

The officers drove around the block and when they returned, they saw Calloway run from the store and get into the backseat of a blue Toyota Celica. The officers followed the Toyota and saw Calloway, the only passenger in the backseat, remove his jacket. This also contributed to the officers' suspicion.

Martinez flagged down Officer Caturay in a marked police vehicle and asked Caturay to effect a traffic stop of the Toyota. Before Caturay stopped the car, it appeared to voluntarily pull over to the side of the street. The officers approached the Toyota, identified themselves as police officers, and asked Calloway to step out of the vehicle. As Calloway was exiting, Liu saw him shove his jacket to the side in the back seat.

When Calloway got out of the car, Martinez conducted a pat search of Calloway. Martinez asked Calloway where his jacket was, and Calloway refused to answer. Liu went to the Toyota and asked the driver for the jacket Calloway was wearing. As the driver grabbed the jacket from the back seat, the jacket fell down onto the floor board and made a "clunk" sound. Martinez believed the sound was consistent with a firearm falling. The driver handed Liu the jacket, who gave it to Martinez. Martinez thought the jacket was heavy and consistent with the weight of a firearm. The butt of a gun was visible from one pocket of the jacket. Martinez recovered the weapon, which he determined was a fully-loaded 9mm Smith & Wesson semi-automatic pistol (Martinez Decl. ¶¶ 2-9).

Calloway contends that there was no probable cause or reasonable suspicion to detain him on August 30, 2002. His contention lacks merit. "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). It is evident that the officers had reasonable suspicion to stop the car in which Calloway was riding. Officer Martinez's declaration explains that

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Calloway matched a description given by a victim who had been followed just a few days before.

2   Martinez recognized Calloway as a local gang member.  When Calloway saw the officers, he ran

3   into the Little Village Market and hid behind an interior doorway.  This behavior was consistent

4   with earlier instances when officers determined that Calloway was either armed or possessed

5   narcotics.  Calloway then ran into the street and got into a car, which drove away.  As soon as he

6   entered the car, Calloway removed his jacket.

7          The Supreme Court has instructed that "consideration of the modes or patterns of operation

8   of certain kinds of lawbreakers" is helpful to determining whether reasonable suspicion exists.

9   *Cortez*, 449 U.S. at 418.  Calloway's actions here were consistent with behavior Martinez knew to

10  be consistent with the actions of individuals who were hiding contraband.  Here, viewing the

11  objective evidence as one "versed in the field of law enforcement," Martinez's observations satisfy

12  the standard for reasonable suspicion.  His observations were "specific, articulable facts which,

13  together with objective and reasonable inferences, form[ed] the basis for suspecting that the

14  particular person detained [was] engaged in criminal activity." *United States v. Hernandez-*

15  *Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989).

16         Because the officers lawfully stopped the car, the next issue is whether they reasonably

17  recovered the gun from the jacket.  This question is easily resolved in the government's favor

18  because Calloway has no standing to challenge the seizure of the gun.  "As a passenger with no

19  possessory interest in the car [driven by another person, Calloway] had no reasonable expectation of

20  privacy in a car that would permit his Fourth Amendment challenge to a search of the car." *United*

21  *States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005) (internal quotations omitted).  As in *Pulliam*,

22  Calloway "made no showing that he had any legitimate expectation of privacy in the area under the

23  seat of the car in which he was merely a passenger, as this is an area in which a passenger *qua*

24  passenger simply would not normally have a legitimate expectation of privacy."  Here, where

25  Calloway was only a passenger in the car and the car was still under the driver's control, Calloway

26  did not have a reasonable expectation of privacy to prevent a search of the car.  Moreover, the driver

27  of the car consented to the search by handing the jacket to the officers.  Calloway cannot claim that

28  the officers were not justified in seizing the gun from the jacket.  Even if Calloway "claimed

1    ownership" of the jacket and gun, that would not confer standing upon him to seek suppression of

2    the gun. *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980).

