IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EDGAR DIAZ, RICKEY ROLLINS, DON JOHNSON, ROBERT CALLOWAY, DORNELL ELLIS, EMILE FORT, CHRISTOPHER BYES, PARIS RAGLAND, RONNIE CALLOWAY, ALLEN CALLOWAY, and REDACTED DEFENDANTS NOS. ONE & TWO,

    Defendants.

No. CR 05-0167 WHA

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT DIAZ'S MOTION TO SUPPRESS EVIDENCE FOLLOWING EVIDENTIARY HEARINGS [DOCKET NO. 605]**

**INTRODUCTION**

In this RICO gang prosecution, defendant Edgar Diaz moves to suppress evidence obtained during various incidents. On September 28, 2006, this Court issued an order ruling on the admissibility of the majority of the evidence contested by Diaz on the papers. Evidentiary hearings were held on October 18 and October 25, 2006, with respect to two remaining events: (1) the shooting of Marvin Evans on November 19, 2002, and (2) the detention of Diaz outside of the San Francisco General Hospital on May 13, 2004. This order addresses the admissibility of evidence and statements obtained by police in relation to these two events.

### 1.    THE SHOOTING OF MARVIN EVANS.

Hearings regarding the shooting of Marvin Evans were held on October 18 and October 25, 2006.  At the hearings, San Francisco Police Officers Leonard Broberg, Maris Goldborough, Dominic Yin, Michael Howard, and Kevin Knoble testified.  Purported eyewitness Guillermo Chacon also testified.  A videotaped conversation between defendant Diaz and his mother, recorded on November 19, 2002, at the Hall of Justice, was shown.  An audiotape of an interrogation of Diaz by Officers Broberg and Knoble conducted on January 28, 2003, was also provided and listened to by the Court in chambers.

*Factual Findings*.

On November 19, 2002, at roughly 10:30 a.m., Officers Goldborough and Howard responded to a bulletin that a shooting had occurred on a Muni Bus at the intersection of Sunnydale and Hahn in the Sunnydale Housing Project.  This area is known by SFPD officers to be frequented by members of the Down Below Gang, a reputedly violent street gang.  According to the initial bulletin, the bus was being followed by a green or blue car in which the shooter was riding.

Officers Goldborough and Howard tracked down the bus on which the shooting occurred at the intersection of Bayshore and Arlita.  Officer Goldborough interviewed several individuals on the stopped bus.  The bus driver informed the officer that the shooter entered through the rear door of the bus and fired five shots towards the rear-bench seat of the bus.  The shooter was described as an African-American male, juvenile or adult, wearing a black shirt and black or blue jeans.  Two passengers on the bus provided the officers with a similar description.  The witnesses explained that the assailant fled on foot after exiting through the rear of the bus.  The gun was described as a silver automatic pistol.  The apparent intended victim of the shooting, identified as Marvin Evans, was not hit by the by the shots, as the shots were blocked by the metal plating on the seat just in front of the bench seat.  Evans refused to answer Officer Howard's questions.

Officer Howard then issued a bulletin over police radio with the description he got from the witnesses:  African-American male, juvenile or adult, wearing dark clothing.  Officer

Howard told officers at the location of the shooting, Sunnydale and Hahn, to detain all suspects in front of the Little Village Market, a market located at the intersection and a suspected hangout for members of the Down Below Gang.

Officer Yin responded to Officer Howard's bulletin, detaining at least five suspects purportedly matching the description, although some of the suspects were apparently not wearing all black clothing — some wore black tops and light pants and others wore light tops and black pants. Officer Yin detained the suspects at gunpoint against a fence across the street from the Little Market Village. Officer Yin recognized one of the five suspects as Greg Jackson, now deceased, who was the reputed head of the Down Below Gang. Officer Yin also recognized amongst the group, Jaquan Williams, another suspected member of the Down Below Gang. Defendant Diaz was also in the group, but Officer Yin did not recognize him. Officer Yin notified Officers Goldborough and Howard that he was detaining the five suspects. Officer Yin then moved the suspects in handcuffs into a police wagon.

Within less than a half hour from the time of the shooting, Officer Howard arrived at the Little Village Market where Officer Yin was holding the suspects. Officer Howard brought two potential witnesses who had been riding on the bus where the shooting occurred for a "cold show" (*i.e.*, an informal identification lineup conducted in the field). The two witnesses remained in Officer Howard's patrol car as Officer Yin brought the suspects out of the police wagon into the line of sight of the two witnesses at a distance of approximately fifty feet. One witness, an unnamed woman, was unable to identify any of the suspects as the shooter. A second witness, Guillermo Chacon, picked out defendant Diaz. Chacon, however, did not indicate that he recognized Diaz's face — Chacon made clear to Officer Howard that he never saw the shooter's face on the bus. Rather, Chacon merely indicated that due to the color of Diaz's clothing he "could" be the shooter.

3

1  After the cold show, Officer Yin transported Diaz in his patrol car to Ingleside Station.
2  According to the police report, this was denoted as an "arrest" of Diaz.[1]  Officer Yin also
3  notified Diaz's mother that her son was being brought into the station.  After arriving at
4  Ingleside Station, Diaz was then transported by officers to the Hall of Justice, and specifically
5  to the offices of the Gang Task Force.  The distance between Ingleside Station and the Hall of
6  Justice is several miles.

7  Officer Broberg, who was then assigned to the Gang Task Force, escorted Diaz into an
8  interview room in the Task Force's offices.  At some point shortly thereafter, Diaz's mother
9  arrived.  The interview room was locked.  Broberg did not interrogate Diaz at that point, as he
10 was waiting for his superior officer, Officer Wells to arrive to assist in the interrogation.
11 Broberg did, however, turn on video-surveillance equipment, thus recording visuals and audio
12 in the interview room where Diaz and his mother were waiting.  The video-surveillance
13 equipment was hidden and it was not possible for an individual in the room to detect whether or
14 not the equipment was turned on and recording, or even that there was any such equipment.  In
15 addition, Officer Broberg placed a *second* recording device in the interrogation room.  This
16 second device was a simple audio-recording device.  Officer Broberg did not turn the audio
17 device on.  The audio device was easily visible to Diaz and his mother such that they could
18 determine by looking at the audio-recording device that it was not recording.

19 At the October 18 evidentiary hearing, the secret videotape of Diaz and his mother
20 picked up by the surveillance camera was shown to the Court.  The audio from the tape was
21 difficult to decipher, but conversations, potentially even incriminating conversations, were held
22 between Diaz and his mother.  The two were alone in the room for roughly fifteen minutes
23 before the interrogation by Officers Broberg and Wells began.

24 Once the interrogation began, the officers turned on the audio-recording device.  Officer
25 Broberg read defendant Diaz his *Miranda* rights.  Defendant Diaz asserted his right to counsel.
26 Officer Broberg asked no further questions about the Evans shooting.  Officer Wells, however,

---

[1] The police report relating to this incident was prepared by Officer Goldsborough.  Officer Goldsborough testified that he later was informed that Diaz was "detained" not "arrested," but he did not go back and change the report.

4

continued to speak to Diaz and his mother, asking about incidents unrelated to the Evans shooting. At some point while being held at the Hall of Justice, defendant Diaz's clothing were seized and tested for gunshot residue. Diaz was released that day.

On the following evening, November 20, 2002, eyewitness Chacon went to the police station to view a photo lineup. Out of the photo lineup, Chacon identified Diaz as "familiar," although again Chacon stated that he had never seen the shooter's face. He had seen Diaz's face at the cold show the day before. Chacon admitted to being scared for his family that lived in the area of the Sunnydale Projects due to his cooperation with police.

On January 28, 2003, nearly two months after the shooting, the police prepared a warrant for defendant Diaz's arrest. The district attorney approved the warrant and a court authorized the issuance of the warrant. Officer Kevin Knoble executed the warrant, arresting Diaz at his home. Officer Knoble then brought Diaz to Ingleside Station. While at Ingleside Station, Officers Knoble, Broberg, and a third officer interrogated Diaz for approximately forty minutes. The interrogation was recorded on an audio tape which was submitted by defendant into evidence. At the outset of the interrogation, Officer Broberg read Diaz his *Miranda* rights. Officers Broberg and Knoble then proceeded to ask Diaz a series of questions about the shooting, telling Diaz on several occasions that many people had come forward identifying Diaz as the shooter. Diaz denied responsibility, claiming that he was on a separate bus traveling in the opposition direction from the bus on which the shooting occurred.

After the interrogation at Ingleside Station ended, Officer Knoble transported Diaz to the Youth Guidance Center to process and book Diaz (Diaz was 17 at the time of his second arrest). At some point while Diaz was being booked, he stated to Officer Knoble "I will take the first deal they offer me."

*Analysis.*

Defendant Diaz seeks to suppress three pieces of evidence pertaining to the Evans shooting: (1) clothing seized from Diaz on November 19, 2002 and the results of subsequent testing done on this clothing for gunshot residue, (2) statements made by Diaz (not by Diaz's

5

mother) on the surveillance videotape recorded on November 19, 2002, (3) statements made by Diaz to police on January 28, 2003, in the Ingleside Station and at the Youth Guidance Center.

(1) *Investigative Stop of Diaz Outside of the Little Village Market.*

The first question is whether Officer Yin had sufficient reasonable suspicion to detain Diaz outside of the Little Market Village in the minutes following the shooting of Evans. "An officer may make an investigatory stop if he is aware of specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989) (citing *United States v. Cortez*, 449 U.S. 411, 416–18 (1981)). "Such determination is not readily reduced to 'a neat set of legal rules.'" *Ibid*. (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "The officer must consider the 'totality of the circumstances — the whole picture.'" *Ibid*. (quoting *United States v. Sokolow*, 490 U.S. 1 (1989)).

Here, the totality of the circumstances forms a basis for Officer Yin's reasonable suspicion to temporarily detain Diaz. *First*, Diaz fit the general description provided over the police bulletin by Officer Howard: African-American male wearing a black top and black pants. *Second*, defendant Diaz was present at the exact location where the shooting had just occurred — the intersection of Hahn and Sunnydale in front of the Little Village Market. Defense counsel argued that Diaz's presence at that location actually militated against suspicion of Diaz's involvement in the crime, because the shooter was described by witnesses having fled the scene on foot. Nevertheless, none of the witnesses saw how far away the shooter ran, nor could they state whether the shooter left the scene and then returned. *Third*, Officer Yin recognized two of the individuals that Diaz was with as members of the Down Below Gang, including Greg Jackson, the suspected head of the gang. Viewing the whole picture before Officer Yin, he had sufficient articulable basis for detaining defendant Diaz.

(2) *Arrest of Diaz Following Cold Show.*

It is a separate matter, however, whether the subsequent transportation of Diaz to Ingleside Station and then the Hall of Justice was justified. As a threshold matter, this order

6

finds that the act of taking Diaz in a patrol car to two separate police stations and holding him for questioning was an arrest.  "There is no bright-line rule to determine when an investigatory stop becomes an arrest."  *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citing *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988)).  "Rather, in determining whether stops have turned into arrests, courts consider the 'totality of the circumstances.'"  *Ibid*. (quoting *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990)).  "In looking at the totality of the circumstances, we consider both the intrusiveness of the stop, *i.e.*, the aggressiveness of the police methods and how much the plaintiff's liberty was restricted."  *Ibid*. (citing *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987)).  "[A]n officer cannot negate a custodial situation simply by telling a suspect that he is not under arrest."  *United States v. Bravo*, 295 F.3d 1002, 1011 (9th Cir. 2002) (citing *United States v. Lee*, 699 F.2d 466, 467 (9th Cir. 1982)).

Here, after the cold show at the Little Village Market, defendant Diaz was placed in a patrol car while still handcuffed.  He was then transported to the nearby Ingleside Station.  Thereafter, he was transported to yet another station, the Hall of Justice, several miles away.  Although Diaz was apparently not "booked," he was placed in a locked-interview room at the offices of the Gang Task Force with his mother.  It is clear under these circumstances that Diaz's liberty was restricted to such an extent that the investigative stop turned into an "arrest" when Diaz was transported from the scene of the cold show.  *See, e.g.*, *Dunaway v. New York*, 442 U.S. 200, 207 (1979) ("There can be little doubt that petitioner was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station").

The question, therefore, is whether there was probable cause for the arrest.  "Absent probable cause, a warrantless arrest is illegal."  *United States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2005).  "Officers have probable cause for an arrest if at the time of the arrest, 'the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing' that the defendant committed an offense."  *United States v. Henderson*, 241 F.3d 638, 648 (9th Cir. 2000) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

7

1  This order finds that the information available to officers at the time they transported
2  Diaz to Ingleside Station, *i.e.*, the time of arrest, was insufficient to provide probable cause.
3  The police merely had a general description of the shooter: An African-American male,
4  juvenile or adult, wearing dark clothing. While the fact that Diaz met this description, coupled
5  with Diaz's presence at the scene of the crime along with other gang members gave the officers
6  reasonable suspicion to detain Diaz for the cold show, the officers needed more particularized
7  belief to arrest Diaz. The cold show did nothing to increase the probability of the officer's
8  suspicions. One of the witnesses that Officer Howard brought to the cold show could not
9  identify the assailant in the group of suspects. The second witness, Guillermon Chacon, merely
10 told Officer Howard that Diaz "could" be the shooter on the basis that Diaz was the only
11 suspect in the lineup wearing entirely matching clothing (all dark-colored clothing rather than
12 mixed dark-colored and light-colored clothing). Chacon told Officer Howard that he did not see
13 the face of the shooter. Thus his identification of Diaz as wearing matching clothing provided
14 no additional basis for the officers to believe that Diaz was the shooter. *See, e.g.*, *Grant v. City
15 of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002) (finding witness identification unreliable as
16 a basis for probable cause where the witness had limited knowledge of the assailant's
17 appearance).

18  Two pieces of contested evidence are the fruit of this poisonous arrest: (1) the clothing
19 and gunshot-residue testing done on Diaz's clothing seized upon his arrest and (2) statements
20 made by Diaz to his mother, captured on video, in the Gang Task Force's interview room.
21 "'[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an
22 illegal search or seizure, but also evidence later discovered and found to be derivative of an
23 illegality or 'fruit of the poisonous tree.'" *United States v. Pulliam*, 405 F.3d 782, 785 (9th Cir.
24 2005) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). "'It extends as well to the
25 indirect as the direct products of unconstitutional conduct.'"[2]

---

[2] There is also a question as to whether Diaz's statements in the interview room should be deemed inadmissible as involuntary, due the surreptitious manner in which they were videotaped. This is a close call under the leading Ninth Circuit precedent of *Siripongs v. Calderon*, 35 F.3d 1308, 1319–21 (9th Cir. 1994). In *Siripongs*, the Ninth Circuit found that an officer was within constitutional bounds where he recorded an

8

1   (3)   *Second Arrest of Diaz on January 28, 2003.*

As noted above, Diaz was arrested again on January 28, 2003, pursuant to a search warrant executed by Officer Knoble. Questioning of Diaz regarding the Evans shooting was reinitiated at Ingleside Station on that day. Diaz also made the statement at the Youth Guidance Center that "I will take the first deal they offer me."

The primary question with respect to the statements stemming from this second arrest is whether Diaz's January 2003 statements were obtained in violation of his *Miranda* rights. In November 2002, Diaz had exercised his right to counsel, expressing his desire not to answer questions regarding the Evans' shooting in the absence of counsel. When Diaz was arrested again in January 2003, Officer Broberg again read Diaz his *Miranda* rights and proceeded to reopen questioning regarding the Evans shooting.

Following *Edwards v. Arizona*, 451 U.S. 477, 479 (1981), reopening questioning into a crime after the defendant has asserted his right to counsel is ordinarily impermissible unless the defendant himself initiates the contact. In *Edwards*, the defendant was arrested on various charges including murder. He told the police that he did not want to make any deals without first speaking to counsel. The next day officers took the defendant from his cell and performed further questioning on the defendant. The defendant was told that he had to speak with officers, was read his *Miranda* rights again, and his confession was videotaped. The Supreme Court deemed this tactic a violation of the defendant's Fifth Amendment right to counsel:

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.

---

arrestee's telephone conversation in the police station. The arrestee had the conversation within a few feet of an officer. Even though he conducted the conversation in Thai, the court found that the arrestee had no "reasonable expectation of privacy." *Id.* at 1320.

 Here, Officer Broberg lured Diaz into a false sense of security by placing an audio-recording device in the off position in the interview room with Diaz and his mother, while simultaneously turning on a concealed video-recording device. The interview room was locked and no officers were present in the room. Diaz and his mother were left alone for fifteen minutes. Under such circumstances, it seems that Diaz did have a reasonable expectation of privacy. Nevertheless, since this order holds that the statements are otherwise inadmissible, this order need not reach the issue.

9

*Id*. at 484.  Moreover:

> We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id*. at 484–85.

In the wake of *Edwards*, the Ninth Circuit has made clear that the *Edwards* rule *does not apply* where there has been a significant break between interrogations during which time the defendant has been released from custody.  "[T]he *Edwards* rule does not apply to suspects who are not in continuous custody between the time they request counsel and the time they are reinterrogated."  *United States v. Hines*, 963 F.2d 255, 257 (9th Cir. 1992) (citing *United States v. Skinner*, 667 F.2d 1306 (9th Cir.1982)).  "Because Defendant had been released from custody for a significant period of time before investigators questioned him again, the district court's refusal to suppress those statements did not violate *Edwards*."  *United States v. Coleman*, 208 F.3d 786, 790 (9th Cir. 2000).

So too here.  Diaz was released and free from custody for two months between interrogations.  That time period is much longer than that found to be a significant break by the Ninth Circuit.  For example, in *Hines*, a break of two days was sufficiently significant to eliminate invocation of the *Edwards* rule.  963 F.2d at 256–57.  In January 2003, Diaz was arrested pursuant to an arrest warrant.  He was read his *Miranda* rights again.  Diaz's assertion of his right to counsel two months simply did not bar the reinterrogation.  Diaz, thus, is not entitled to suppress the statements he made on January 28, 2003.

### 2. DETENTION OF DIAZ OUTSIDE HOSPITAL.

An evidentiary hearing regarding the detention of Diaz outside of the San Francisco General Hospital on May 13, 2004, was held on October 18, 2006.  At the evidentiary hearing, San Francisco Police Officers Mikail Ali and Wendy Frisk testified.

*Factual Findings.*

On May 13, 2004, a police bulletin was sent out reporting a shooting at the intersection of Santos and Brookdale in the Sunnydale Housing Project.  The intersection was a suspected

10

1  stronghold of the Down Below Gang.  Officer Ali responded to the scene.  Ali determined that a
2  shootout had occurred between several individuals, presumably between two rival gangs, rather
3  than simply a shooting of one person by another person.  Officer Ali based this conclusion on
4  the existence of two sets of shell casings fired from different types of weapons.  Throughout the
5  street, the casings of automatic rifles were strewn.  Across the street up on a grassy
6  embankment, Officer Ali discovered the casings of 9mm handguns.  Further, during his
7  investigation, Officer Ali learned that one of the individuals wounded during the shootout was
8  Rickey Rollins.  Rollins was identified as having been escorted to the hospital in a silver van.  A
9  second van, described as white with the logo of the "San Francisco Housing Authority," was
10 identified as carrying the assailants.

11     At the same time, Officer Frisk was also responding to the bulletin regarding the
12 shooting.  As Officer Frisk approached the shooting scene, she saw a silver van driving
13 erratically away from the scene.  Officer Frisk attempted to stop the van but was unsuccessful.
14 She then escorted the van to assure that it did not cause any traffic accidents.  She followed the
15 van to the San Francisco General Hospital.

16     At the hospital, Officer Frisk saw Diaz and another man with the last name of Rose help
17 Rickey Rollins into the hospital.  Officer Frisk then attempted to question Rose in the
18 hospital-waiting room.  Rose avoided Officer Frisk's questioning, told her he had to catch a bus,
19 and then proceeded outside.  Once outside, Rose met up with a pacing Diaz in the hospital's
20 parking lot.  Officer Frisk followed Rose and Diaz, and as she followed them Rose and Diaz
21 walked away quickly almost at a running pace.

22     At that point, Officer Frisk told Rose and Diaz to stop and she detained them.  Officer
23 Frisk handcuffed Rose and Diaz.  At that time, Officer Dean and Carp arrived by patrol car to
24 assist in the detention.  The officers decided to place Rose and Diaz in the patrol car because it
25 was a very hot day outside.  As Officer Dean was placing Diaz in the patrol car, Diaz dropped a
26 sock onto the pavement.  Officer Dean gave the sock to Officer Frisk who placed the sock in the
27 patrol car.  Diaz then stated, not in response to any question,"that the sock didn't have crack in
28

11

1  it but only 'pot.'" Officer Frisk opened the sock and discovered marijuana in several small
2  plastic bags.

3  Thereafter, Officer Frisk was contacted by Officer Ali over police radio. Officer Ali
4  told Officer Frisk to detain Rose and Diaz until Officer Ali arrived from the shooting scene.
5  Diaz and Rose were detained for roughly ten minutes prior to Officer Ali's arrival. Upon his
6  arrival, Officer Ali requested that Rose be released. Diaz was ordered to be held on possession
7  of marijuana with intent to distribute and also for suspicion of Diaz's connection with an
8  outstanding warrant that turned out not to be related to Diaz. The officers transported Diaz to
9  Ingleside Station, booked him, and seized the money in his possession.

10  *Analysis.*

11  Defendant seeks to suppress the marijuana and money seized by police on May 13,
12  2004, as well as statements he made while detained. Defendant's primary argument is that
13  Officer Frisk lacked reasonable suspicion to detain Diaz for an investigative stop outside of the
14  hospital.

15  As set forth above, "[a]n officer may make an investigatory stop if he is aware of
16  specific, articulable facts which, together with objective and reasonable inferences, form a basis
17  for suspecting that the particular person detained is engaged in criminal activity." *United*
18  *States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989) (citing *United States v.*
19  *Cortez*, 449 U.S. 411, 416–18 (1981)). "The officer must consider the 'totality of the
20  circumstances — the whole picture.'" *Ibid*. (quoting *United States v. Sokolow*, 490 U.S. 1
21  (1989)).

22  Diaz argues that viewing the facts known to Officer Frisk in isolation, she lacked
23  reasonable suspicion to detain Diaz. It is true, in isolation, Officer Frisk only had the following
24  facts before her: (1) that Rickey Rollins had been shot in the shooting at Santos and Brookdale,
25  (2) that Rollins was being aided to the hospital by Diaz, (3) that Diaz and Rose refused to
26  answer her questions, and (4) that Diaz and Rose walked away from her in a hurried, almost
27  running pace. According to this view, Officer Frisk only had reason to believe that Diaz was
28  helping the victim of a crime and that he chose not to talk to police. If this were the end of the

12

analysis, there is support for Diaz's legal theory. "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (citation omitted). "He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Id*. at 498.

The facts known to Officer Ali, however, also are to be imputed to Officer Frisk for determination of whether the totality of circumstances justified her in detaining Diaz. The Ninth Circuit recently explained that courts look to the collective knowledge of the officers involved in the investigation, not just to the knowledge of one particular officer. *United States v. Mayo*, 394 F.3d 1271, 1275 n. 7 (9th 2005). The *Mayo* Court explained:

> Officer Golden, who arrived on the scene first, did not know all of these facts. The dispatcher told him to investigate suspicious narcotics activity and gave him a description of the cars involved, including Mayo's. Collectively, however, officers knew all of these facts before Officer Golden detained Mayo and asked for his identification.

*Ibid.*; *see also United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986) ("We look to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop").

Under this collective-knowledge analysis, we also must include the information known by Officer Ali to the reasonable-suspicion calculus. Officer Ali had determined that the shooting at Brookdale and Santos was not just a single-person shooting with a single victim (*i.e.*, Rickey Rollins). Rather, the array of shell casings made clear that a large-scale shootout between multiple individuals had occurred. Under such a scenario, even one who had been shot in the melee could be suspected as not just a victim, but also as an assailant. Diaz was with Rollins and thus was also implicated as a potential participant in the shootout. Under these circumstances, Diaz's hurried fleeing from Officer Frisk appears more nefarious. The totality of the circumstances, viewed collectively, provided Officer Frisk with more than ample suspicion to detain Diaz. Given that the detention was valid, there is no taint to the subsequent

seizure of marijuana, money, and statements. Diaz's request to suppress that evidence is **DENIED**.

## CONCLUSION

For the foregoing reasons, defendant Diaz is entitled to suppression of evidence seized and statements taken following his arrest on November 19, 2002. Diaz, however, is not entitled to suppression of statements he made following his arrest on January 28, 2003. Diaz is also not entitled to suppression of any evidence following his detention outside of the San Francisco General Hospital on March 13, 2004.

**IT IS SO ORDERED.**

Dated: October 30, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE