1

2

3

4

5

6                  IN THE UNITED STATES DISTRICT COURT

7

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   UNITED STATES OF AMERICA,                    No. CR 05-00167 WHA

11              Plaintiff,

12        v.                                       **ORDER DENYING IN PART AND
                                                   DEFERRING IN PART
13   EDGAR DIAZ, RICKEY ROLLINS,                   DEFENDANTS' MOTIONS
     DON JOHNSON, ROBERT CALLOWAY,                 RELATED TO IMPOSITION OF
14   DORNELL ELLIS, EMILE FORT,                    THE DEATH PENALTY (Docket
     CHRISTOPHER BYES, PARIS                       Nos. 923, 924, 969, 970, 971, 972,
15   RAGLAND, RONNIE CALLOWAY,                     975)**
     ALLEN CALLOWAY, TERRELL JACKSON
16   and REDACTED DEFENDANT NO. ONE,

17              Defendants.

18   _____/

19                              **INTRODUCTION**

20        In this criminal gang prosecution, the government has filed notices of intent to seek the

21   death penalty against defendants Emile Fort and Edgar Diaz.  Defendants have moved to strike

22   the notices and declare the Federal Death Penalty Act unconstitutional.  A prior order directed

23   the government to amend the notices to provide more factually detailed support for the factors

24   listed in the notices.  *See United States v. Diaz*, No. CR 05-00167 WHA, 2007 WL 196752

25   (N.D. Cal. Jan. 23, 2007).  These revised notices and any superseding indictment are due on

26   March 9, 2007.  This order rules on defendants' challenges for which the revised death notices

27   are not required.  The vast majority of defendants' claims lack merit and are **DENIED** for the

28

*United States District Court*
*For the Northern District of California*

reasons stated herein.  A few issues must be addressed after the death notices have been filed.
The conclusion of this order sets forth a briefing schedule for those issues.

### STATEMENT

Under the Federal Death Penalty Act, if the government believes that the circumstances of an offense justify a death sentence, it must, a "reasonable time" before trial, serve on the defendant a notice stating that death will be sought and "setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death."  18 U.S.C. 3593(a).

Before a death sentence may be imposed, the defendant must first be convicted of an offense for which death is a prescribed sentence.  Upon conviction of such an offense, a separate sentencing hearing must be held.  At that hearing, the government may present evidence in support of the aggravating factors for which it has given notice and the defendant may present evidence of mitigating factors.  18 U.S.C. 3593(b), (c).

To impose a death sentence at the conclusion of the hearing, the jury must make several determinations.  *First*, the jury must find unanimously and beyond a reasonable doubt that the defendant had the requisite intent to commit the charged offense.  These statutorily-enumerated mental states are often referred to as "gateway" factors because the sentencing jury must find that a defendant had at least one of these four mental states before it may consider whether to recommend a death sentence.  *Second*, the jury must find, unanimously and beyond a reasonable doubt, that at least one of the sixteen aggravating factors set forth in Section 3592(c)(1)–(16) ("statutory aggravating factors") also exists.  18 U.S.C. 3591(a)(2), (c).  The defendant is considered eligible for the death penalty once the jury finds that:  (1) the defendant possessed the requisite mental state and (2) one of the statutory aggravating factors exists.

Finally, after finding a defendant to be death eligible, the jury makes its third and final determination — selection of the appropriate sentence for the defendant.  For this stage, the government may present both the statutory aggravating factors and "any other factor for which notice has been given" ("non-statutory aggravating factors").  Any aggravating factors

**United States District Court**
For the Northern District of California

1   considered by the jury must be found by the jury unanimously and beyond a reasonable doubt.

2   Also at this stage, the burden of establishing any mitigating factor falls on the defense.  Any

3   mitigating factor need only be found by a preponderance of the evidence and need not be found

4   unanimously.  Any single juror who finds that a mitigating factor exists may consider that factor

5   regardless of whether the other jurors agree that the factor has been established.  18 U.S.C.

6   3593(c).  The jury must then determine whether "all the aggravating factor or factors found to

7   exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence

8   of death or, in the absence of a mitigating factor, whether the aggravating factor or factors alone

9   are sufficient to justify a sentence of death."  18 U.S.C. 3593(e).  Finally, "[b]ased upon this

10  consideration, the jury by unanimous vote . . . shall recommend whether the defendant should

11  be sentenced to death, life imprisonment without possibility of release or some other lesser

12  sentence."  The FDPA does not require the weighing of the aggravating and mitigating factors

13  to be decided beyond a reasonable doubt.

14          In the case at bar, the second superseding indictment charges defendant Fort with the

15  murders of Glenn Maurice Timmy "Baby" Molex, Jovanie Banks, and Michael Hill.  Defendant

16  Diaz is charged with the murders of Beverly Robinson, Kenya Taylor, and Antoine Morgan.

17  All of these murders are capital offenses.  The government filed notices of intent to seek the

18  death penalty against Diaz on July 7, 2006, and against Fort on October 3, 2006.

19                                          **ANALYSIS**

20  **1.      FACIAL CHALLENGES TO THE FDPA.**

21          **A.      Constitutionality of the FDPA.**

22          Defendants contend that the procedure for the imposition of the FDPA violates the

23  Constitution.  Defendants allege that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its

24  progeny, including *Ring v. Arizona*, 536 U.S. 584 (2002), have rendered the FDPA

25  unconstitutional.

26          Defendants make two related claims.  *First*, they contend that the Constitution requires

27  that non-statutory aggravating factors be submitted to the grand jury and charged in the

28                                              3

**United States District Court**
For the Northern District of California

1   indictment.  *Second*, they contend that the FDPA is facially unconstitutional because it does not

2   require the weighing of aggravating factors and mitigating factors to be found by the jury

3   beyond a reasonable doubt.  For the reasons stated below, this order holds that defendants are

4   wrong as to both of these issues.

5        In *Ring*, the Supreme Court stated that "[i]f a State makes an increase in a defendant's

6   authorized punishment contingent on the finding of a fact, that fact — no matter how the State

7   labels it — must be found by a jury beyond a reasonable doubt."  *Ring*, 536 U.S. at 602 (citing

8   *Apprendi*, 530 U.S. at 482–83).  The Court applied that principle to Arizona's death-penalty

9   statute, which allowed the judge, rather than the jury, to find the existence or absence of certain

10  enumerated aggravating factors.  The Court held that "[b]ecause Arizona's enumerated

11  aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the

12  Sixth Amendment requires that they be found by a jury."  *Id.* at 609.

13       Virtually all courts that have considered the issue have applied *Ring*'s Sixth Amendment

14  rule to the indictment stage of criminal proceedings.  Those courts have held that the gateway

15  mental state factors and statutory aggravating factors, as "functional equivalent[s] of . . .

16  element[s] of a greater offense," must be alleged in the indictment.  *United States v. Bourgeois*,

17  423 F.3d 501, 507–08 (5th Cir. 2005); *see also United States v. Robinson*, 367 F. 3d 278, 284

18  (5th Cir. 2004); *United States v. Higgs*, 353 F. 3d 281, 298 (4th Cir. 2003).  In this case, the

19  government requested that the grand jury make specific findings that the threshold mental

20  culpability and statutory aggravating factors existed.  Those factors are listed in the indictment

21  as "special findings."

22       The government did not, however, ask the grand jury to consider any of the

23  non-statutory aggravating factors.  Nor was the grand jury asked to consider whether any

24  aggravating factors sufficiently outweighed the mitigating factors to justify a death sentence.

25  Defendants contend that this was violated the indictment clause.

26       The circuits that have considered whether non-statutory aggravating factors must be

27  alleged in the indictment have rejected defendants' argument.  *See United States v. Brown*, 441

28

4

1   F. 3d 1330, 1368 (11th Cir. 2006); *United States v. Purkey*, 428 F.3d 738, 749–50 (8th Cir.

2   2005); *Bourgeois*, 423 F.3d at 507–08; *Higgs*, 353 F.3d at 298-99.  As the Eleventh Circuit

3   explained:

> The non-statutory aggravating factors, although relevant to
> determining whether a jury decides to impose the death penalty,
> do not make a defendant statutorily eligible for any sentence that
> could not be otherwise imposed in their absence.  They are neither
> sufficient nor necessary under the FDPA for a sentence of death.
> This rule comports with recent Supreme Court precedent because
> a non-statutory aggravating factor does not "increase the penalty
> for a crime beyond the prescribed statutory maximum," *see*
> *Apprendi*, 530 U.S. at 490, nor does it somehow allow the
> imposition of a more severe sentence than could have been
> imposed without it. *See Blakely v. Washington*, 542 U.S. 296,
> 303-04 (2004).  Thus, a non-statutory aggravating factor is not
> one of those "facts legally essential to the punishment" that must
> be included within the indictment.

11  *Brown*, 441 F. 3d at 1368 (some citations and quotations omitted).  This order follows the clear

12  weight of authority from other courts in holding that the government need not submit

13  non-statutory aggravating factors to the grand jury or charge those factors in the indictment.

14      The same principles apply to the weighing of aggravating and mitigating factors, which

15  is in the purview of the sentencing authority and need not be charged in the indictment.  *See*

16  *United States v. Haynes*, 269 F. Supp. 2d 970, 980 (W.D. Tenn. 2003).  The weighing

17  determination is not an element for which the grand jury must find probable cause.  As the

18  Eighth Circuit has stated, "[i]n the words of the statute, [the weighing determination] is a

19  'consideration,' 18 U.S.C. § 3593(e), — that is, the lens through which the jury must focus the

20  facts that it has found to produce an individualized determination regarding 'whether the

21  defendant should be sentenced to death, to life imprisonment without possibility of release or

22  some lesser sentence.'" *Purkey*, 428 F.3d at 749–50.  Accordingly, it need not be charged in the

23  indictment.[1]

---

[1] In *United States v. Green*, 372 F. Supp. 2d 168, 172–73 (D. Mass. 2005), the district court created a
limited exception to the general principle that non-statutory aggravating factors need not be included in an
indictment.  *Green* held that unadjudicated criminal conduct is "uniquely prejudicial."  Thus, unadjudicated
conduct unrelated to the charged offense and never presented to a grand jury, could not be included in the death
notice because it had not been included in the indictment.  No other court has recognized a similar exception for

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    Defendants' next argument — that the sentencing jury must weigh aggravating and

2  mitigating factors beyond a reasonable doubt — is also based on *Ring*.  The Supreme Court

3  there held that "capital defendants . . . are entitled to a jury determination of any fact on which

4  the legislature conditions an increase in their maximum punishment."  536 U.S. at 589.

5  Accordingly, "[i]f a State makes an increase in a defendant's authorized punishment contingent

6  on the finding of a fact, that fact — no matter how the State labels it — must be found by a jury

7  beyond a reasonable doubt."  *Id.* at 602 (citing *Apprendi*, 530 U.S. at 482–83).

8    The FDPA mandates that the jury conduct the first two steps of its penalty phase

9  analysis under the reasonable doubt standard.  Specifically, the jury is required to find the

10  mental state and at least one statutory aggravating factor beyond a reasonable doubt.

11  Defendants contend, however, that the jury should also be required to make the final

12  determination — that aggravating factors "sufficiently outweigh" mitigating factors — beyond

13  a reasonable doubt.  Because the FDPA does not require the last decision to be made beyond a

14  reasonable doubt, defendants contend that the FDPA is facially unconstitutional.

15    This order holds that the weighing of aggravating and mitigating factors is not an "fact"

16  that must be found by a jury beyond a reasonable doubt.  The death penalty is "authorized"

17  immediately following the jury's finding of the requisite mental state and at least one statutory

18  aggravating factor.  The finding of the first two facts beyond a reasonable doubt — the requisite

19  mental state and at least one statutory aggravating factor — qualifies a defendant as eligible for

20  the death penalty.  At that point, the maximum penalty the defendant can receive is the death

21  penalty.  *See*, *e.g.*, *United States v. Paul*, 217 F.3d 989, 1001 (8th Cir. 2000).

22    The remaining determination requires the jury to consider whether any aggravating

23  factors outweigh the mitigating factors so as to warrant a punishment of death.  It is at this stage

24  that the jury — which has already determined that the defendant is eligible for the death

25

26  unadjudicated conduct.  *See United States v. Rodriguez*, 380 F. Supp. 2d 1041, 1051–52 (D.N.D. 2005) (citing
    cases).  This order declines to follow the limited exception recognized by *Green*.  Unadjudicated criminal
27  conduct does not need to be alleged in the indictment.

28

1    sentence — selects the appropriate punishment.  This selection decision is not a "fact" that

2    increases the sentence authorized for the defendant.  Indeed, the jury need not actually conduct

3    any "weighing" because the statute permits the jury to recommend a death sentence if the

4    "aggravating factor or factors alone are sufficient to justify a sentence of death."  18 U.S.C.

5    3593(e).  Thus, where the weighing determination is only an issue of sentence *selection* rather

6    than *eligibility* for a particular sentence, it need not be found beyond a reasonable doubt.

7        Other federal courts have rejected similar contentions by other defendants:  "[T]he

8    jury's weighing of aggravating and mitigating circumstances pursuant to 18 U.S.C. § 3593(e)

9    does not constitute a factual finding that elevates the penalty beyond the statutory maximum

10   sentence and, thus, is not subject to the reasonable doubt standard."  *United States v. Gooch*,

11   Crim. Action No. 04-128-23 (RMC), 2006 WL 3780781, at *1 (D.D.C. 2006); *see also United*

12   *States v. Henderson*, 461 F. Supp. 2d 133, 134–35 (S.D.N.Y. 2006); *United States v. Natson*,

13   444 F. Supp. 2d 1296, 1304 (M.D. Ga. 2006); *Haynes*, 269 F. Supp. 2d at 980.  This order

14   follows the clear weight of federal authority and holds that the jury need not find that

15   aggravating factors substantially outweigh mitigating factors beyond a reasonable doubt.

**B.    Whether the FDPA Permits Government to Submit "Special
Findings" to Grand Jury.**

17       Defendants' next argument concerns the government's practice of submitting to the

18   grand jury the mental state and statutory aggravating factors.  Defendants contend that because

19   the FDPA does not explicitly provide for that practice, it is facially unconstitutional in light of

20   *United States v. Jackson*, 390 U.S. 570 (1968).  In *Jackson*, the Supreme Court rejected the

21   possibility that a court would "create from whole cloth a complex and completely novel

22   procedure and to thrust it upon unwilling defendants for the sole purpose of rescuing a statute

23   from a charge of unconstitutionality."  390 U.S. at 580.  Defendants contend that, following

24   *Ring* and *Apprendi*, the government has begun to submit mental state and statutory aggravating

25   factors to the grand jury to "rescue" the FDPA from unconstitutionality.  This order disagrees.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California

"[T]here is nothing unusual about the omission of a provision in the [FDPA] mandating that the mens rea requirements and statutory aggravating factors appear in the indictment. The sufficiency of an indictment is not articulated in the statute identifying the substantive crime, but is provided for in [Rule 7(c)]." *United States v. Lentz*, 225 F. Supp. 2d 672, 681 (E.D. Va. 2002). Moreover, "the mere fact that the statute is silent regarding whether sentencing factors must be treated as elements in order for those factors to increase the defendant's statutory maximum sentence does not make the statute inconsistent with the constitutional requirement that those factors receive that treatment." *United States v. McAllister*, 272 F.3d 228, 233 (4th Cir. 2001). This order agrees and holds as other courts have: "*Ring* does not require that any provision of the Federal Death Penalty Act be rewritten. [I]t only requires that the grand jury perform its traditional function concerning facts that are now deemed to be elements, or the functional equivalent of elements, of offenses for which Congress has decided the death penalty can be imposed." *United States v. Sampson*, 245 F. Supp. 2d 327, 338 (D. Mass. 2003). Indeed, it appears that "[e]very circuit court of appeals which has addressed this argument has rejected it." *United States v. LeCroy*, 441 F. 3d 914, 920–21 (11th Cir. 2006).

### C.    Grand Jury Need Not Be Informed of the Capital Consequences of the "Special Findings."

Defendants also contend that the grand jury should have been informed of the potential effect of the "special findings." This order disagrees.

As an initial matter, it is not necessary for an indictment to charge the ultimate punishment sought for the crime charged. "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117 (1974). The indictment here set forth the elements that constituted the offenses charged against defendants. It also provided defendants with notice of the mental state and statutory aggravating factors that the government intends to prove at the penalty phase. This order agrees

that an indictment "need only charge the elements necessary to constitute the offense, and need not charge the ultimate punishment sought for the offense committed." *United States v. Haynes*, 269 F. Supp. 2d 970, 980–81 (W.D. Tenn. 2003) (citing *Hamling*, 418 U.S. at 117); *see also Natson*, 444 F. Supp. 2d at 1305.

Nor must the grand jury be informed of the potential punishment arising out of the special findings. Defendants contend, as did the defendant in *Haynes*, that the grand jury could not perform its role as a check on prosecutorial discretion if it did not know that its special findings might make defendants eligible for the death penalty. This order agrees with the sound reasoning of the *Haynes* court in dismissing this argument. "The grand jury's role is not to decide whether probable cause supports the imposition of a particular *sentence* against a charged individual; rather, the grand jury check on prosecutorial power stems from its independent *factual* determination of the existence of probable cause for the essential elements of the charged offense. *Haynes*, 269 F. Supp. 2d at 981. Moreover, it has been stated: "Grand juries do not make findings or recommendations concerning punishment or sentencing and such considerations should not influence their decision. It is for the petit jury to make that determination. The role of the grand jury simply is to investigate possible crimes against the sovereign so that it can make a judgment whether a trial on specific charges is necessary." *United States v. Matthews*, 246 F. Supp. 2d 137, 146–47 (N.D.N.Y. 2002) (quoting *United States v. Suleiman*, 208 F.3d 32, 39 (2d Cir. 2000)) (internal quotations omitted).

Notwithstanding the above discussion, the grand jury in this case *was* informed of the capital consequences of the special findings. The transcript of the grand jury proceedings, read into the record during the hearing on the instant motions, reveals the following colloquy:

> Grand Juror:   Now, this — I don't know. This is a legal question. The Notice of Special Findings, is that the ground work for asking for the death penalty? Is that the purpose of it?
>
> Mr. Kearney:   It is something required to do in a death-eligible case, because the nature of the case is homicide, and if it's a death-eligible case, we're required to put this in there.

9

1    This order holds that the government need not inform the grand jury of the potential

2    capital consequences of its special findings.  Nevertheless, in this case, the grand jury was told.

3    *See Gooch*, 2006 WL 3780781, at *19 ("Since as a matter of fact the grand jury knew that the

4    nature of the charges in the Indictment could well lead to a death sentence, the Court will not

5    address the significance, if any, of the return of a capital indictment without the jury's so

6    understanding.").

7                    **D.      Evidentiary Standard in Penalty Phase.**

8    Defendants also contend that the penalty phase's relaxed evidentiary standard renders

9    the FDPA unconstitutional.  The FDPA provides that during the penalty phase, "[i]nformation is

10   admissible regardless of its admissibility under the rules governing admission of evidence at

11   criminal trials except that information may be excluded if its probative value is outweighed by

12   the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C.

13   3593(c).  This argument has been considered and rejected by other courts.  *See United States v.*

14   *Fell*, 360 F. 3d 135, 144–45 (2d Cir. 2004); *United States v. Cheever*, 423 F. Supp. 2d 1181,

15   1193–94 (D. Kan. 2006); *United States v. Rodriguez*, 380 F. Supp. 2d 1041, 1054 (D.N.D.

16   2005).  This order agrees with those decisions that have declined to declare the FDPA

17   unconstitutional for permitting a relaxed evidentiary standard.

18          "The [Federal Rules of Evidence] do not set forth the constitutional parameters of

19   admissible evidence, nor does a criminal defendant have a constitutional right to have the

20   [Rules of Evidence] in place.  Indeed, the [Rules of Evidence] are inapplicable in several

21   criminal proceedings, including sentencing proceedings before a judge."  *Fell*, 360 F. 3d at

22   144–45.  In spite of that principle, defendants contend that the Supreme Court's decision in

23   *Crawford v. Washington*, 541 U.S. 36 (2004), supports their contention.  In *Crawford*, the

24   Supreme Court held that where a conflict existed between Washington Rule of Evidence

25   804(b)(3) and the Confrontation Clause, the Confrontation Clause prevailed over the state

26   evidentiary rule.  *See Crawford*, 541 U.S. at 61.

27

28                                           10

United States District Court
For the Northern District of California

1   This order disagrees with defendants' reliance on *Crawford*. "[T]he lesson from

2   *Crawford* that forecloses defendant's argument is that the Constitution includes its own set of

3   evidentiary rules, and therefore does not rely on the Federal Rules of Evidence to make a

4   particular proceeding constitutional. The fact that 18 U.S.C. § 3593(c) makes the Federal Rules

5   of Evidence inapplicable during the sentencing phase of a capital case does not strip defendant

6   of any constitutional protections." *Cheever*, 423 F. Supp. 2d at 1194. Defendants have offered

7   no argument that would warrant disturbing the sound reasoning of *Cheever* and other holdings

8   that the FDPA's evidentiary standard does not violate the Constitution. Indeed, the Supreme

9   Court has recognized that in making death penalty decisions, it is preferable "for the jury to

10  have as much information before it as possible when it makes the sentencing decision." *Gregg*

11  *v. Georgia*, 428 U.S. 153, 204 (1976). "This principle is embodied in the FDPA wherein a

12  defendant is given the right to put forth virtually anything as a mitigating factor." *Cheever*, 423

13  F. Supp. 2d at 1195. The evidentiary standard of the FDPA does not render that act

14  unconstitutional.

15               **E.      Presumption of Innocence.**

16       This order also rejects another contention raised by defendants — that the FDPA denies

17  a defendant the presumption of innocence. As an initial matter, "[o]nce the defendant has been

18  convicted fairly in the guilt phase of the trial, the presumption of innocence disappears." *Delo*

19  *v. Lashley*, 507 U.S. 272, 278–79 (1993). Defendants contend that under *Taylor v. Kentucky*,

20  436 U.S. 478, 485 (1978), however, a defendant is entitled to a "presumption of innocence as to

21  the sentencing elements of the offense." In *Taylor*, the Supreme Court found that it was error

22  for the trial court to omit an instruction on the presumption of innocence during the guilt phase

23  of trial, even though the instruction was not constitutionally required. In reaching this

24  conclusion, the Court held that the omission of such an instruction could impinge on a

25  defendant's right to a fair trial if, for example, the trial court had given an insufficient

26  instruction on the reasonable doubt standard and the prosecutor had made improper suggestions

27

28
                                              11

that the jury could convict based on facts outside of the evidence.  *See Taylor*, 436 U.S. at 486–89.

*Taylor* and the presumption of innocence are irrelevant to the instant question. "[R]ather than help the jury as in *Taylor*, an instruction on the presumption of innocence at the penalty phase would, in fact, cause the jury more confusion. . . . Such an instruction would then necessarily give rise to some other instruction that endeavors to explain what it means for a guilty person to be considered innocent and how the jury is to perform the mental gymnastics necessary to meaningfully employ that presumption in its deliberations." *Cheever*, 423 F. Supp. 2d at 1196.  At the penalty phase, it is sufficient that the jury is clearly instructed that it is the burden of the government to prove "to a unanimous jury beyond a reasonable doubt everything required to make [a] defendant eligible for the death penalty, and everything required for the jury to return a recommendation of death, as contemplated by both the FDPA and the Constitution."  In addition, the jury will also be instructed that the defendant has no duty to prove anything, unless the defendant intends to prove mitigating factors by a preponderance of the evidence.  The FDPA is not undermined by any lack of the presumption of innocence during the penalty phase.

## 2.   CHALLENGES TO MENTAL STATE FACTORS.

Defendants move to dismiss the superseding indictment and death notices on various grounds related to the gateway mental-state allegations.  Defendants contend that:  (1) alleging all four mental states fails to narrow the class of death-eligible defendants, (2) it is improper to allege more than one mental state because allegation of multiple mental states skews consideration in favor of aggravating factors when aggravating factors are being weighed against mitigating factors, and (3) the assertion of all four mental states denies defendants reasonable notice of the charges against which they must defend.

Under the heading of "Statutory Proportionality Factors Enumerated under 18 U.S.C. § 3591(a)(2)," the death notices list between two and four mental states as to each separate charged homicide.  For example, the death notice for defendant Diaz alleges, with respect to the

12

United States District Court

For the Northern District of California

murder of Beverly Robinson, that he:  (1) intentionally killed the victim, (2) intentionally inflicted serious bodily injury that resulted in the death of the victim, (3) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used, and the victim died as a result, or (4) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, such that participation in the act constituted a reckless disregard for human life and the victim died as a result.  These are the gateway mental state factors, of which the government must prove one for the defendant to be considered death eligible.

A capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  Defendants assert that alleging these mental states does not serve a narrowing function. The Fifth Circuit has rejected this argument, explaining:

> [Section] 3591(a) does not set forth a list of aggravating factors, but, on the contrary, serves a gatekeeping function.  Section 3591(a) codifies the command in *Enmund v. Florida*, 458 U.S. 782, 797 (1982), and *Tison v. Arizona*, 481 U.S. 137, 157 (1987), to limit the imposition of the death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life.  Satisfaction of these elements only begins the death penalty inquiry; it does not and cannot establish death penalty eligibility by itself.  The limiting factors, which [the defendant] claims are lacking, are, of course, the aggravating circumstances set forth in § 3592(b) and (c), which guide the jury in its capital decision after it finds at least one element of intent under § 3591(a) as a threshold matter.

*United States v. Webster*, 162 F.3d 308, 355 (5th Cir.1998).  The FDPA thus narrows the class of death-eligible defendants twice.  *First*, the jury must find one of the mental states as a preliminary threshold qualifier.  *Second*, the jury must find at least one statutory aggravating factor.  The jury cannot recommend the death penalty without finding both an intent element under 18 U.S.C. 3591(a)(2) and at least one statutory aggravating factor under 18 U.S.C. 3592(c).  *See United States v. Minerd*, 176 F. Supp. 2d 424, 440–41 (W.D. Pa. 2001).  When

13

considered in light of the FDPA procedure, the assertion of all four mental states still serves a narrowing function.

Defendants also contend that it is illogical to allege that they committed the charged homicides with more than one mental state. Defendants are incorrect. The four mental states in the FDPA are merely variations on the same theme. The jury may find that the evidence supports any one of the mental states. It would be unfair to force the government to restrict its theories before presentation of the evidence. "[T]he FDPA does not require that the Government identify any mental state in the Notice. Therefore, the fact that the Government currently believes its evidence might show more than one level of intent is certainly not injurious of any of [defendants'] rights." *Gooch*, 2006 WL 3780781, at *21 (citing 18 U.S.C. 3593(a)).

Moreover, the allegation of more than one mental state would not impermissibly skew the weighing of aggravating and mitigating factors. Defendants cite to *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), in which the Fourth Circuit held that it was error for the trial court to instruct the jury that it needed to find "at least one" of the statutory intent elements listed in the death penalty provisions of the Anti-Drug Abuse Act. The FDPA, however, differs significantly from the ADAA in its use of mental state factors. "Under the ADAA, the four intent elements (which are similar to the ones enumerated in the FDPA) are aggravating factors and are considered with other aggravating factors when weighed by the jury against mitigating factors." *United States v. Cooper*, 91 F. Supp. 2d 90, 109 (D.D.C. 2000). This is an important distinction because in the FDPA, "the intent elements are not aggravating factors to be weighed against mitigating factors." Thus, "[i]f the jury finds one or all four of the factors, there is no risk of skewing because the jury finds intent, and then starts with a clean slate in evaluating separate aggravating factors." *Id.* at 110 (citing *Webster*, 162 F.3d at 355). The argument that alleging multiple mental states results in impermissible skewing therefore lacks merit. *See Cheever*, 423 F. Supp. 2d at 1199–1200 (discussing and rejecting identical argument).

14

1    **3.    CHALLENGES TO STATUTORY AGGRAVATING FACTORS.**

2        **A.    The Defendant Committed the Offense After Substantial Planning
              and Premeditation to Cause the Death of a Person (18 U.S.C.
3             3592(c)(9)).**

4        The notices allege the "substantial planning and premeditation" statutory aggravating

5    against both Diaz and Fort on all counts of murder for which they are charged.  Defendants

6    contend that this factor must be struck because the factor is facially inadequate to narrow the

7    class of murders eligible for the death penalty, since "almost every murder" involves some

8    planning and premeditation.  Defendants also contend that this factor is duplicative of the

9    murders with which they are charged.  Furthermore, defendants contend that this factor is

10   insufficiently vague.

11       Numerous federal courts have addressed and rejected these arguments.  This order

12   follows the weight of the authority holding that the "substantial planning and premeditation"

13   factor is valid.  *See, e.g.*, *Bourgeois*, 423 F.3d at 511; *Cheever*, 423 F. Supp. 2d at 1203 & n.21;

14   *United States v. Frank*, 8 F. Supp. 2d 253, 278 (S.D.N.Y. 1998).

15       To comport with the Eighth Amendment, an aggravating factor must "genuinely narrow

16   the class of persons eligible for the death penalty and must reasonably justify the imposition of

17   a more severe sentence on the defendant compared to others found guilty of murder."

18   *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988).  This order agrees with other courts which

19   have found, contrary to defendant's contention, that "not every murder involves substantial

20   planning and premeditation."  *United States v. Mayhew*, 380 F. Supp. 2d 936, 949 (S.D. Oh.

21   2005); *Minerd*, 176 F. Supp. 2d at 439.  Thus, the factor "adequately assists the jury in

22   distinguishing those who deserve capital punishment from those who do not."  *Mayhew*, 380 F.

23   Supp. 2d at 949 (internal quotations omitted).

24       Nor is the phrase "substantial planning and premeditation" unconstitutionally vague.

25   *See United States v. O'Driscoll*, 203 F. Supp. 2d 334, 344–45 (M.D. Pa. 2002).  The Supreme

26   Court has held that, "[f]or purposes of vagueness analysis . . . our concern is that the factor have

27   some common sense core of meaning . . . that criminal juries should be capable of

28
                                           15

understanding." *Tuilaepa v. California*, 512 U.S. 967, 975 (1994).  The Fourth Circuit,

addressing a similar vagueness challenge, was "satisfied that in total context of the statutory

text and the district court's instructions . . . 'substantial' as a modifier of 'planning and

premeditation' could only have been understood by the jury to mean a higher degree of

planning that would have the words 'planning and premeditation' alone — *i.e.*, more than the

minimum amount sufficient to commit the offense." *Tipton*, 90 F.3d at 896.  The Fourth Circuit

concluded that the "aggravating factor's use of the word 'substantial' to modify 'planning and

premeditation' does not render [the statute] unconstitutionally vague, but instead, conveys with

adequate precision a commonly understood meaning of 'considerable,' or 'more than merely

adequate,' thereby ensuring that the . . . factor served sufficiently to channel the jury's

discretion in assessing eligibility for the death penalty."  Defendants' citation to a dated Georgia

Supreme Court decision holding that the word "substantial" was unconstitutionally vague

because it was "highly subjective," is unpersuasive.  *Arnold v. State*, 224 S.E.2d 386, 392 (Ga.

1976).  This order agrees with overwhelming weight of recent federal decisions finding that the

"substantial planning and premeditation" factor is not unconstitutionally vague.  *See United

States v. Bin Laden*, 126 F. Supp. 2d 290, 296 & n.7 (S.D.N.Y. 2001) (finding that "the

statutory factor of 'substantial planning and premeditation' is not unconstitutionally vague" and

citing cases).

> **B.**     **The Defendant, in the Commission of the Offense, or in Escaping
> Apprehension for the Violation of the Offense, Knowingly Created a
> Grave Risk of Death to One or More Persons in Addition to the
> Victim of the Offense (18 U.S.C. 3592(c)(5)).**

The statutory "grave risk of death" factor, 18 U.S.C. 3592(c)(5), is alleged against Fort

for all three counts of murder, and against Diaz for Count 10, the murder of Beverly Robinson.

Defendants make several arguments with respect to this factor.

Defendants contend that this factor duplicates the preliminary mental state factors.

Those mental states are alleged as follows:

> The defendant participated in an act, contemplating that the life of
> a person would be taken or intending that lethal force would be

16

United States District Court

For the Northern District of California

1

2

> used in connection with a person, other than one of the
> participants in the offense, and the victim died as a direct result of
> the act.  18 U.S.C. (a)(2)(C).

3

4

5

> The defendant intentionally and specifically engaged in an act of
> violence, knowing that the act created a grave risk of death to a
> person, other than one of the participants in the offense, such that
> participation in the act constituted a reckless disregard for human
> life and the victim died as a direct result of the act.  18 U.S.C.
> 3591 (a)(2)(D).

6

7

Defendants essentially contend that the statutory "grave risk of death" aggravating

8

factor is so similar to the two gateway mental-state factors that there is impermissible

9

duplication of aggravating factors.  Defendants rely on the premise that "double counting of

10

aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing

11

process and creates the risk that the death sentence will be imposed arbitrarily and thus,

12

unconstitutionally."  *United States v. McCullah*, 76 F.3d 1087, 111 (10th Cir. 1996).  They

13

therefore contend that the mental-state factors are duplicated by the statutory "grave risk of

14

death" aggravating factor.  To defendants, this is an impermissible double-counting of

aggravating factors.

15

This argument was considered — and rejected — by the district court in *United States v.*

16

*Llera Plaza*, 179 F. Supp. 2d 464, 486 (E.D. Pa. 2001).  This order agrees with the reasoning of

17

*Llera Plaza.*  As the court there stated, the duplication problem recognized by *McCullah* was

18

not present with respect to the "grave risk of death" factor and the mental states because "the

19

FDPA uses the mental state . . . as a threshold factor, not as an aggravating factor, and the

20

government evidently does not plan to use it as anything else."  Thus, there is no

21

unconstitutional overlapping of aggravating factors under the FDPA when one of the allegedly

22

duplicative factors is a mental state.  This is because under the FDPA "the intent elements are

23

not aggravating factors to be weighed against mitigating factors."  *Cooper*, 91 F. Supp. 2d at

24

110.

25

Defendants also contend that this factor is unconstitutionally vague and does not

26

sufficiently narrow the class of defendants eligible for the death penalty.  In *United States v.*

27

28

17

*Barnette*, 211 F.3d 803, 819–20 (4th Cir. 2000), the Fourth Circuit addressed a vagueness challenge to this factor.  The court recognized that in *Gregg v. Georgia*, 428 U.S. 153, 202 (1976), a plurality of the Supreme Court held that the "grave risk" factor could be unconstitutionally vague, depending on the facts.  In *Gregg*, the Supreme Court looked to the "underlying Georgia courts' interpretations of the factors and found that they were not vague as applied."  In *Barnette*, the Fourth Circuit explained that "the district court clarified the meaning of grave risk of death in the jury instructions, defining it as 'a significant and considerable possibility' and as placing other persons in a 'zone of danger.'"  *Barnette*, 211 F.3d at 819.  Applying the principle from *Gregg*, the Fourth Circuit held that "the instruction was not overly broad and provided a common sense core of understanding to the factor that the jurors could understand."  This order finds that "it is clear that similar jury instructions in this case can likewise ensure that [the "grave risk of death" factor] is not unconstitutionally vague as applied here."  *United States v. Le*, 327 F. Supp. 2d 601, 613 (E.D. Va. 2004).

> ### C.    The Defendant Committed the Offense in an Especially Heinous, Cruel, or Depraved Manner in That It Involved Torture or Serious Physical Abuse to the Victim (18 U.S.C. 3592(c)(6)).

The "heinous, cruel, or depraved manner" aggravating factor is alleged against defendant Diaz with respect to Count 12, the murder of Kenya Taylor.  Defendant Diaz contends that this factor is overbroad and vague.

The Fifth Circuit has addressed the formulation of the language in this factor:

> The language "especially heinous, cruel, and depraved" without a limiting instruction would be unconstitutionally vague.  Any vagueness in the language, however, is cured by the limitation in the statute that the offense involve torture or serious physical abuse.  Moreover, the district court defined each term in [the aggravating factor], which resolved any possible vagueness or ambiguity of the language.

*United States v. Jones*, 132 F.3d 232, 249–50 (5th Cir. 1998), *aff'd* 527 U.S. 373, 403–05 (1999) (citations omitted).  Here, the FDPA expressly limits the "heinous, cruel, or depraved" factor by requiring that the crime have "involved torture or serious physical abuse to the victim."  18 U.S.C. 3592(c)(6).  Pursuant to *Jones*, this aggravating factor is not unconstitutionally vague so

United States District Court

For the Northern District of California

long as the jury is instructed that it is "required to find that the defendant engaged in torture or serious physical abuse." *United States v. Chanthadara*, 230 F.3d 1237, 1262 (10th Cir. 2000). Indeed, the Ninth Circuit has upheld this factor, as it is alleged in the notice, as "authoritatively settled." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1030 (9th Cir. 1997). Diaz raises no new arguments that have not been rejected by the Supreme Court and other courts. *See, e.g.*, *Bourgeois*, 423 F.3d at 511 (noting that "the factor indisputably narrows the class of murderers who are eligible for the death penalty and is sufficiently specific to pass constitutional muster"); *Frank*, 8 F. Supp. 2d at 277–78.

> **D.      The Victim was Particularly Vulnerable Due to Old Age, Youth, or Infirmity (18 U.S.C. 3592(c)(11)).**

In defendant Fort's death notice, the "old age, youth, or infirmity" statutory aggravating factor is alleged in Count 4, which charges Fort with the death of Glenn Maurice Timmy ("Baby") Molex. According to the record and other filings in this case, Baby Molex was seven weeks old when he was killed. Fort contends that the "old age" and "infirmity" language should be struck from the notice because the special findings in the indictment only listed "youth," and not "old age" and "infirmity." According to Fort this variance impermissibly broadens the charges in the grand jury's indictment. *See United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) ("[O]nly the grand jury may broaden or alter the charges in the indictment.").

This order declines to find that the government impermissibly broadened the indictment when it charged the "old age, youth, or infirmity" statutory aggravating factor exactly as it is worded in the FDPA. The death notice provides sufficient notice as to this statutory aggravating factor. It is not improper for the statute to allege old age, youth, and infirmity in the disjunctive. Undoubtedly if the government had alleged the statutory aggravating factor without the "old age" or "infirmity" language, defendant Fort would object that the death notice did not correspond with the statute. This factor was properly alleged in the indictment and included in the death notice.

19

United States District Court

For the Northern District of California

### E.   Inconsistencies Between Death Notices and Indictment.

Defendant Diaz notes that there are several inconsistencies between the indictment and his death notice.  On the basis of those inconsistencies, Diaz moves to strike the portions of the death notice that do not correspond with the indictment.  In its opposition and at oral argument, the government indicated that it was considering superseding the indictment to reconcile the two (Docket No. 1092 at 14).  This order reserves ruling on the issue of any inconsistencies. The revised death notice and any new superseding indictment are due by March 9.  If any inconsistencies arise the Court will entertain an argument to strike portions of the death notices to the extent the documents do not correspond.

### 4.   GENERAL CHALLENGES TO NON-STATUTORY AGGRAVATING FACTORS.

Defendants contend that the use of non-statutory factors allows for arbitrary and capricious imposition of the death penalty, violates the prohibition against ex post facto laws, and is inconsistent with the FDPA.  This order disagrees with all of these claims.

### A.   Government Selection of Non-Statutory Aggravating Factors.

Defendants contend that the FDPA procedure allowing the government to allege additional non-statutory aggravating factors is invalid under the constitution and the FDPA itself.  These arguments have been raised by other defendants before other district courts. Those courts have rejected the arguments. *See*, *e.g.*, *Cooper*, 91 F. Supp. 2d at 100 ("The provision of the FDPA allowing for the use of non-statutory aggravating factors is not facially invalid."); *Frank*, 8 F. Supp. 2d at 265 ("[T]he use of such non-statutory aggravating factors — far from injecting arbitrariness into the process — is to be encouraged.").  This order does the same.

Defendants contend that the FDPA allows for arbitrary and capricious selection of non-statutory aggravating factors against defendants.  It is recognized that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

20

United States District Court

For the Northern District of California

1   Defendants contend that under the FDPA the government has "unconstrained ability" to decide

2   on and allege non-statutory aggravating factors.  Thus, in defendants' view, the FDPA violates

3   the Eighth Amendment.  This contention is dismissed.

4          The Supreme Court has stated:  "Our cases indicate . . . that statutory aggravating

5   circumstances play a constitutionally necessary function at the stage of legislative definition:

6   they circumscribe the class of persons eligible for the death penalty.  But the Constitution does

7   not require the jury to ignore other possible aggravating factors in the process of selecting from

8   among that class, those defendants who will actually be sentenced to death.  What is important

9   at the selection stage is an individualized determination on the basis of the character of the

10  individual and the circumstances of the crime."  *Zant*, 462 U.S. at 878–79.

11         After the jury finds a gateway mental state factor and one statutory aggravating factor,

12  the defendant is then eligible for the death penalty.  Those eligibility factors serve the

13  constitutional narrowing function required by the Supreme Court.  *See Cheever*, 423 F. Supp.

14  2d at 1205.  "[O]nce death eligibility requirements have been satisfied by convicting a capital

15  defendant of murder and finding at least one aggravating circumstance, the same 'unbridled

16  discretion' that was found taboo in [*Furman v. Georgia*, 408 U.S. 238 (1972)] becomes

17  completely appropriate under the Eighth Amendment."  *Id.* at 1206 (citing *Tuilaepa*, 512 U.S. at

18  971–72, 979).

19         The function of the non-statutory aggravating factors is to provide relevant information

20  during the capital sentencing phase to allow the jury to make the selection based on an

21  "individualized determination."  If the jury proceeds to the death-selection stage, the focus

22  shifts to providing the jury with all possible relevant evidence to tailor its decision to the

23  individual before it.  The Supreme Court has held that non-statutory aggravating factors are

24  appropriate under state death-penalty schemes.  *See*, *e.g.*, *Zant*, 462 U.S. at 878.  Other courts

25  have extended the Supreme Court's reasoning to find that the use of non-statutory aggravating

26  factors in the FDPA scheme is constitutional.  *See United States v. Glover*, 43 F. Supp. 2d 1217,

27

28

21

United States District Court

For the Northern District of California

1228–29 (D. Kan. 1999); *United States v. Nguyen*, 928 F. Supp. 1525, 1538 (D. Kan. 1996).

This order agrees with those decisions.

Furthermore, defendants are incorrect that the range of statutory factors is "restricted

only by the imagination of the prosecutor." Courts have recognized several limitations on both

statutory and non-statutory factors:

> First, the aggravator must not be so vague as to lack "some common-sense core meaning . . . that criminal juries [are] capable of understanding." [*Tuilaepa v. California*, 512 U.S. 967, 972 (1994).] Second, the aggravator cannot be overbroad such that a sentencing juror "fairly could conclude that [the] aggravating circumstance applies to every defendant eligible for the death penalty." [*Arave v. Creech*, 507 U.S. 463, 474 (1993).] Third, the aggravator must be "sufficiently relevant to the question of who should live and who should die." [*United States v. Davis*, 912 F. Supp. 938, 943 (E.D. La.1996); *see Arave*, 507 U.S. at 474; *United States v. Cuff*, 38 F. Supp. 2d 282, 288–289 (S.D.N.Y. 1999) ("A predicate to fulfilling the constitutional conditions for an aggravating factor is that the disputed factor be an aggravating factor in the first place."); *United States v. Friend*, 92 F. Supp. 2d 534, 541 (E.D. Va. 2000).] Fourth, even if relevant, the aggravator may be excluded "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." [18 U.S.C. § 3593(c); see also *Friend*, 92 F. Supp. 2d at 541 (deeming it "essential that an aggravating factor be measured in perspective of the fundamental requirement of heightened reliability").]

*Bin Laden*, 126 F. Supp. 2d at 298. Furthermore, courts also recognize the requirement that

aggravating factors cannot impermissibly duplicate each other. *See McCullah*, 76 F.3d at

1111–12. "Reduced to a list then, non-statutory aggravating factors must be both relevant and

reliable, while they may not be vague, duplicative, or perhaps, overbroad. If the government

charges non-statutory aggravating factors that violate these requirements, the court can strike

them from the [death notice]. This process adequately protects [a] defendant's rights."

*Cheever*, 423 F. Supp. 2d at 1207. The use of non-statutory aggravating factors is not

unconstitutional.

### B.   Ex Post Facto.

Defendants' next argument is that non-statutory aggravating factors violate the Ex Post

Facto Clause of Article I of the Constitution. Defendants contend that by allowing the

22

**United States District Court**
For the Northern District of California

1   government to decide non-statutory factors not enumerated in the statute, the FDPA permits the

2   retroactive application of aggravating factors to crimes committed before those factors were

3   identified.

4          Defendants acknowledge that the Eighth Circuit rejected this argument in *United States*

5   *v. Allen*, 247 F. 3d 741, 759 (8th Cir. 2001) ("[P]roposing nonstatutory aggravating factors to

6   the jury does not in any way alter the definition of the underlying crime for which Allen was

7   convicted, nor does it increase the punishment to which Allen is subjected."). This order finds

8   no reason to vary from that holding. Ex post facto safeguards are not triggered by procedural

9   changes in a capital sentencing scheme that "simply alter[] the methods employed in

10  determining whether the death penalty [is] to be imposed," where such procedural changes did

11  not change "the quantum of punishment attached to the crime" or the definition of the crime

12  itself. *Dobbert v. Florida*, 432 U.S. 282, 293–94 (1977).

13         Without discussion, defendants contend that the analysis in *Allen* "cannot survive

14  *Apprendi*, *Ring*, *Booker*, and *Blakely*." This order disagrees. "[E]ven accepting for sake of

15  argument defendant's conclusion that *Ring* created a new offense of federal capital murder . . . ,

16  the 'elements' of such a crime would at most include one of the gateway intent factors and one

17  statutory aggravating factor. Once the jury makes those findings, a defendant is eligible for the

18  death penalty, and the penalty that he faces cannot be increased any further. Non-statutory

19  aggravators do not even come into play until after the jury has found a defendant eligible for the

20  death penalty. They neither change the definition of the underlying crime, nor do they increase

21  the potential punishment." *Cheever*, 423 F. Supp. 2d at 1208; *see also Gooch*, 2006 WL

22  3780781, at *12; *Glover*, 43 F. Supp. 2d at 1229–30.

23              **C.      FDPA Provision for Non-Statutory Aggravating Factors.**

24         Defendants also contend that the FDPA itself prohibits the use of non-statutory

25  aggravating factors. Defendants quote the statutory language that a defendant "shall be

26  sentenced to death if *after consideration of the factors set forth in section 3592 . . . it is*

27  determined that imposition of a sentence of death is justified." 18 U.S.C. 3591 (emphasis

28

                                                    23

United States District Court

For the Northern District of California

1    added).  Defendants point out that Section 3592(c) does not "set forth" any non-statutory

2    aggravating factors and only provides that "the jury . . . may consider whether any other

3    aggravating factor for which notice has been given exists."  Thus, defendants contend that

4    because Section 3591 specifically limits the government's ability to seek death, it nullifies the

5    provision allowing consideration of non-statutory factors.  This argument lacks merit.

6         The two provisions within the FDPA are not irreconcilable.  "There is nothing internally

7    contradictory or ambiguous about a statute referring to something 'set forth' in a 'catch-all

8    provision.'  It is a frequently employed tool of the law."  *Nguyen*, 928 F. Supp. at 1536.

9    Moreover, several other provisions within the FDPA allow consideration of factors that are not

10   enumerated in Section 3592.  For example, Section 3593(a), describing the factors the

11   government can identify in the death notice, includes the "effect of the offense on the victim

12   and the victim's family."  Victim impact is not "set forth" in Section 3592 as a statutory

13   aggravating factor.  Additionally, Section 3593(e) requires the jury to weigh "all the

14   aggravating factor or factors found to exist."  This language supports the interpretation that

15   Congress did not intend to limit the aggravating factors to the sixteen factors listed in Section

16   3592(c).  *See Cheever*, 423 F. Supp. 2d at 1208–09; *see also Robinson*, 367 F.3d at 293; *Llera*

17   *Plaza*, 179 F. Supp. 2d at 457–59.

18        **5.    CHALLENGES TO INDIVIDUAL NON-STATUTORY FACTORS.**

19            **A.    General Challenges Raised with Respect to Multiple Non-Statutory**
                    **Factors.**

20
21   With respect to individual non-statutory aggravating factors, defendants have raised

     several arguments that apply to multiple factors.  This order deals with those arguments first.

22
23        Defendants have raised the possibility that several of the non-statutory aggravating

24   factors are impermissibly duplicative.  Specifically, those factors include "participation in

     additional homicides," "participation in additional serious acts of violence," "contemporaneous

25
     criminal conduct," "obstruction of justice," "leadership role in a criminal enterprise," and

26
     various subfactors of the "future dangerousness of the defendant" factor.  Defendants' argument

27
28
                                                    24

United States District Court

For the Northern District of California

1  may have merit.  The skeletal death notices currently under consideration, however, make it

2  difficult to render any conclusion on the issue.  If the factual bases for the factors are too similar

3  or substantially overlap, the Court will give serious consideration to whether the factors are

4  duplicative and cumulative so as to be unconstitutional unless collapsed to a more compact set

5  of factors for presentation to the jury.  *See United States v. McCullah*, 76 F.3d 1087 (10th Cir.

6  1996); *Bin Laden*, 126 F. Supp. 2d at 299 ("[A]n aggravating factor that is necessarily and

7  wholly subsumed by a different aggravator within the same death penalty notice is invalid *per*

8  *se* and should not be submitted to the penalty jury for sentencing consideration.").  In amending

9  the notices, the government is free to withdraw any of the aggravating factors.

10         Another argument raised by defendants is that some of the non-statutory aggravating

11  factors inappropriately duplicate charges in the indictment.  Specifically, defendants contend

12  that aspects of the "participation in additional serious acts of violence," "contemporaneous

13  criminal conduct," "leadership role in a criminal enterprise," and "future dangerousness"

14  non-statutory aggravating factors are all included in various parts of the indictment.  This

15  contention is without merit because "the Eighth Amendment does not prohibit the use of an

16  aggravating factor during the sentencing phase that duplicates one or more elements of the

17  offense of the crime found at the guilt phase."  *Higgs*, 353 F.3d at 315 (citing *Lowenfield v.*

18  *Phelps*, 484 U.S. 231, 246 (1988)).  These factors will not be struck solely because of any

19  alleged duplication of indictment charges.

20                              **B.      Victim Impact Evidence.**

21         The government seeks to establish the non-statutory "victim impact" aggravating factor

22  against both defendants on all counts.  Defendants argue that allowing victim impact evidence

23  as a non-statutory aggravating factor in the sentencing phase violates defendants' constitutional

24  rights.  Defendants contend that this type of evidence leads jurors to draw impermissible

25  conclusions by allowing them to weigh the comparative impact of one victim's life versus that

26  of another.  Additionally, defendants argue that allowing the jury to empathize with victims'

27  families is unduly prejudicial and violates defendants' due process rights.  In presenting their

28

25

arguments, defendants contend that victim impact evidence generally violates the Fifth and Eighth Amendments.

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court held that "the Eighth Amendment erects no *per se* bar" to the admission of victim impact evidence in the sentencing phase. Confronted with a double-murder case in which the victims' relatives had testified during the sentencing phase about the impact the defendants' murders had on their lives, the Court explained that a "[s]tate may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Payne*, 501 U.S. at 825. In so ruling, the Court did not require or even endorse the use of such evidence. Instead, it merely held that victim impact evidence is allowable to demonstrate the specific harm caused by the crime, with certain limitations. *Id.* at 831 (O'Connor, J., concurring). In setting forth one of these limitations, the Court stated that the admission of such evidence will be deemed unconstitutional if it is "so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825.

The FDPA explicitly allows the jury to consider non-statutory aggravating factors once the government proves the existence of at least one statutory factor. 18 U.S.C. 3593. Of these non-statutory aggravating factors, the FDPA specifically allows for the consideration of "factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." 18 U.S.C. 3593(a). The FDPA, thus, specifically allows for the introduction of properly noticed victim impact evidence during the sentencing phase.

In *Jones v. United States*, 527 U.S. 373 (1999), the Supreme Court was confronted with a question concerning the constitutionality of victim impact evidence under the FDPA. In that decision, during the death-eligible defendant's sentencing phase, the government had presented two non-statutory aggravating factors for the jury, one of which was victim impact evidence.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

The jury unanimously found that the government had established the existence of both non-statutory aggravating factors (in addition to two statutory aggravating factors) and the defendant was sentenced to death.  While a majority of the Court could not agree on whether the notice, as drafted by the government, was impermissibly vague, the Court did find that any error was harmless.  In so holding, the Court's majority stated that "[t]he error in this case, if any, rests in loose drafting of the nonstatutory aggravating factors; as we have made clear . . . victim impact evidence [is an] appropriate subject[] for the capital sentencer's consideration."  *Jones*, 527 U.S. at 402.

This order finds that to establish the harmful effect of the alleged murders on the victims' families, victim impact evidence may be admissible in the penalty phase.  Strong precedent supports this holding.  *First*, in overturning past precedent to find that victim impact evidence does not always violate a defendant's rights, *Payne* laid the foundation for Congress to "properly conclude" that such evidence is necessary to the jury's sentencing decision.  501 U.S. at 825.  *Second*, three years later, Congress enacted the FDPA, which included the possibility for non-statutory aggravating factors and even specifically mentioned victim impact as one. *Third*, in 1999, the Supreme Court specifically addressed victim impact evidence in *Jones* as a non-statutory aggravating factor under the FDPA and found it an "appropriate subject[] for the capital sentencer's consideration."  As such, this order is satisfied that these authorities, bolstered by the widespread use of victim impact evidence in capital cases across the United States, are sufficient to validate the government's use of such evidence in the present case.  *See*, *e.g.*, *Chanthadara*, 230 F.3d at 1273–74 (holding that argument that victim impact evidence does "not narrow the class of offenses for which the death penalty may be imposed" is "foreclosed by binding case law," including *Jones*); *United States v. McVeigh*, 944 F. Supp. 1478, 1491 (D. Colo. 1996) (allowing 38 witnesses to testify in support of the victim impact non-statutory aggravating factor at the penalty phase), *aff'd*, 153 F.3d 1166, 1221-22 (10th Cir. 1998).

27

1    Defendants' arguments to the contrary are unavailing.  Specifically, the arguments on

2    comparative impact and impermissible conclusions are specifically discussed and dismissed in

3    *Payne*.  501 U.S. at 823 (stating "victim impact evidence is not offered to encourage

4    comparative judgments . . . [i]t is designed to show instead *each* victim's 'uniqueness as an

5    individual human being'").  Additionally, the decisions defendants cite are consistent with

6    *Payne* and not with defendants' conclusions.  To the extent that defendants are directly

7    challenging the above referenced statute and Supreme Court precedent, this order is without

8    authority to grant such relief.  As such, this order finds that victim impact evidence offered by

9    the government to demonstrate the specific harm caused by the crime is not barred as a matter

10   of law.  *See id.* at 825.

11   Defendants argue that the government's victim impact evidence will be unduly

12   prejudicial to defendants, thus raising the due process issues addressed in *Payne*.  While the

13   Court understands the *potential* for victim impact evidence to contaminate the proceedings and

14   render the defendants' trials unfair, such concerns are premature at this time.  If the trial reaches

15   the penalty phase, the Court will necessarily have to consider the scope of the government's

16   victim impact evidence at sentencing and "use its traditional supervisory powers to ensure the

17   exclusion of information" that might unduly prejudice the defendants.  *See United States v.*

18   *Edelin*, 134 F. Supp. 2d 59, 79 (D.D.C. 2001).  Until then, the Court refuses to "endeavor to

19   divine what the government might try to present and render a preemptive ruling."  *See United*

20   *States v. Cheever*, No. 05-10050-01-MLB, 2006 U.S. Dist. LEXIS 14107, *9 (D. Kan. Mar. 29,

21   2006).  Of course, the government will be expected to conform the victim impact evidence to

22   the above mentioned precedent if it will admit any such evidence.  It may, however, be possible

23   to address this issue after the government revises the death notices.

**C.    Participation in Additional Serious Acts of Violence and
Contemporaneous Criminal Conduct.**

25   Defendants also seek to strike the "participation in additional serious acts of violence"

26   and "contemporaneous criminal conduct" factors.  Defendants contend that these factors are

28

United States District Court

For the Northern District of California

1    invalid as an attempt to circumvent Congress's intent in 18 U.S.C. 3592(c), which sets forth

2    specific types of criminal activity that may be considered as aggravating factors.  This order

3    agrees in part.  As explained below, while there is no *per se* barrier to introducing unadjudicated

4    criminal conduct, it is helpful to look at Section 3592(c) to determine what conduct should be

5    admitted.

6         "Congress did not intend, in delineating statutory aggravating factors, to forbid the

7    introduction of other crimes as nonstatutory aggravating factors."  *United States v. Gilbert*, 120

8    F. Supp. 2d 147, 152 (D. Mass. 2000).  "[T]he statutory aggravating factors serve the unique

9    gate-keeping function of limiting the type of murderers who will be exposed to the death

10   penalty in the first place.  Congress could reasonably conclude that the most fair, objective and

11   reliable way to do that, in terms of a prior criminal history, is to restrict those factors to proven

12   convictions of a certain severity."  *United States v. Davis*, 912 F. Supp. 938, 948 n.25 (E.D. La

13   1996).  This order agrees, however, that "[o]nce an offender has passed through that narrowing

14   gate . . . Congress could reasonably decide that equally serious unadjudicated conduct, if

15   reliably proven, could be considered in the overall weighing process."  Indeed, the FDPA

16   provides that in addition to the statutorily-enumerated aggravating factors, "the jury . . . may

17   consider whether any other aggravating factor for which notice has been given exists."  18

18   U.S.C. 3592(c).  The "overwhelming majority of federal courts has held that neither the Eighth

19   Amendment nor the due process clause impose a *per se* barrier to the use of unadjudicated

20   criminal conduct in capital sentencing."  *Gilbert*, 120 F. Supp. 2d at 151–52; *see also Davis*,

21   912 F. Supp. at 949 ("This court is persuaded that Congress did not intend a *per se* rule

22   excluding such information; had they so intended, they would have said so, and nowhere in the

23   statutory language is such an exclusion even implied.").

24        It has been recognized, however, that the lack of a *per se* bar to unadjudicated criminal

25   conduct does not mean that the government can introduce any unadjudicated criminal conduct

26   to the jury.  "[S]uch crimes must be relevant to the decision of who should live and who should

27   die."  *Gilbert*, 120 F. Supp. 2d at 152.  To that end, courts have been "guided by the statutory

28

aggravating factors Congress has listed in 18 U.S.C. § 3592, which provide a 'ready framework

for determining Congressional intent' on this matter." *Id.* (quoting *Davis*, 912 F. Supp. at 944).

> The statutory aggravating factors list only very serious or repetitive felony offenses, such as child molestation, previous conviction of a capital crime, or prior conviction of a felony involving a firearm. See 18 U.S.C. § 3592(c). From these factors, it is clear that to be a relevant aggravating factor in favor of the death penalty, prior misconduct must at least be a crime, and a grave one at that. *See United States v. Friend*, 92 F. Supp. 2d 534, 544 (E.D. Va. 2000). Consideration of relatively minor misbehavior, however disturbing, would undermine the seriousness of the death penalty decision. Rather than helping the jury's decision, the previous misconduct would be a "pernicious distraction[] . . . in considering whether a defendant shall live or die." *United States v. Peoples*, 74 F. Supp. 2d 930, 932 (W.D. Mo. 1999).

*Id.* at 152–53. It is premature to decide whether the additional serious acts of violence or

contemporaneous criminal conduct the government will seek to introduce at the penalty phase

are "relevant to the decision of who should live and who should die." Resolution of this issue

may be possible once the government revises its death notices for both defendants.[2]

### D.    Participation in Additional Homicides.

Defendants next contest the "participation in additional homicides" factor. While this

order holds that there is no *per se* bar to unadjudicated criminal conduct, defendants appear to

contend that evidence of unadjudicated *murders* should be given even closer scrutiny.

Defendants' principal challenge to this factor is based on *United States v. Gonzalez*, No.

3:02CR7(JBA), 2004 WL 1920492, at*2–*3 (D. Conn. Aug. 17, 2004). There, the district court

struck evidence of the defendants' four unadjudicated murders pursuant to 18 U.S.C. 3593(c),

which provides that "[t]he government may present any information relevant to an aggravating

factor for which notice has been provided . . . except that information may be excluded if its

---

[2] Defendants also challenge the wording of the "contemporaneous criminal conduct" factor insofar as it alleges that they have already been convicted of the charged capital murders. Defendants contend this is a factual impossibility because they have not been convicted. This objection is meritless because the death notices will only take effect for penalty purposes once defendants are convicted of the charged murders, if at all.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    probative value is outweighed by the danger of creating unfair prejudice, confusing the issues,

2    or misleading the jury."  The *Gonzalez* court summarized its holding as follows:

3              This Court's finding of unfair prejudice to Gonzalez is based on a
               recognition that Gonzalez is entitled to the presumption of
4              innocence in the trial at the penalty phase on unrelated
               unadjudicated charges, and that the presumption of innocence is
5              too likely eroded when a jury, having deliberated and found the
               defendant guilty of capital murder, is then charged with
6              determining whether the Government has proved beyond a
               reasonable doubt that Gonzalez committed four other murders.
7              The underlying crime is of an inflammatory nature, making it
               more likely that a jury's finding of guilt on the indicted crime on
8              trial will bleed into its deliberations on the unrelated penalty
               phase crimes.  In addition, as will be detailed below, the
9              unadjudicated murders sought to be proven at the penalty phase,
               while distinct and unrelated to the underlying murder of Teddy
10             Casiano, are based on fact patterns similar to that of the
               underlying crime, further increasing the risk that the jury will use
11             its guilt phase findings of guilt in its adjudicatory penalty phase
               deliberations.

12   *Id.* at*2–*3.

13             This order holds that while the *Gonzalez* rationale may be persuasive, it is inappropriate

14   to strike this factor without seeing the government's revised notice.  *Gonzalez* reached the

15   relevant holding after "the Government submitted at the Court's request a proffer of the

16   evidence it intends to introduce in the penalty phase of the trial in support of the four

17   unadjudicated murders alleged."  *Id.* at *1.  This Court will be in a better position to rule on this

18   issue after the government submits its revised notice.[3]

19             **E.    Obstruction of Justice.**

20             Defendants contend that the "obstruction of justice" factor must be dismissed because

21   there is no allegation or proof that the commission of the charged capital crimes involved

22   obstruction of justice.  Defendants cite *United States v. Honken*, 381 F. Supp. 2d 936, 1008

23   (N.D. Iowa 2005), for the proposition that "[w]here commission of the charged capital crimes

24

25        [3]  The "additional homicides" factor is alleged three times in each death notice, corresponding each
26   time with a different charged murder.  Defendants contend that it is error to list this aggravating factor more
     than once in this manner.  This order postpones resolution of this challenge to the death notices "until after the
27   jury has rendered its liability verdict, at which time there will be no need to speculate as to what particular
     counts in the indictment Defendants will be convicted of, if any."  *Bin Laden*, 126 F. Supp. 2d at 298 n.14.

28

                                                    31

United States District Court

For the Northern District of California

1    involved obstruction of justice, consideration of that obstruction of justice as a non-statutory

2    aggravating factor 'clearly direct[s] the jury to the individual circumstances of the case and [that

3    factor] therefore d[oes] not offend the Constitution on the basis of being overbroad." 

4    Defendants construe that statement to mean that obstruction of justice may only be a

5    non-statutory aggravating factor when the charged crime involved obstruction of justice.  This

6    order disagrees.

7           The notices state that the individuals defendants conspired to murder were "potential

8    witnesses" against defendants and other members of the Down Below Gang.  "[O]bstruction of

9    justice aggravating factors are common aggravating factors where the defendant killed the

10   victim in order to obstruct the investigation or prosecution of another offense."  *United States v.*

11   *Grande*, 353 F. Supp. 2d 623, 640 (E.D. Va. 2005) (internal quotations omitted); *United States*

12   *v. Cisneros*, 363 F. Supp. 2d 827, 841–42 (E.D. Va. 2005).  In this case, the jury will be aware

13   of defendants' membership as Down Below Gang members.  Indeed the basis for this entire

14   case rests on defendants' alleged membership in the Down Below Gang.  Conspiring to murder

15   a potential witness against Down Below Gang members is thus related to the underlying

16   conspiracy which is charged in this case.  Diaz has cited no decision or rule *requiring* that the

17   obstruction factor directly connect with the charged capital offense.  Here it is sufficient that the

18   threatened witness may have testified against Diaz or other Down Below Gang members for

19   activities related to their membership in the gang.

20          If, however, the government's factual proffer demonstrates that the obstruction of justice

21   was altogether unrelated to defendants' alleged gang activities, this factor may need to be

22   stricken.  Furthermore, it is conceivable that the government's factual proffer will not support

23   the conclusion that there was any conspiracy.  *See United States v. Friend*, 92 F. Supp. 2d 534,

24   544–45 (E.D. Va. 2000) (striking factor that defendant had "discussed killing" a potential

25   witness because there was no accompanying overt act).  These issues may be addressed

26   following the government's revision of the death notices.

27

28
                                            32

United States District Court

For the Northern District of California

**F.      Leadership Role in a Criminal Enterprise.**

The death notices allege as an aggravating factor that both Fort and Diaz had leadership roles in the Down Below Gang.  Defendants contend that the "leadership role in a criminal enterprise" factor must be struck.  According to defendants, the factor is unconstitutionally vague in using words such as "belonged to," "structure," "below," and "leadership role."  This order disagrees.  Defendants do not specify how the sentencing jury would be confused by these terms.  The notice is sufficiently clear for this factor.  The "leadership role" factor provides a "common-sense core of meaning . . . that criminal juries [are] capable of understanding."  *Tuilaepa*, 512 U.S. at 975 .

Additionally, defendants contend that this factor "authorizes a jury to draw adverse inferences from conduct that is constitutionally protected."  *Zant*, 462 U.S. at 885.  In support, they cite *Dawson v. Delaware*, 503 U.S. 159 (1992).  In *Dawson*, the Supreme Court considered the propriety of admitting a defendant's membership in the Aryan Brotherhood during the defendant's capital sentencing proceeding.  The Supreme Court held that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment."  There, however, the Court held that the evidence of the defendant's membership was insufficient to prove any aggravating circumstance.  Specifically, the evidence had not "prove[d] that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts."  The evidence only proved the "abstract beliefs" of the defendant and the Aryan Brotherhood and was thus not relevant to the sentencing proceeding.  *Dawson*, 503 U.S. 162–67.  The Supreme Court held in *Dawson*:  "A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future.  Other evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances."  *Id.* at 166.  Under *Dawson*, then, the government should be permitted to introduce evidence of

33

1    defendants' roles in the Down Below Gang, provided that the evidence meets the relevant

2    requirements, including that it demonstrate more than defendants' "abstract beliefs."

3         The government here has referenced defendants' role in the Down Below Gang twice in

4    the death notices.  It is first mentioned in the "leadership role" aggravating factor.  It is

5    mentioned a second time in the "membership in a criminal enterprise" subfactor of the "future

6    dangerousness" aggravating factor.  Applying *Dawson*, it is clear that the government may use

7    evidence of defendants' gang membership in support of the future dangerousness aggravating

8    factor.  But the government has not cited, nor can the Court find, any decision allowing

9    associational evidence to support a separate "leadership role" factor.  The Court is concerned

10   that the factual bases for the "leadership role" factor will overlap substantially with the

11   "membership" subfactor of the future dangerousness factor and that this will be impermissibly

12   duplicative.  *See Bin Laden*, 126 F. Supp. 2d at 299.  Indeed, most decisions upholding evidence

13   of gang membership do so in the context recognized by *Dawson* — with respect to the

14   defendant's future dangerousness.  *See United States v. Wilson*, No. 04-CR-1016 NGG, 2007

15   WL 81935, at *8–*9 (E.D.N.Y. Jan. 9, 2007); *Gooch*, 2006 WL 3780781, at *30.

16        Following the government's factual proffer on this factor, the parties may address

17   whether there is impermissible duplication between the "leadership" factor and the

18   "membership" subfactor.  In addition, the parties should also address whether the "leadership

19   role" factor may stand as its own aggravating factor.  *See, e.g.*, *United States v. Perez*, No.

20   3:02CR7(JBA), 2004 WL 935260, at *9–*10 (D.Conn. 2004) (upholding leadership factor but

21   not discussing whether government also attempted to use membership in gang as evidence of

22   future dangerousness).

23                          **G.    Future Dangerousness of the Defendant.**

24        Defendants challenge the "future dangerousness" factor included in both death notices

25   against both defendants.  "Future dangerousness" is alleged as its own factor with four

26   subfactors:  continuing pattern of violence, lack of remorse, low rehabilitative potential, and

27   membership in a criminal enterprise.  Although this order rejects most of defendants'

28

34

1    contentions, this order withholds final resolution of the future dangerousness factor after the

2    government has submitted its revised death notices.

3         Evidence of future dangerousness has generally been upheld as admissible under the

4    FDPA.  "The Supreme Court has discussed with approbative language the submission of a

5    defendant's future dangerousness as a subject for a penalty jury's consideration."  *Bin Laden*,

6    126 F. Supp. 2d at 303 (citing *Simmons v. South Carolina*, 512 U.S. 154 (1994); *California v.*

7    *Ramos*, 463 U.S. 992, 1002–03 (1983); *Jurek v. Texas*, 428 U.S. 262, 274–76 (1976)).  "Not

8    surprisingly, lower courts have uniformly upheld future dangerousness as a non-statutory

9    aggravating factor in capital cases under the FDPA, including instances where such factor is

10   supported by evidence of low rehabilitative potential and lack of remorse."  *Id.* at 303–04.

11        Notwithstanding the general acceptance of evidence of future dangerousness, the Court

12   is concerned that evidence of defendants' potential for future dangerousness may be irrelevant

13   and more prejudicial than probative.  The government's maximum-security prison facilities are

14   equipped to handle the country's most dangerous criminals.  It is certainly possible that such

15   protections will be sufficient to neutralize the potential dangerousness of defendants Diaz and

16   Fort if they are sentenced to life in prison without the possibility of parole.  Indeed, the parties

17   agree that evidence of defendants' future dangerousness should be limited to that which shows

18   their potential for dangerousness *while incarcerated* (Docket No. 1097 at 35).  *See Llera Plaza*,

19   179 F. Supp. 2d at 488 ("[I]n the FDPA context, government arguments regarding 'future

20   dangerousness' should be limited to the dangers posed by the defendants while serving a life

21   sentence in prison.").  If, however, the government's incarceration protocols would nullify

22   defendants' dangerousness, presentation of this evidence to the jury would not be relevant to the

23   sentencing determination.  At this point, these are only concerns and not a final ruling.  Further

24   briefing following the revised death notices will be helpful.

25        In its revised death notices, the government should indicate how its proffered evidence

26   would correlate with defendants' potential for future danger if they were imprisoned for life

27   without the possibility of parole.  The death notices should also set forth reasons why the

28

                                              35

1  government's incarceration facilities and prison-security protocols would be insufficient to

2  neutralize defendants' potential for harm.

3  Defendants also assert that predictions of future dangerousness are unreliable and that

4  the factor should not be considered by capital sentencing juries.  It is true that some courts have

5  expressed doubts about evidence predicting future dangerousness:  "Projections of future

6  dangerousness are precarious.  They require jurors to predict, beyond a reasonable doubt, future

7  conduct based on an often uncertain pattern of past behavior."  *Taveras*, 424 F. Supp. 2d 446,

8  454 (E.D.N.Y. 2006); *see also United States v. Sampson*, 335 F. Supp. 2d 166, 218 (D.

9  Mass.2004).  But even those courts that have questioned the propriety of considering future

10  dangerousness have not recognized a constitutional *per se* barrier to that evidence.

11  Defendants contend that a hearing is necessary to determine whether a lay jury would be

12  able to accurately distinguish between those defendants who demonstrate future danger from

13  those who do not.  This request is denied.  If, however, the government intends to introduce

14  expert testimony regarding defendants' future dangerousness, a *Daubert* hearing on such

15  testimony might be required.  *See*, *e.g.*, *United States v. Taveras*, No. 04-CR-156 (JBW), 2006

16  WL 1875339, at *23 (E.D.N.Y. July 5, 2006).  Such a hearing will not be granted on the basis

17  of the current record alone.  Defendants' remaining arguments regarding future dangerousness

18  are rejected for the reasons stated below.

19  *(i)       Future Dangerousness as Separate Factor.*

20  Defendants contend that Congress did not intend the future dangerousness factor to be

21  considered as a separate factor.  Specifically, defendants contend that Congress intended the

22  scope of the future dangerousness inquiry to end with the statutory aggravating factors that, in

23  defendants' view, are "closely correlated" with a defendant's likelihood of committing violent

24  crimes in the future.  These factors include, for example:  a prior felony conviction involving

25  the use of a firearm, a prior conviction for an offense carrying a maximum penalty of life

26  imprisonment or death, two or more prior felony convictions for offenses involving serious

27  bodily injury or death, two or more prior felony convictions for distributing a controlled

28

36

substance, and a prior conviction for sexual assault or child molestation.  18 U.S.C. 3592(c)(2), (3), (4), (10), (15).  According to defendants, because none of those statutory aggravating factors have been alleged, the government should not be allowed to assert that they will be dangerous in the future based on conduct not expressly enumerated by Congress in the FDPA.

This argument has been rejected by other courts and this order finds no reason to differ from the rationale of their decisions.  *See*, *e.g.*, *Gooch*, 2006 WL 3780781, at *27; *United States v. Sablan*, No. 00-CR-00531-WYD, 2006 WL 1028780, *21–*23 (D.Colo. 2006); *Cooper*, 91 F. Supp. 2d at 111 n.16.  If the government proves to the jury the requisite mental state and statutory aggravating factor, the jury may consider any other factor for which notice has been given.  As the *Gooch* court stated: "On one hand, information about prior serious crimes of the sort referenced in the enumerated factors is arguably more strongly probative of future dangerousness than information about other, lesser prior crimes; on the other hand, more frequent participation in lesser crimes . . . might be viewed as equally dangerous."  Thus, "allowing future dangerousness to stand alone as a nonstatutory aggravating factor, measured, in part, by criminal history, allows the jury to make a prediction based on 'all possible relevant information about the individual defendant whose fate it must determine.'"  *Gooch*, 2006 WL 3780781, at *27–*28 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 897 (1983)).

> *(ii)*      ***Lack of Remorse.***

Defendants next contend that the government improperly relies on their "lack of remorse" to demonstrate their future dangerousness.  Defendants contend that this factor would violate both their Fifth Amendment right to remain silent and Sixth Amendment right to trial by imposing an impermissible penalty on the exercise of those rights.  Defendants also contend that this subfactor would infringe upon the Eighth Amendment's requirement of heightened reliability in a capital prosecution.  The government acknowledges that to establish defendants' lack of remorse it may not rely on defendants' invocation of their right to silence, their decision not to testify, or their refusal to plead guilty.  The government states that it will not rely on such

37

1   negative inferences and will only prove defendants' lack of remorse on affirmative evidence

2   (Docket No. 1097 at 30).

3          This order follows the weight of authority from other courts finding "lack of remorse"

4   constitutional and admissible to support future dangerousness.  An oft-quoted passage from

5   *United States v. Davis*, 912 F.Supp. 938, 946 (E.D. La. 1996), states:

6              Lack of remorse is a subjective state of mind, difficult to gage
               objectively since behavior and words don't necessarily correlate
7              with internal feelings.  In a criminal context, it is particularly
               ambiguous since guilty persons have a constitutional right to be
8              silent, to rest on a presumption of innocence and to require the
               government to prove their guilt beyond a reasonable doubt.  To
9              allow the government to highlight an offender's "lack of remorse"
               undermines those safeguards.  Without passing on whether lack of
10             remorse is *per se* an inappropriate independent factor to consider,
               the court finds it inappropriate in this case.  The only information
11             proposed to sustain the factor is Davis' alleged jubilation
               learning that [the victim] had been killed.  The government does
12             not propose to introduce evidence of continuing glee, or
               boastfulness, or other affirmative words or conduct that would
13             indicate a pervading and continuing lack of remorse.
               Furthermore, as already noted, the allegation of lack of remorse
14             encroaches dangerously on an offender's constitutional right to
               put the government to its proof.

15  The court in *Davis* did not allow "lack of remorse " to be alleged as a stand-alone aggravating

16  factor.  It nevertheless permitted the government to present evidence of the defendant's alleged

17  exultation as probative of "future dangerousness."

18         Following *Davis*, courts have permitted the government to introduce evidence of

19  defendants' alleged lack of remorse to support the future dangerousness aggravating factor.

20  "Lack of remorse demonstrates a negative.  If defendant, even upon his arrest, incarceration and

21  pending trial, has not expressed remorse for the killings, he is less likely to be rehabilitated or

22  deterred from crime by further incarceration, making the ultimate form of incapacitation

23  through death a proper sentence."  *Taveras*, 424 F. Supp. 2d at 456; *see also O'Driscoll*, 203 F.

24  Supp. 2d at 345 ("Furthermore, we see no reason to strike the allegations of 'low rehabilitative

25  potential' and 'lack of remorse' from the government's notice of intent to pursue the death

26  penalty.  As we view the government's notice those allegations are not being used as separate

27

28
                                                       38

United States District Court

For the Northern District of California

1    aggravating factors but as support for the aggravating factor of future dangerousness. Such use

2    is clearly permissible.").

3       As with all other evidence in the penalty phase of a capital trial, evidence of defendants'

4    lack of remorse is "subject to scrutiny to ensure that it is relevant, reliable, and its probative

5    value outweighs any danger" of unfair prejudice, confusion, or misleading the jury. *Cooper*, 91

6    F. Supp. 2d at 113. At this point, however, such a determination is premature and may be

7    postponed until after the government revises the death notices. *See Glover*, 43 F. Supp. 2d at

8    1226–27.[4]

9                 ***(iii)***      ***Membership in a Criminal Enterprise.***

10      Defendants also argue that the "membership in a criminal enterprise" subfactor is

11   unconstitutionally vague. This order has already explained that, in support of a defendant's

12   future dangerousness, the Supreme Court permits a jury to consider a defendant's participation

13   in a criminal organization so long as certain requirements are met. This order disagrees that it is

14   unconstitutionally vague to allege that defendants had "allegiance to" and "actively led" or had

15   "active membership" in the Down Below Gang. These terms all have a "common-sense core of

16   meaning . . . that criminal juries should be capable of understanding." *Tuilaepa*, 512 U.S. at

17   975. This subfactor is permissible to prove future dangerousness. *Gooch*, 2006 WL 3780781,

18   at *30 ("Mr. Gooch's alleged decision to join and remain loyal to the M Street Crew, a group

19   that pooled its energies and resources toward violent ends, ineluctably bears on whether he

20   would follow the same behavior patterns in prison.").

21            **5.**      **TIMELINESS OF DEATH NOTICE.**

22      In November 2006, defendant Fort filed a motion contending that the interval between

23   the filing of the death notice and the trial date provided him with insufficient time to prepare for

24   ───────────────

25        [4] In addition, this order holds that it is not improper for the government to list various subfactors in
   support of the future dangerousness aggravating factor. This has been upheld before. *See, e.g.*, *United States v.*

26   *Mayhew*, 380 F. Supp. 2d 936, 950–51 (S.D.Ohio 2005) ("In the case sub judice, the government lists 'Low
   Rehabilitative Potential' as way to prove 'Future Dangerousness.' Thus, because 'Low Rehabilitative Potential'

27   is a subfactor of 'Future Dangerousness' and because this configuration precludes the jury from weighing the
   same factor twice, the Court finds the two factors non-duplicative.").

28

United States District Court

For the Northern District of California

1   a capital trial.  The Court originally set September 22, 2006, as the deadline for the government

2   to file its Section 3593(a) notice as to Fort.  The government, apparently through inadvertence,

3   filed Fort's death notice on October 3, 2006.  The lapse was later excused by the Court.

4           At the time the government filed its notice, trial was scheduled for January 22, 2007.

5   Following the guilty pleas of eight of the non-capital co-defendants in early December 2006,

6   trial was rescheduled for September 17, 2007.  Notwithstanding the continuance of the trial

7   date, at the hearing on the instant motions, defendant Fort persisted in arguing that the

8   government's untimely death notice was "oppressive conduct."  He contends the notice should

9   be struck.  This order disagrees.

10          Fort's counsel conceded in October 2006 that they had been notified by telephone on

11  September 22, 2006, that the government intended to seek the death penalty against Fort.

12  Counsel admitted that after September 22 they had operated under the belief that the

13  government would seek the death penalty against their client (Docket No. 831).  Fort was

14  clearly not prejudiced by the late filing.

15          In addition, Section 3593(a) requires the government to serve "a reasonable time before

16  the trial" notice to the defendant its intent to seek the death penalty.  The Eleventh Circuit has

17  explained that what constitutes a "reasonable time before trial" is a question of objective

18  reasonableness.  *United States v. Wilk*, 452 F.3d 1202, 1221 (11th Cir. 2006).  The *Wilk*

19  court stated that factors that may be considered when evaluating the totality of the circumstances

20  include:  (1) what transpired in the case before the formal Death Notice was filed; (2) the period

21  of time remaining for trial after the Death Notice was filed; (3) the status of discovery and

22  motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the

23  aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the

24  defense, if known.

25          This order adopts the rationale of the government in addressing these factors and holds

26  that Fort's death notice was filed a "reasonable time before trial" (Docket No. 189 at 4).  More

27  importantly however, if trial proceeds as scheduled in September, Fort will have had almost

28

40

**United States District Court**
For the Northern District of California

eleven months to prepare for trial following filing of the death notice and almost two years since he was first indicted. Even if the death notice was filed unreasonably late relative to the now-vacated January 2007 trial date — which this order does not concede — the Eleventh Circuit has appropriately held the following:

> Continuing the trial after the Death Notice is filed does not undermine but rather preserves the defendant's statutory right not to stand trial for his life without reasonable notice of the government's intent to seek the death penalty. Where a district court determines that the Death Notice was filed at a time when either party, particularly the defense, would reasonably be unprepared for a capital trial on the previously scheduled trial date, a continuance of the trial is appropriate. That a district court continues an earlier scheduled trial date for a murder case after a Death Notice is filed in order to make sure defense counsel has adequate preparation time for a now-required death defense is to be commended even if in the process it cures what might have otherwise been an untimely Death Notice.

*Id.* at 1223–24. Thus a continuance of the trial is the appropriate remedy for an unreasonably late death notice. A continuance was granted here. Defendants have sufficient time to prepare for a capital trial in September. Defendant Fort's motion, joined by defendant Diaz, is therefore denied.

## CONCLUSION

For the foregoing reasons, defendants' motions are **DENIED** in part. As stated above, some of defendants' arguments must be addressed after the government files its revised death notices and any superseding indictment on March 9. The January 23 order permitted the defense to file motions for an evidentiary hearing on the reliability of the government's evidence by March 23. In addition to any request for an evidentiary hearing, the motions may also address the issues listed below. This is not an invitation to re-raise issues that have been rejected already or that should have been otherwise raised in defendants' initial motions.

1.     The extent to which any inconsistencies between the revised notices and the operative indictment warrant striking the inconsistent portions of the death notices.

41

**United States District Court**
For the Northern District of California

2.      Whether any non-statutory aggravating factors are impermissibly duplicative so as to warrant striking any factor or factors pursuant to *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996).

3.      Whether the victim impact evidence will be unduly prejudicial to defendants.

4.      Whether the evidence of unadjudicated conduct the government plans to introduce is relevant to the sentencing decision and whether such evidence's probative value would be outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury.  This applies to both unadjudicated murders and any other unadjudicated criminal conduct the government plans to introduce.

5.      Whether the government's factual proffer on the "obstruction of justice" factor: (1) supports the conclusion that there was a conspiracy or (2) demonstrates that the conspiracies to murder Jaamar Jackson and Harry Cael, Jr. were related to the activities of the Down Below Gang.

6.      Whether the "leadership role in a criminal enterprise" factor may stand as an independent non-statutory aggravating factor when "membership in a criminal enterprise" is alleged in support of the "future dangerousness" factor.

7.      Whether, considering the facilities and security procedures available to the government, evidence of defendants' future dangerousness would be relevant to the sentencing decision and whether such evidence's probative value would be outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury.

For case management purposes, the parties should also address when resolution of these issues would be most appropriate.  The **MARCH 23** deadline for defendants' opening briefs remains firm.  The government may have until **APRIL 6** to file its oppositions.  Any replies by defendants must be filed by **APRIL 13**.  Each defendant may only file one opening brief and one

reply brief.  The opening briefs and the government's oppositions are limited to 25 pages (12-point font, double-spaced, no footnotes).  Any replies by defendants are limited to 15 pages (12-point font, double-spaced, no footnotes).

**IT IS SO ORDERED.**

Dated:  February 28, 2007.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California