IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAYMON MILBURN, EDGAR DIAZ, and EMILE FORT,<br><br>Defendants. | No. CR 05-00167 WHA<br><br>**ORDER DENYING ALL DEFENDANTS' MOTIONS FOR SEVERANCE (Dkt. Nos. 1447, 1449, and 1452)** |

## INTRODUCTION

Criminal defendants Raymon Milburn, Edgar Diaz, and Emile Fort face charges for RICO conspiracies and related charges. Diaz and Fort have been authorized for a death-penalty prosecution. Because he was more recently apprehended, Milburn is still awaiting a decision on whether or not he is authorized for capital punishment. Each defendant moves to sever his case from that of the other two defendants. For the reasons stated below, defendants' motions are **DENIED**.

## STATEMENT

The government filed an indictment against twelve defendants in this gang prosecution in 2005. Nine have pled guilty. Defendants Milburn, Diaz, and Fort are the remaining three defendants. Currently, Milburn, Diaz, and Fort are joined for a single trial. As members of the Down Belong Gang, they have been charged with multiple conspiracies, witness tampering,

drug distribution, firearms possession, and homicides. Specifically, the charges in the indictment against the defendants are as follows (from approximately 1998 to 2005).

Count One charges all twelve defendants with knowingly and intentionally conspiring to possess with the intent to distribute fifty grams or more of crack cocaine, marijuana, and ecstasy, in violation of 21 U.S.C. 846. The indictment alleged seventy-three overt acts in furtherance of the conspiracy

Count Two charged nine defendants, including Milburn, Diaz, and Fort, with conspiring to participate in a racketeer influenced and corrupt organization, in violation of 18 U.S.C. 1962(d). There were thirty racketeering activities, including drug distribution, robbery, and murder.

Count Three charged all twelve defendants with the conspiracy to use, carry, and possess firearms during and in relation to a drug conspiracy, in violation of 18 U.S.C. 924(o). Fifty-seven overt acts were alleged against defendants.

The remaining counts were charged against individual defendants. This order focuses on the allegations against the moving defendants:

| Count | Defendant(s) | Description |
| --- | --- | --- |
| Four | Fort | Murder of Glenn Maurice Timmy ("Baby") Molex in aid of racketeering (18 U.S.C. 1959(a)(1)) |
| Five | Fort | Attempted murder of Glenn Maurice Molex, Jr.'s in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Six | Fort | Destroying property by means of fire (18 U.S.C. 844(i)) |
| Seven | Fort | Murder of Jovanie Banks in aid of racketeering (18 U.S.C. 1959(a)(1)) |
| Eight | Fort | Murder of Michael Hill in aid of racketeering (18 U.S.C. 1959(a)(1)) |
| Nine | Fort | Attempted murder of Restelli Richson in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Ten | Diaz (along with five others) | Murder of Beverly Daryl Robinson in aid of racketeering (18 U.S.C. 1959(a)(1)) |
| Eleven | Diaz | Attempted murder of Monique Jones in aid of racketeering (18 U.S.C. 1959(a)(5)) |

2

| Twelve | Milburn and Diaz (along with one other) | Murder of Kenya Taylor in aid of racketeering (18 U.S.C. 1959(a)(1)) |
|---|---|---|
| Thirteen | Milburn and Diaz | Murder of Antoine Morgan in aid of racketeering (18 U.S.C. 1959(a)(1)) |
| Fourteen | Milburn and Fort | Conspiracy to murder Harry Cael Jr. in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Fifteen | Milburn and Fort | Conspiracy to tamper with witness Harry Cael Jr. (18 U.S.C. 1512(k)) |
| Sixteen | Diaz (and one other) | Conspiracy to murder members of the Up-the-Hill gang in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Seventeen | Diaz (and one other) | Conspiracy to murder members of the Towerside gang in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Eighteen | Diaz (and three others) | Conspiracy to murder members of the Up-the-Hill gang in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Nineteen | Diaz (and three others) | Armed assault of Paulette Jackson in aid of racketeering (18 U.S.C. 1959(a)(3)) |
| Twenty | Diaz (and three others) | Armed assault of Cordis Webb in aid of racketeering (18 U.S.C. 1959(a)(3)) |
| Twenty-One | Diaz (and one other) | Attempted murder of Jamar Nelson in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Twenty-Two | Diaz (and one other) | Attempted murder of Gowan McLin in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Twenty-Four | Diaz (and one other) | Attempted murder of Gowan McLin in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Twenty-Five | Diaz (and one other) | Attempted murder of Avery Clark in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Twenty-Six | Fort | Threat to commit murder of Jamaar Jackson in aid of racketeering (18 U.S.C. 1959(a)(4)) |
| Twenty-Seven | Milburn, Fort and Diaz (and one other) | Conspiracy to murder Jamaar Jackson in aid of racketeering (18 U.S.C. 1959(a)(5)) |
| Twenty-Eight | Milburn, Fort and Diaz (and one other) | Conspiracy to tamper with witness Jamaar Jackson (18 U.S.C. 1512(k)) |
| Twenty-Nine | Fort | Conspiracy to distribute and possess with intent to distribute 5 grams or more of cocaine base and heroine (21 U.S.C. 846) |
| Thirty through Thirty-Nine | Fort | Unlawful use of communication facility (21 U.S.C. 843(b)) |
| Forty-Six | Diaz | Possession with intent to distribute marijuana (21 U.S.C. 841(a)(1) and 841(b)(1)(D)) |

3

| | | | |
|---|---|---|---|
| Forty-Seven | Diaz | | Possession with intent to distribute marijuana within 1,000 feet of a public elementary school, a public housing facility and a playground (21 U.S.C. 860(a)) |
| Fifty-Six | Fort | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim "Baby" Molex |
| Fifty-Seven | Fort | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Glenn Molex |
| Fifty-Eight | Fort | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Jovanie Banks |
| Fifty-Nine | Fort | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Michael Hill |
| Sixty | Fort | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Restelli Richson |
| Sixty-One | Diaz | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Beverly Robinson |
| Sixty-Six | Diaz | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Monique Jones |
| Sixty-Eight | Diaz | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Antoine Morgan |
| Sixty-Nine | Milburn | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Harry Cael, Jr. |
| Seventy | Milburn | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Harry Cael Jr. |
| Seventy-One | Diaz | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victims Up-the-Hill gang members |
| Seventy-Three | Diaz | | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victims Towerside gang members |

4

| | | |
|---|---|---|
| Seventy-Five | Diaz | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victims Up-the-Hill gang members |
| Seventy-Nine | Diaz | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Jamar Nelson |
| Eighty-Three | Diaz | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Gowan McLin |
| Eighty-Five | Diaz | Using, carrying and possessing firearm during and relation to crime of violence (18 U.S.C. 924(c)(1)(A)(i)) — victim Avery Clark |

As stated, Fort and Diaz are authorized for the death penalty while Milburn awaits a decision as to whether or not he too will face the death penalty. All three defendants are also awaiting proposed offers to enter guilty pleas if they are not authorized or de-authorized for capital punishment. They now move for a severance.

## ANALYSIS

**A.   JOINDER UNDER FRCRP 8(B).**

Diaz moves for severance pursuant to FRCrP 8(b). The rule provides: "The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." The Ninth Circuit further clarified in *United States v. Sarkisian*, 197 F.3d 966, 975–76 (9th Cir. 1999):

> "Under this rule, when multiple defendants are involved, joinder is improper unless all offenses arise out of the same series of acts or transactions." Because "[t]he goal of Rule 8(b) is to maximize trial convenience and efficiency with a minimum of prejudice," "Rule 8(b) is construed liberally in favor of joinder."
> In determining whether two or more offenses are part of the "same series of acts or transactions constituting an offense," this court looks for a "logical relationship" between the offenses. As this court has explained: "[W]e have stated that "transactions" has a flexible meaning and that the existence of a "series" depends upon the degree to which the events are related. Mere factual similarity of events will not suffice. Rather, there must be some greater "logical relationship" between the occurrences. Such a logical relationship may be shown by the existence of a common plan,

5

> scheme, or conspiracy. A "logical relationship" may also be shown if "the common activity constitutes a substantial portion of the proof of the joined charges."[1]

Diaz first argues that joinder was improper under FRCrP 8(b) because defendants did not participate in the same series of acts or transactions as their co-defendants. Nor was there a "logical relationship" between some of the counts and the rest of the indictment, Diaz says. For example, Counts Twenty-Nine through Thirty-Nine charge only Fort with conspiracy and the unlawful use of a communication facility when he tried to smuggle narcotics into San Francisco County Jail. None of the other defendants face the same charges, and the counts were unrelated to Count One's drug conspiracy (which alleged distribution of drugs by the Down Belong Gang in a Sunnydale public housing complex).

This order disagrees. Significantly, FRCP 8(b) states, "All defendants need not be charged in each count." Instead, the Ninth Circuit has "held that joinder is the rule rather than the exception and that the burden is on the defendant in his appeal following denial of the motion to sever to show that joinder was so manifestly prejudicial that it outweighed the *dominant concern with judicial economy* and compelled exercise of the court's discretion to sever." *United States v. Armstrong*, 621 F.2d 951, 954 (9th Cir. 1980) (emphasis added). As stated, "Rule 8(b) is construed liberally in favor of joinder." *Sarkisian*, 197 F.3d at 975.

Joinder is especially appropriate when the defendants were indicted together, were charged with conspiracy, and/or were charged with a RICO violation. "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). "[A] logical relationship may be shown by the existence of a common plan, scheme, or conspiracy." *Sarkisian*, 197 F.3d at 976. "We have previously noted that a joint trial is particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." *United States v. Fernandez*, 388 F.3d 1199, 1242 (9th Cir. 2004). In *Fernandez*, the Ninth Circuit also cited a Second Circuit decision with

---

[1] Unless indicated otherwise, internal citations are omitted from quoted authorities in this order.

6

respect to RICO violations: "Proof of [RICO] elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant, and the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless." *Id*. at 388 F.3d at 1242 (citing *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992)).

Another factor that militates strongly in favor of joinder is the safety of civilian witnesses. A previous order has explained why the defendants and their confederates might try to eliminate civilian witnesses. Defendants are charged with conspiracy, and there is a large amount of overlapping evidence, civilian witness testimony being potentially a crucial part. If the trial were severed, the witnesses would be known and at risk long before the second trial started.

Moreover, although it is true that Counts Twenty-Nine through Thirty-Nine charge only Fort with trying to smuggle drugs into jail, Diaz and Fort were indicted at the same time and were prominent members of the joint drug, firearms, and RICO conspiracies charged in Counts One through Three. Similarly, while Milburn was not yet arrested at the time, he was indicted as "Redacted Defendant 1" and was also involved in the same joint conspiracies. Aside from the joint conspiracies, the three defendants were engaged in the same series of acts and transactions. For example, Milburn and Diaz allegedly murdered Kenya Taylor and Antoine Morgan. Milburn and Fort allegedly conspired to kill Harry Cael Jr. All three were charged with the conspiracy to murder Jamaar Jackson in aid of racketeering. In a conspiracy, each co-conspirator is guilty of all murders in furtherance of the conspiracy even if he were not present at all of them.

Diaz cites *Sarkisian*, *United States v. Martin*, 567 F.2d 849 (9th Cir. 1977), and *People v. Satterfield*, 548 F.3d 1341 (9th Cir. 1977), as examples of when the Ninth Circuit found improper joinder of defendants. These decisions, however, do not apply here.

In *Sarkisian*, multiple defendants were convicted for trafficking in altered motor vehicle parts and conspiracy to violate the Motor Vehicle Theft Prevention Act. Some of the

7

defendants (the appellants) were convicted for collection of an extension of credit by extortionate means. The defendant-appellants therefore argued that there was improper joinder under FRCrP 8(b) because the extortion and trafficking charges were not "logically related," nor was there a large area of overlapping proof between the joined charges. The Ninth Circuit agreed. It stated, "This is not an instance where one criminal activity naturally flows from separate criminal conduct." *Sarkisian*, 197 F.3d at 976. Moreover, "[t]he only meaningful connections between the extortion count and the car counts are that some of the same defendants were charged in both counts, and the extortion incident occurred while the car scheme was ongoing." *Ibid*. Here, that is not the case. All three defendants were charged as members of the same drug, racketeering, and firearms conspiracy. They engaged in violent acts in furtherance of the goals of the same conspiracy. Their acts and charges were sufficiently intertwined to justify joinder. Unduly prejudicial evidence pertaining to unrelated acts, if any, can be redacted to avoid tainting jury deliberations.

In *Martin*, two defendants were convicted of narcotics conspiracy. Count One charged appellant-defendant Martin with conspiring with his co-defendant Macias to import heroin. Counts Two through Five charged them with conspiring to possess with the intent to distribute heroin, amphetamines, cocaine, and marijuana. Martin was not charged in the remaining four counts (which dealt with conspiracies to possess and distribute marijuana and cocaine). The Ninth Circuit found joinder improper. It reasoned that not all of the offenses arose out of the same "series of acts or transactions" because the government failed to provide proof of "substantially different facts in order to support conviction on the counts unrelated to [the defendant]." *Martin*, 567 F.2d at 853. The Ninth Circuit nonetheless noted that it "has taken a pragmatic approach to problems of joinder . . . The purpose of rule 8(b), rather than the formalities of pleading, controls the analysis of whether joinder was proper in a given case. The purpose of rule 8(b) is to balance the need to avoid the potential prejudice that may result from joining multiple defendants for trial with the need to attain trial efficiency. These objectives are best served by joinder whenever 'the common activity constitutes a substantial portion of the proof of the joined charges.'" *Martin*, 567 F.2d at 853.

8

1   Finally, in *Satterfield*, the Ninth Circuit found improper joinder because the
2   appellant-defendant was involved in only two of the five bank robberies charged in the
3   indictment (while his co-defendant was involved in all five).  Most of the testimony concerned
4   robberies in which only the co-defendant was involved.  The Ninth Circuit therefore said that
5   joinder was prejudicial.  In contrast, here all defendants were charged and were involved in the
6   three main conspiracies (relating to drugs, firearms, and RICO).  They engaged in various other
7   related acts throughout the indictment.  While many of Fort's unlawful telephone calls were
8   evidence of his conspiracy to smuggle drugs into jail, some of these calls also had to do with the
9   other conspiracies of which the other defendants were charged.  It would be an extreme —
10  and unpragmatic — approach to only allow joinder if all three defendants were charged with
11  exactly the same offenses in an 86-count indictment.  In sum, this order holds that all three
12  defendants have been properly joined.

### B.     SEVERANCE UNDER FRCrP 14(A).

14  Defendants Fort and Milburn move for severance pursuant to FRCrP 14(a).
15  Defendants fear "prejudicial spillover."  According to FRCrP 14(a), "[i]f the joinder of offenses
16  or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a
17  defendant or the government, the court may order separate trials of counts, sever the
18  defendants' trials, or provide any other relief that justice requires."[2]

#### 1.     Capital Prosecution.

20  Fort argues that unique problems flow from a capital prosecution that justify severance.
21  The Supreme Court has recognized that "the penalty of death is qualitatively different from a
22  sentence of imprisonment, however long . . .  Because of that qualitative difference, there is a
23  corresponding difference in the need for reliability in the determination that death is the
24  appropriate punishment in a specific case."  *Woodson v. North Carolina*, 428 U.S. 280, 305

---

[2] The Ninth Circuit's decision in *United States v. Adams*, 518 F.2d 193 (9th Cir. 1978), is instructive. While this case is clearly not at the same stage of proceedings as in *Adams*, it is noteworthy that the Ninth Circuit stated, "The test for determining whether the trial court abused its discretion is whether a joint trial was so prejudicial as to require the trial judge to exercise his discretion in but one way.  The burden of demonstrating prejudice rests on the appellant, and is a heavy one.  He must show more than that a separate trial might offer 'a better chance' of acquittal." *Id*. at 198.

9

(1976). Consequently, defendants in a capital conspiracy prosecution have greater need for individual consideration — at the guilt phase and sentencing phase. Fort argues that a court's interest in judicial economy should not mean "sacrificing individual justice." *United States v. Eubanks*, 591 F.2d 513, 522 (9th Cir. 1979) (Ely, J., concurring).

Furthermore, Fort says, the government wrongfully focuses only on the guilt phase of a capital trial. Individualized sentencing needs to occur at the guilt *and* penalty phases. The Eighth Amendment requires "precise and individualized sentencing." *Stringer v. Black*, 503 U.S. 222, 232 (1992). This means that a jury must be given the opportunity to consider the entire panoply of mitigating factors. *See Penry v. Johnson*, 532 U.S. 782, 797 (2001). Fort then cites *United States v. McVeigh*, 169 F.R.D. 362, 364 (D. Colo. 1996), where the district court stated that "[t]he nature and scope of the charges, the quantity of the evidence and the intensity of the public interest in all aspects of this criminal proceeding *compel caution and restraint* in ruling on these motions."

The *McVeigh* decision cited by Fort, however, states that "[a] showing of potential prejudice is not enough to require separate trials, recognizing the public interest in economy and expedition in judicial administration. The policy preference for a joint trial is particularly strong when a conspiracy is charged." 169 F.R.D. at 364. Furthermore, courts have held that joint penalty trials are not *per se* unconstitutional. In *United States v. Tipton*, 90 F.3d 861, 892 (4th Cir. 1996), the appellant-defendants argued that "joint capital sentencing hearings are *prima facie* inconsistent with the Eighth Amendment." The Fourth Circuit first noted, "More important of course than any consideration of inconvenience or possible unfairness to the Government from sequential separate trials are the possibilities of unfairness to the accused persons from a joint penalty-phase trial — specifically the threat posed to individualized consideration of their situations, and in particular the quite different mitigating factors relevant to each. While such a potential risk was certainly present here, as it will be in any case involving multiple defendants, it could not of course have been entirely removed by conducting three sequential, largely repetitive hearings before the same jury." *Id.* at 892. The Fourth Circuit was satisfied with the district court's instructions that the jury give each defendant's

10

case individualized consideration. It also stated that it was entitled, "in the absence of any directly negating evidence, to presume that the jury heard, understood, and did follow these instructions." *Id.* at 893. The court of appeals therefore found no abuse of discretion when the district court conducted a joint penalty-phase trial.

Fort argues that *Tipton* is inapposite because "defendants here have shown that instructions are unlikely to appreciably reduce the risk here, which in any event is greater than the usual risks posed by joint pending trials" (Reply 4). Fort refers instead to the declaration of political science professor Dr. Edward Bronson, who recommends the use of separate juries as a better way of reduce the risks of an unfair trial. This order finds that the declaration does not show the ineffectiveness of careful and frequent instructions. According to Ninth Circuit precedent, "We have repeatedly held that a district court's careful and frequent limiting instructions to the jury, explaining how and against whom certain evidence may be considered, can reduce or eliminate any possibility of prejudice arising from a joint trial." *Fernandez*, 388 F.3d at 1243. Furthermore, the Ninth Circuit "presume[s] jurors follow the court's instructions absent extraordinary situations." *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005). Because defendants have not shown how juries cannot be trusted to follow careful instructions by the judge to give each defendant's case individual consideration, this order finds that severance is not justified. Moreover, if some evidence were unfairly prejudicial, it would be redacted.

### 2. Individualized Sentencing.

As stated, a capital defendant is entitled to precise and individualized sentencing. Fort says that a joint trial jeopardizes this right in the following ways. There is the risk that the negative aspects of one defendant's character will be attributed to his co-defendant's character. Fort is not charged with any of the murders allegedly committed by Diaz or Milburn, yet the jury would be exposed to inflammatory victim-impact evidence against all three defendants. In addition, the likelihood of negative blending increases because the three defendants "share characteristics such as race, gang associations, and conspiracy charges with overlapping overt acts" (Br. 9).

11

United States District Court

For the Northern District of California

1    According to defendants, there is, unfortunately, no countervailing effect with mitigating
2    factors; the mitigating evidence presented by other defendants could serve as aggravating
3    evidence against their co-defendants. For example, Diaz could argue that he was only
4    following Fort's orders, an argument tending to exculpate Diaz and inculpate Fort. The effect
5    of mitigating evidence could be diluted in another way; as each defendant presents his side,
6    the jury could feel that "it has heard that [argument] before."

7    Fort further contends that comparison with co-defendants could only work to any
8    particular defendant's disadvantage. Rather than determine whether a defendant deserved the
9    death penalty, the jury might compare the defendant to his compatriots to the defendant's
10   detriment.

11   Again, these arguments are unpersuasive. By Fort's own words, the defendants share
12   "conspiracy charges with overlapping overt acts" (Br. 9). Defendants have merely raised
13   speculations of prejudice; they have not made any showing as to how their circumstances
14   require separate trials or how a jury could not be trusted to follow careful instructions. This is
15   not enough to justify severance.

16   With respect to the purportedly inflammatory victim-impact evidence, Congress has
17   approved of its use by the government: "The factors for which notice is provided under this
18   subsection may include factors concerning the effect of the offense on the victim and the
19   victim's family, and may include oral testimony, a victim impact statement that identifies the
20   victim of the offense and the extent and scope of the injury and loss suffered by the victim and
21   the victim's family, and any other relevant information." 18 U.S,C. 3593(a). *See also Mitchell*,
22   502 F.3d at 968 (finding that the victim impact evidence "was not so plainly inflammatory that
23   it should have been excluded *sua sponte*").

24   Moreover, jurors can be trusted to "compartmentalize" charges against the three
25   defendants, to avoid problems of "prejudicial spillover." In *United States v. Patterson*, 819
26   F.2d 1495, 1501 (9th Cir. 1987), multiple defendants were charged with the conspiracy to
27   distribute heroin. One of the defendants, Mitchell, was the ringleader. He was also convicted
28   with separate charges — directing a criminal enterprise, tax evasion, and failure to file tax

12

returns. At the trial, Mitchell's co-defendants unsuccessfully moved to sever themselves from him. On appeal, they argued improper joinder; they should not have been tried with Mitchell as the evidence showing his assets and income (relating to his tax-evasion charge) was irrelevant to their conspiracy charge. The Ninth Circuit disagreed, reasoning that evidence of the tax violations related directly to the conspiracy; it was the handling of large sums of money up through the hierarchy that demonstrated the illegal scheme. The Ninth Circuit further noted that "the defendants provide[d] no explanation as to why the jurors could not fairly 'compartmentalize' the conspiracy and tax evasion evidence and charges in their deliberations." *Id.* at 1501. Because jurors could be expected to compartmentalize evidence, especially with proper instructions, severance is not justified on these grounds.

### 3. Evidentiary Issues.

Fort further contends that a joint trial will cause numerous evidentiary problems. A court would be constantly embroiled in the admissibility of evidence and redactions with respect to some defendants and not others. Both the court and jurors would have difficulty keeping straight the thorny record. It is not clear that instructions could limit or cure evidentiary problems.

Again, this order disagrees. Fort does not point to specific items of evidence. "The fact that there may be more incriminating evidence against one defendant than there is against another, is insufficient to justify a separate trial for the latter." *United States v. Marcello*, 731 F.2d 1354, 1360 (9th Cir. 1984).

### 4. Antagonistic Strategies.

Antagonistic strategies will inevitably arise between co-defendants, Fort says. While "[i]nconsistency, alone, seldom produces the type of prejudice that warrants reversal," "[t]he probability of reversible prejudice increases as the defense move beyond the merely inconsistent to the antagonistic." *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991). Here, Fort says that the parties have "varying interests," which will become evident as the trial unfolds (Br. 20). For example, one defendant might attack victims acting as prosecution witnesses while his co-defendant might handle the witness more delicately if it will affect his

13

case during the penalty phase. Also, each defendant will most likely claim that he was less culpable than his compatriots because he occupied a lower level of the gang hierarchy.

Again, potential prejudice is simply not enough to justify severance. It has also been the experience of this Court that improper severance forces the government and courts to squander limited resources while allowing each defendant to point the finger of guilt at each other in absentia.

### 5. Potential Racial Stereotyping.

Defendants argue that they may not receive individualized consideration because of the risk of racial stereotyping. The jury will see before them: three young, African-American males charged with gang-activities relating to drugs, guns, and violence. Diaz introduces evidence by Dr. Bronson, who testified to the problems of guilt by association and racial bias.

This argument is unconvincing. By defendants' reasoning, multiple defendants of the same race should never be tried together in a capital case. Moreover, the FDPA makes a special precaution to ensure against discrimination: "In a hearing held before a jury, the court, prior to the return of a finding under subsection (e), shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant or of any victim may be." 18 U.S.C. 3593(f). Because there are sufficient safeguards against racial bias, this is not sufficient grounds for severance.

### 6. Non-Capital Defendant with Capital Defendants.

Milburn also moves for severance pursuant to FRCrP 14(a). He claims that it would be highly prejudicial to be tried in the same trial as his capital co-defendants Diaz and Fort. One problem is related to jury selection and instructions, he says. While the opinions of prospective jurors on capital punishment are important for Diaz and Fort, they are irrelevant for Milburn during voir dire. A joint trial "will result in the dismissal of a substantial number of jurors who would otherwise not be stricken for cause and who would be considered appropriate jury members if Mr. Milburn's trial were separate" (Br. 4).

14

Moreover, the focus on the death penalty would imply Milburn's guilt, regardless of curative and limiting instructions or the hope that jurors would be able to compartmentalize evidence with respect to each of the three defendants. *See Bruton v. United States*, 391 U.S. 123, 135 (1968).

Because Milburn is not yet a capital defendant, his counsel and the counsel of Diaz and Fort would adopt allegedly antagonistic tactical approaches. For example, Milburn is charged with having occupied a high leadership role in the Down Below Gang. Fort and Diaz are charged with the death penalty and are likely to claim that they acted under Milburn's orders. Such a defense would be possibly antagonistic to Milburn's defense.

This order disagrees with Milburn. It is not *per se* prejudicial to join non-capital defendants with capital defendants. In *Buchanan v. Kentucky*, 483 U.S. 402 (1987), there was a joint trial for two defendants charged with sexual assault, kidnaping, and murder. One defendant, a juvenile during the commission of the offense, did not face the death penalty. The Supreme Court held that the "death qualification" of a capital jury, in which prospective jurors were excluded because of their stated inability to set aside their strong opposition to the death penalty, did not violate the defendant's right to a jury selected from a representative cross-section of the community. *Id.* at 415. Nor did this kind of jury selection deny a defendant's right to an impartial jury. *Id.* at 416. The Supreme Court further stated, "The Commonwealth's interest in a joint trial also is bound up with a concern that it not be required to undergo the burden of presenting the same evidence to different juries where, as here, two defendants, only one of whom is eligible for a death sentence, are charged with crimes arising out of the same events . . . Such a result [of not joining capital defendants with non-capital defendants] would place an intolerable administrative burden upon the Commonwealth." *Id.* at 418–19.

As stated, this order finds that jurors are able to "compartmentalize" charges against Diaz, Fort, and Milburn. Had all twelve defendants decided to go to trial, the jury would have confronted an evidentiary behemoth and severance would have been more justifiable. That is not the case here. Only three defendants remain. They are each charged with conspiracies

15

relating to RICO, firearms, and drugs. Given the vast amount of overlapping evidence and the minimal risk of "prejudicial spillover," Milburn's trial need not be severed from that of Fort and Diaz, whether or not he is authorized for the death penalty.

### C. THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT.

Milburn contends that there are possible problems under the Confrontation Clause of the Sixth Amendment. The Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Although the Supreme Court has not explicitly defined a "testimonial statement," it has lent some guidance. One example of a "testimonial statement" is a statement "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52.

Milburn says that the government is likely to introduce recorded statements made between Fort and Diaz while Fort was an inmate at the San Francisco County Jail. These statements implicate Milburn. He argues that the statements are testimonial in nature because they were made in a situation that would lead an objective witness reasonably to believe that the statement would be used at a later trial. To further support this argument, Milburn says that earlier orders and the government have found that there was no objectively reasonable expectation of privacy with respect to these jail calls. The introduction of these recorded statements would therefore violate Milburn's rights under the Confrontation Clause, giving further justification for a severance.

Not necessarily. *First*, the lack of an objectively reasonable expectation of privacy regarding the recorded jail calls did not mean that the calls had been made under circumstances that would lead an objective witness reasonably to believe that the statement would be later used at trial. There is a middle ground. After all, defendants were *not* speaking to police officers and *were likely* speaking in code to each other. Accordingly, while there was no reasonable expectation of privacy (given the taped signs in the telephone room), the

16

circumstances could still be such that the speakers would not think that the statements would used by police.

*Second*, co-conspirator statements made in furtherance of a conspiracy are admissible, notwithstanding the Confrontation Clause. *See United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005). This order assumes that the vast majority of statements introduced at trial will be co-conspirator statements, as represented by the government. There is one caveat. As the government acknowledges, some statements are not co-conspirator statements and may be so prejudicial in nature that limiting instructions and/or redactions will be necessary. This can be decided on an item-by-item basis.[3]

## CONCLUSION

For the foregoing reasons, defendants' motions for severance are **DENIED**. This order reminds the government that it must produce co-conspirator statements pursuant to FRCrP 16-1(c)(4) by September 22, 2008. The defense will then be given the opportunity to object to them and to request redactions on a statement-by-statement basis.

**IT IS SO ORDERED.**

Dated: June 24, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[3] Certain statements may not constitute co-conspirator statements because they were not made during a conspiracy. Whether or not a statement is a co-conspirator statement is a fact issue. "Under Rule 801(d)(2)(E), the statement of a co-conspirator is admissible against the defendant if the government shows by a preponderance of the evidence that a conspiracy existed at the time the statement was made; the defendant had knowledge of, and participated in, the conspiracy; and the statement was made in furtherance of the conspiracy." *United States v. Bowman*, 215 F.3d 951, 960–61 (9th Cir. 2000). This does not mean that a district court is required to have an evidentiary hearing on the matter. *See United States v. Long*, 706 F.2d 1044, 1053 (9th Cir. 1983) (disagreeing with defendant's contention that a district court was required to have a pretrial evidentiary hearing to determine the admissibility of co-conspirators' statements).