3         Finally, this order considers whether Calloway's arrest was reasonable under the Fourth

4    Amendment.  An arrest is constitutionally valid if the arresting officers had probable cause to make

5    the arrest.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  Officers have probable cause to make an arrest

6    when "at that moment the facts and circumstances within their knowledge and of which they had

7    reasonably trustworthy information were sufficient to warrant a prudent man in believing that the

8    [defendant] had committed or was committing an offense."  Here, the officers retrieved the semi-

9    automatic pistol from the jacket they saw Calloway wearing just a few minutes before.  This order

10   finds that the discovery of the gun coupled with the previous observations of the officers constituted

11   sufficient probable cause to justify a warrantless arrest of Calloway.  His motion to suppress the

12   fruits of the August 2002 search and arrest is denied.

13                 **B.        February 19, 2004 — Arrest and Search After Shooting.**

14        On February 19, 2004, SFPD Inspector Robert McMillan received information from an

15   informant that "Nutso" had fired shots from a gun and ran into 1533 Sunnydale Avenue in San

16   Francisco.  Through prior contacts, McMillan knew "Nutso" to be defendant Calloway.  McMillan

17   was aware that Calloway was on probation and that there was a search condition in his probation

18   order that allowed any law enforcement officer to search Calloway at any time without a warrant.

19   McMillan had worked with and received reliable information from the informant before.

20        Calloway's girlfriend was Patrice Freeman.  McMillan knew that 1533 Sunnydale Avenue

21   was Patrice's address.  Patrice's mother, Patricia, was the leaseholder of the apartment.  McMillan

22   told four other officers of the information he had learned, and asked for assistance in searching the

23   residence.  When the officers arrived, the officers told Patricia that they had information that

24   Calloway had brought a gun on the premises and asked Patricia if they could search the apartment.

25   McMillan asked Patricia if Calloway was in the apartment.  Patricia replied that she did not think so.

26   Patricia gave the officers permission to enter and search the apartment.

27        The officers were unable to locate Calloway.  They went into a rear bedroom upstairs in the

28   residence.  Both Patricia and Patrice gave the officers verbal permission to search the room and later

14

United States District Court

For the Northern District of California

1    signed permission-to-search forms.  One of the officers lifted a mattress and found a gun, magazine,

2    and a live round.  The officers also found other evidence linking Calloway to that room.  Patricia

3    then told McMillan that earlier in the day, she heard gunshots, and five minutes later she heard

4    Calloway's voice in the apartment but did not see him.

5          Meanwhile, Officer Chad Campos and his partner saw Calloway walking on Sunnydale

6    Avenue.  Campos knew about the information McMillan's informant had provided.  Campos was

7    told to detain Calloway for questioning.  Campos knew Calloway through prior contacts and knew

8    that Calloway had a probation order with a search condition.  Campos asked Calloway to stop and

9    talk with him.  Calloway ran away, and the officers chased him on foot.  The officers caught up with

10    Calloway and placed him under arrest.

11          While at the Freemans' residence, McMillan was informed that Calloway had been detained

12    by Campos.  Because Calloway was on probation, and because the informant's tip appeared to be

13    correct, McMillan asked that Calloway be transported to his office for further investigation.  Officer

14    Campos complied with that request.  Based on the information from McMillan's informant, Campos

15    conducted a pat search on Calloway.  During the pat down, Campos felt a large object in Calloway's

16    pants pocket.  Based on Campos's training and experience, he believed the plastic baggie contained

17    narcotics.  Campos retrieved the baggie and saw a substance he believed to be marijuana.

18          When McMillan met Calloway in his office, he advised Calloway of his *Miranda* rights and

19    interviewed him.  Calloway told McMillan that he had not possessed or shot a gun that day, and that

20    he never handled a .40 caliber Smith & Wesson handgun.  He was later released (McMillan Decl. ¶¶

21    3-9; Campos Decl. ¶¶ 3-6).

22          As an initial matter, Calloway does not have standing to contest the lawfulness of the search

23    at the Freemans' apartment.  If Calloway sought to suppress evidence obtained as a result of an

24    unlawful search, he would have to first establish that he had "an expectation of privacy in the

25    [Freeman's apartment] and that [his] expectation was reasonable."  *United States v. Silva*, 247 F.3d

26    1051, 1054 (9th Cir. 2001).  Officer McMillan's declaration states that Patricia Freeman was the

27    leaseholder of the residence, and that she consented to the search.  The Supreme Court has

28    recognized that a search "authorized by consent is wholly valid."  *Schneckloth v. Bustamante*, 412

U.S. 218, 222 (1973).  Calloway has filed no declaration or other evidence suggesting that he had an expectation of privacy in the Freeman's apartment.  This order finds that the evidence seized from the Freeman's apartment should not be suppressed, due to Calloway's lack of standing.

Calloway contends that the officers had no reasonable suspicion or probable cause to arrest him in February 2004.  His contention lacks merit.  Officer Campos, the arresting officer, knew that an informant had told police officers that Calloway had recently fired a gun.  The informant, who had previously given McMillan reliable information, gave detailed information that Calloway had fired a gun and that he had run into 1533 Sunnydale Avenue.  "The suspect was clearly indicated and his criminal actions were described with some particularity," thereby giving the officers reasonable suspicion to detain Calloway.  *United States v. Sierra-Hernandez*, 581 F.2d 760, 763-64 (9th Cir. 1978).  Moreover, Campos knew that Calloway had a search clause in his probation order.  The officers would only have needed even reasonable suspicion to search Calloway.  *See United States v. Knights*, 534 U.S. 112, 121-22 (2001).  As the *Knights* court stated, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."  Finally, when Campos saw Calloway on the street, Calloway began to run away from the officers.  This order finds that Calloway's "flight together with other evidence gave rise to probable cause."  *United States v. Fuentes*, 105 F.3d 487, 490 (9th Cir. 1997).  The officers' arrest of Calloway was lawful under the Fourth Amendment.

It necessarily follows that the search of Calloway was incident to the lawful arrest.  *United States v. Tank*, 200 F.3d 627, 631-32 (9th Cir. 2000).  The search was "roughly contemporaneous" with the arrest.  Accordingly, the marijuana seized from Calloway's person immediately after the arrest may not be suppressed.  Finally, Calloway's statement following the arrest was also obtained lawfully.  Calloway has not asserted that his statement was given involuntarily.  Calloway offers no evidence to rebut McMillan's declaration, which establishes that McMillan read Calloway his *Miranda* rights and Calloway waived those rights.  "The statements came not only after the *Miranda* warnings, but in the face of the advice of the officers not to talk."  *Riley v. United States*, 411 F.2d

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  1146, 1150-51 (9th Cir. 1969).  Accordingly, the statement may not be suppressed.  Calloway's

2  motion to suppress the fruits of the February 2004 police search and arrest is denied.

3             **C.**      **April 7, 2004 — Arrest and Search Authorized by Probation Officer.**

4         In April 2004, SFPD Sergeant Inspector Toney Chaplin believed that there was evidence of

5  on-going narcotics distribution and gang association in Calloway's residence.  Chaplin formed his

6  belief for several reasons.  He knew about the February 19th incident, during which officers had

7  found a gun, magazine, and live round in connection with an alleged shooting by Calloway.  Chaplin

8  was aware that Calloway was released from custody after that incident.  He also knew of Calloway's

9  on-going relationship with the Down Below Gang, the associated gang-related violence, and his

10  "obvious" narcotics-sales activities before the February arrest.  Chaplin advised Calloway's

11  probation officer of the February arrest, and the probation officer authorized Calloway's arrest and a

12  search of his residence.

13         The officers located Calloway near the intersection of Sunnydale Avenue and Hahn Street

14  and placed him under arrest.  They took him to his residence at 189 Garrison Street for a probation

15  search.  The officers advised Calloway's mother, Zina Brown, that they were there for a probation

16  search.  Brown consented to a search of the home and led the officers to Calloway's room.

17         During the search of Calloway's room, Officer Broberg found marijuana, a digital scale,

18  baggies, and videotapes.  Officer Wells also found marijuana and indicia linking Calloway to the

19  room.  All the items were seized as evidence.

20         Officers Yin and Dong assisted in the search of Calloway's residence.  Yin removed

21  Calloway from the police vehicle and Calloway advised Yin that he had marijuana in his jacket

22  pocket.  Yin seized the marijuana.

23         The officers took Calloway to a police station.  Chaplin read Calloway his *Miranda* rights,

24  which he waived.  During a taped interview, Calloway admitted that: (1) he possessed the marijuana

25  in his pocket for sale, and (2) on February 19, 2004, he possessed and fired a Smith & Wesson

26  handgun, subsequently ran to his girlfriend's apartment at 1533 Sunnydale Avenue, and hid the

27  handgun under a mattress in the bedroom (Chaplin Decl. ¶¶ 4-9).

28

1    Calloway maintains that his arrest and the search of his apartment were unlawful under the

2    Fourth Amendment.  His contentions lack merit.  California Penal Code Section 1203.2 provides that

3    during a probationary period, "if any probation officer or peace officer has probable cause to believe

4    that the probationer is violating any term or condition of his or her probation or conditional sentence,

5    the officer may, without warrant or other process . . . rearrest the person . . . ."  Here, Calloway's

6    probation officer authorized his arrest based on information provided by Chaplin.  Chaplin knew that

7    the informant's tip from February 19th had been corroborated: officers found a gun, magazine, and a

8    live round at 1533 Sunnydale Avenue, the location to which Calloway had allegedly run after he had

9    fired a weapon.  The corroboration of the informant's tip gave law enforcement probable cause to

10   arrest Calloway for the February 19th shooting.  *See United States v. Larkin,* 510 F.2d 13, 14-15 (9th

11   Cir. 1974).  Moreover, the officers knew of Calloway's on-going relationship with the Down Below

12   Gang, and his "obvious" narcotics-sales activities before the February arrest.  Accordingly, probable

13   cause existed for the probation officer to authorize a warrantless arrest of Calloway.  The known

14   facts also provided officers with sufficient probable cause to justify a warrantless arrest of Calloway

15   under the Fourth Amendment.  *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir. 1984).

16   The search of Calloway's residence was justified as a condition of his probation.  As stated

17   in *United States v. Knights*, 534 U.S. 112, 121-22 (2001), "[w]hen an officer has reasonable

18   suspicion that a probationer subject to a search condition is engaged in criminal activity, there is

19   enough likelihood that criminal conduct is occurring that an intrusion on the probationer's

20   significantly diminished privacy interests is reasonable."  As this order holds, officers had probable

21   cause to believe that Calloway continued to be involved in criminal activity.  Under *Knights*,

22   probable cause was more than sufficient to justify the warrantless search of Calloway's room.

23   Accordingly, none of the fruits of the April 7, 2004 search and arrest may be suppressed.

24       **4.    DOCUMENT NO. 604 — MOTION TO SUPPRESS BY DEFENDANT BYES**

25   Defendant Christopher Byes seeks to suppress evidence seized and subsequent statements

26   taken after a parole search of his residence on October 19, 2004 (Doc. No. 604).  On the date of the

27   search, Byes was a parolee in the California system.  At that time, Byes resided at 1607 Sunnydale

28   in San Francisco, and that was the address on file with his parole officer (Byes Decl. ¶ 2).  Byes'

declaration offered no details of the October 2004 search except to indicate his residence. The residence was apparently in an area known to be "controlled by the Down Below Gang" (Roumbanis Decl. ¶ 4). As part of the terms of his parole, Byes signed an agreement that "[y]ou and your residence and any property under your control may be searched without a warrant by an agent of the Department of Corrections or any law enforcement officer" (Opp. Exh. C).

On October 19, 2004, Parole Officer Daniel Roumbanis and several SFPD officers visited Byes' residence to perform a compliance check. When the officers arrived at 1607 Sunnydale, Officer Roumbanis and Officer Kevin Knoble identified themselves to a woman who was leaving the premises. The woman yelled inside that "parole" was there (Roumbanis Decl. ¶ 5). The officers heard shouts from their fellow officers at the back of the house, so Officers Roumbanis and Knoble proceeded to look inside. Inside the house, they saw defendant Byes and defendant Don Johnson, whom Officer Knoble recognized as a suspected DBG member. Byes and Johnson were apparently moving from the kitchen towards the back of the house.

When Officers Roumbanis and Knoble approached Byes and Johnson in the kitchen, they saw Johnson holding an orange shoe box. Johnson attempted to put the orange shoe box underneath the kitchen sink but dropped the box. Officer Roumbanis inspected the box. It contained marijuana and numerous plastic bags. After the search, the SFPD officers transported Byes and Johnson to Ingleside police station. According to the police report, after receiving a reading of his *Miranda* rights Byes told officers that the marijuana "was all his" and that "he was responsible for everything" (Tamor Decl. Exh. A).

No material issues of fact exist necessitating an evidentiary hearing. On the face of Byes' moving and supporting papers, Byes' motion to suppress lacks merit. The Supreme Court recently upheld the lawfulness of suspicionless searches of parolees subject to agreements similar to that entered into by Byes. *Samson v. California*, 126 S. Ct. 2193, 2196 (June 19, 2006). "On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id*. at 2197. "Examining the totality of the circumstances pertaining to petitioner's status as a parolee, 'an established variation on imprisonment,' including the plain terms of the parole search condition, we conclude that petitioner

did not have an expectation of privacy that society would recognize as legitimate." *Id*. at 2199

(internal citation omitted). "The State's interests, by contrast, are substantial. This Court has

repeatedly acknowledged that a State has an 'overwhelming interest' in supervising parolees because

'parolees . . are more likely to commit future criminal offenses.'" *Id*. at 2200 (internal citation

omitted). Accordingly, the Supreme Court held "that the Fourth Amendment does not prohibit a

police officer from conducting a suspicionless search of a parolee." *Id*. at 2202.

Given that the officers' search of Byes' residence was lawful, the only remaining question is

whether the subsequent search of the orange shoe box was justified. Byes argues that since the box

was in the control of Johnson, the search of that closed container was not a reasonable extension of

the lawful parole search. In the context of probation searches, the Ninth Circuit has held that:

> Requiring the police to inquire into ownership, possession or
> control in all instances when ownership, custody, or control is not
> obviously and undeniably apparent, would force courts to undertake
> the difficult task of evaluating, in every case of doubt, the nature of
> the measures taken and the credibility of the responses given.

*United States v. Davis*, 932 F.2d 752, 760 (9th Cir. 1991). As *Samson* made clear, a parolee has

even less expectation of privacy than an individual on probation. Thus, it seems clear that the

officers did not have a duty to inquire into Byes' ownership of the box. In any event, it was

reasonable to assume that Byes was associated with the box even though Johnson happened to be

holding it at that moment. The box was in Byes' residence. Byes and Johnson rushed toward the

back of the house, thus it reasonably seemed that grabbing the box was done more out of exigency

than out of a calculated assessment of ownership. Finally, Johnson was attempting to hide the box

under the kitchen sink, clearly within the scope of Byes' residence and, consequently, of his control.

The search and seizure were lawful, and accordingly, so was Byes' subsequent statement at the

police station that marijuana was his, made after he was read his *Miranda* rights. In sum, Byes'

motion lacks merit.

United States District Court

For the Northern District of California

**5.      DOCUMENT NO. 605 — OMNIBUS MOTION TO SUPPRESS BY DEFENDANT DIAZ.**

Defendant Diaz's omnibus motion seeks to suppress evidence and statements pertaining to 23 separate incidents (Doc. No. 605).[6] Diaz did not submit a sworn declaration in support of the factual assertions with respect to any of these incidents.  Instead, Diaz's motion papers are based on excerpts from police reports, a police dispatch log, an unsworn investigative report by a private investigatory, a state-court transcript, and transcripts of police interviews with defendant Diaz.  The Court has compared the foregoing with the government's opposition, which consists of fifteen declarations and three further police reports.  As noted at the outset of this order, the purpose of this review has been to determine the extent to which the facts present a reasonable likelihood that an evidentiary hearing would develop facts warranting the relief sought.  With limited exceptions discussed below, Diaz is not entitled to an evidentiary hearing on these incidents.

The Court has reviewed the merits of the remaining incidents on the papers and found that defendant is not entitled to suppression of the evidence seized or statements taken related to the remaining incidents.  In particular, fourteen of the challenged incidents involved so-called "field interviews."  These field interviews apparently involved nothing more than observations of officers, recorded on computer-generated cards.  Diaz does not identify any evidence that was seized or any statements that were taken during these field interviews.  In opposition, the government submitted declarations from several SFPD officers explaining the nature and procedure of field interviews.  For example, Officer Cox explained that "the information that is entered into field interview cards is gathered in several possible ways" (Cox. Decl. ¶ 3).  "I may be on patrol and observe individuals acting or loitering in a certain area and note their actions on a field interview card, but not have contact with any of the individuals.  I may have contact with the individuals and note the contact on a field interview card.  The contact may be as minor as saying 'hello' or casual conversation" (*ibid.*).  Furthermore, Officer Cox added "[w]hen I have contact with individuals during a field interview, it is voluntary and consensual.  If an individual from the group walks away, they are permitted to do so unless the circumstances presented give rise to reasonable suspicion to detain that individual" (*id.* at

_____

[6] Defendant Diaz's motion was joined by defendants Rickey Rollins, Don Johnson, and Robert Calloway.

United States District Court

For the Northern District of California

¶ 4).  These field interviews, therefore, do not in and of themselves bear evidence justifying suppression.  Only subsequent *Terry* stops, detentions or arrests, would be the proper subjects for possible suppression.  Again, except as to the following incidents, Diaz's omnibus motion is denied.[7]

### A.    April 2, 1998 — Attack at Visitacion Valley Middle School.

In its opposition, the government agreed not to use evidence and statements pertaining to this incident occurring on April 12, 1998, in the government's case in chief (Opp. 4 n. 2).  Accordingly, defendant Diaz's motion as to this evidence is granted, without need for an evidentiary hearing.

### B.    November 19, 2002 — Attempted Murder of Marvin Evans.

There is a sufficiently strong possibility of merit to warrant an evidentiary hearing on defendant Diaz's motion to suppress evidence and statements pertaining to the shooting of Marvin Evans.  On November 19, 2002, two males allegedly entered a MUNI bus, one of whom then shot at Marvin Evans.  After the assailants jumped off the bus, they purportedly followed the bus in a car.  The bus driver described the shooter to police as a black male wearing a black t-shirt and black jeans, and described the weapon as a silver automatic pistol.  The victim, Marvin Evans, apparently fled.

Thereafter, a broadcast was put out to find the assailant.  The precise details of the bulletin are not clear, but the bulletin apparently lacked specificity beyond describing black males wearing black clothing in the Sunnydale area.  Several individuals ostensibly meeting this description were detained.  Thereafter, the police brought a witness to the area where the individuals were being detained for a "cold show," whereupon the witness stated that the shooter was possibly Diaz.  The police brought Diaz to the police station for further questioning.  The manner in which Diaz was apprehended raises issues worthy of further evidentiary hearing.  Unlike the tailored bulletin issued in relation to the October 2001 bus incident discussed above, which described unique clothing, mode of travel, and defendant Rollins' name, the bulletin issued after the Evans shooting apparently lacked meaningful particulars.  A generalized alert for black males wearing black clothing in the Sunnydale area sounds like the type of description that the Ninth Circuit has found inadequate to justify an

---

[7] The final challenge raised in the omnibus motion involved DNA evidence.  Issues relating to DNA evidence were previously addressed in this Court's order issued on September 19, 2006 (Doc. No. 784).

United States District Court

For the Northern District of California

1  investigatory stop, let alone an arrest.  *See, e.g.*, *United States v. Thomas*, 211 F.3d 1186, 1190 (9th

2  Cir. 2000); *Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002).  The evidence seized

3  from Diaz's possession after this potentially unconstitutional arrest, as well as the subsequent

4  testing, observations, statements, and partial identifications may also be tainted by arrest's possible

5  invalidity.

6        The suspect constitutionality of this detention and arrest was apparently compounded by a

7  subsequent interrogation conducted by SFPD officers of defendant Diaz in the presence of his

8  mother at the police station.  The investigator read Diaz his *Miranda* rights, at least in part, but

9  seemingly continued the interrogation *after* Diaz's mother indicated a desire for counsel (Burt Decl.

10  Exh. 1).  Diaz's mother, after hearing the recitation of her son's *Miranda* rights, asked the inspector

11  "He don't have to say nothing, right?  Until a lawyer's present, right?  He has that right, right?"

12  (*ibid.*).  The inspector responded, "[y]es, he does.  I said I was going to talk to him.  And that's what

13  I'm doing.  He hasn't said anything other than he has a right [inaudible statement].  I'm going to talk

14  to him okay?" (*ibid.*).  This is possibly suspect under *Edwards v. Arizona*, 451 U.S. 477, 485 (1981).

15  To add to these worries, the police apparently then recorded conversations between Diaz and his

16  mother while the police were out of the room using a surreptitious recording device.  This

17  interrogation and recording will also be at issue in the evidentiary hearing regarding the suppression

18  of evidence pertaining to the attempted murder of Evans.

19        Finally, the evidentiary hearing will consider the need to suppress any subsequent statements

20  defendant Diaz made to his probation officer.  Without further evidence, it is unclear whether Diaz's

21  purported statement that he would "take the first deal offered" constituted an inadmissible offer to

22  plead guilty, or merely a voluntary admission.  *See, e.g.*, Fed. R. Evid. 410.  In sum, because of the

23  taint of the earlier portions of the Evans' investigation, the government should be prepared to justify

24  the admissibility of all evidence relating to the attempted murder.

25        **C.        May 13, 2004 — Arrest Outside San Francisco General Hospital.**

26        Defendant Diaz is also entitled to an evidentiary hearing with respect to evidence seized and

27  statements taken outside of San Francisco General Hospital on May 13, 2004.  Rickey Rollins had

28  just been shot.  Diaz and two other individuals transported Rollins in a van to San Francisco General

United States District Court

For the Northern District of California

Hospital to obtain medical assistance. Rollins had apparently refused medical attention at the scene of the shooting. Officer Wendy Frisk, purportedly suspicious of this fact, followed the van to the hospital. The officer attempted to question Diaz in the hospital waiting room, and apparently followed Diaz around the hospital after he refused to talk to her. Diaz then went outside. Officer Frisk confronted Diaz in front of the hospital and Diaz told her he was catching the bus. A second officer arrived on the scene, and the two officers detained Diaz outside of the hospital. Diaz apparently did not speak to the officers. After some time outside, the officers put Diaz in their patrol car. As Diaz was being put into the car, he dropped an object that turned out to be a sock. The officers set the sock in the patrol car. While in the patrol car, Diaz stated "that the sock didn't have crack in it but only 'pot.'" Officer Frisk then looked inside the sock and found seven bags of a substance that turned out to be marijuana. Diaz was arrested and certain other of his possessions were seized.

There is enough question of the constitutionality of Diaz's detention outside of the hospital to warrant an evidentiary hearing. Apparently the purportedly suspicious activity committed by Diaz was refusing to talk to police officers. Yet there was no apparent reason why he had to talk to police officers — it does not appear there was a reasonable suspicion that Diaz had just perpetrated a crime. Rather, Diaz was aiding the *victim* of a crime who needed medical attention. "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (citing *Terry v. Ohio*, 392 U.S. 1, 32–33 (1968) (Harlan, J., concurring)). "He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Id*. at 498.

**CONCLUSION**

By this order, all questions of suppression under the Fourth Amendment in this case have now been resolved. At the hearing on defendants' motions to suppress, the government conceded that a supplemental evidentiary hearing was necessary on five of defendants' motions to suppress: Document Nos. 589, 606, 608, 611, and 613. In addition, this order has found the need for evidentiary hearings on two of the incidents challenged in defendant Diaz's omnibus motion (Doc.

No. 605):  The November 2002 shooting of Marvin Evans, and the May 2004 incident at San Francisco General Hospital.  The following schedule is set for these seven evidentiary hearings:

|   | Date | Time | Doc. No. | Defendant |
|---|------|------|----------|-----------|
| 1. | October 4, 2006 | 8:00 a.m. | 608 | Byes |
| 2. | October 16, 2006 | 1:30 p.m. | 611 | Ragland |
| 3. | October 17, 2006 | 8:00 a.m. | 613 | Ragland |
| 4. | October 18, 2006 | 1:30 p.m. | 589 | Fort |
| 5. | October 18, 2006 | 1:30 p.m. | 606 | Byes |

With respect to the November 2002 shooting of Marvin Evans and the May 2004 incident at San Francisco General Hospital, counsel should meet and confer and line up hearing dates convenient to counsel and the witnesses.  Available dates and times are: 8:00 a.m. to 12:00 p.m. on October 16, 2006 and 8:00 a.m. to 12:00 p.m. on October 18, 2006.  Please advise the Court by **TUESDAY, OCTOBER 3, 2006 AT NOON.**

With respect to the hearings specific to a single defendant, it is presumed that only the defendant who brought the motion needs to be present at the hearing.  If any other defendants and counsel wish to be present, please notify Dawn Toland at 415-522-2020.

**IT IS SO ORDERED.**

Dated:  September 28, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE