IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAYMON MILBURN, EDGAR DIAZ, and EMILE FORT,<br><br>Defendants.<br>_____ / | No. CR 05-00167 WHA<br><br>**ORDER**: **(1) DENYING DIAZ AND FORT'S MOTION TO PRECLUDE PUNISHMENT-RELATED QUESTIONS; AND (2) DENYING MILBURN'S MOTION TO DEFER PUNISHMENT-RELATED QUESTIONS (Dkt. Nos. 1499, 1502)** |

**INTRODUCTION**

In this RICO gang prosecution, defendants Edgar Diaz and Emile Fort have been authorized for a death-penalty prosecution. Defendant Raymon Milburn, who was more recently apprehended, is still awaiting a decision as to whether or not he will be authorized for capital punishment. Defendants Diaz and Fort seek to preclude punishment-related questions during voir dire. Defendant Milburn has submitted a similar motion, requesting that such questions be deferred, or in the alternative, that two separate juries be empaneled — one for the guilt phase and a second for the sentencing phase. For the reasons stated below, defendants' motions are **DENIED**. Diaz and Fort also make requests as to the (i) scope of appropriate punishment-related *voir dire*, (ii) attorney questioning, (iii) use of a jury questionnaire, and (iv) individual sequestered *voir dire* on certain topics. Ruling on these requests is addressed in a separate order.

**STATEMENT**

Defendants Edgar Diaz, Emile Fort, and Raymon Milburn are the three remaining defendants in a twelve-defendant RICO gang prosecution that began in 2005. The other nine defendants have pled guilty. The indictment charges Diaz, Fort, and Milburn with multiple conspiracies (relating to drugs, firearms, and RICO), witness tampering, drug distribution, firearms possession, and homicides.

The parties agreed to and adopted the following schedule for filing motions prior to the start of trial. Stage One motions regarding discovery, suppression of evidence or dismissal of counts, exclusion of specific FRE 404(b) evidence, exclusion of co-conspirator statements, and production of witness lists pursuant to 18 U.S.C. 3432 were set for May 5, 2008. Stage Two motions for severance were scheduled for June 18, 2008. The motions for severance and for a multi-phase trial were denied in their entirety. Stage Three motions, including the pending one, were heard on August 18, 2008. Jury selection is scheduled to begin in November 2008.

Diaz and Fort now move to preclude punishment-related questions. They also appended a proposed admonition for the jury and a proposed jury questionnaire. Milburn moves to defer the death-qualification process until after the jury has rendered a guilt-phase verdict, or in the alternative, for a bifurcated jury (Dkt. No. 1502). He also joins his co-defendants' motion to use the aforementioned proposed jury questionnaire.

**ANALYSIS**

**1.   LEGAL STANDARD**

A prospective juror may be excluded for cause because of his views on capital punishment when those "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *United States v. Mitchell*, 502 F.3d 931, 955 (9th Cir. 2007) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). In order to strike a prospective juror for cause, it is not necessary that the juror indicate that he would automatically vote against the death penalty. Likewise, the juror's bias need not be shown with unmistakable clarity. What is required is that the trial court be left with a

2

"definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Deference is owed to the trial judge who sees and hears the juror. *Ibid.*[1]

### 2.   VOIR DIRE.

Death qualification is the process by which jurors in a capital case are screened to ensure that none has an opposition to the death penalty so strong that it would prevent or substantially impair their performance as jurors. A juror who could never vote for the death penalty, regardless of the court's instructions, or a juror who would automatically vote for death in every case similar to the one on trial, should be removed for cause. *See Morgan v. Illinois*, 504 U.S. 719, 728–29 (1992).

The seminal decisions with respect to qualifying potential jurors for capital sentencing are *Witherspoon v. Illinois*, 391 U.S. 510, 521–23 (1968), and *Wainwright v.Witt*, 469 U.S. 412, 424 (1985). *Witherspoon* held that a state infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all members of the venire with conscientious or religious scruples against the death penalty. *Witherspoon* also recognized, however, that states have a legitimate interest in excluding those jurors whose opposition to capital punishment would preclude them from viewing the proceedings impartially. *Id.* at 523 n.21. Many courts have focused on *Witherspoon*'s Footnote 21 in formulating a standard for determining when a juror may be excluded for cause. That footnote stated that jurors may be excluded for cause if they make it

> unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

Recognizing the narrowness of this standard, the Supreme Court later stated that "*Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude." *Adams v. Texas*, 448 U.S. 38, 47–48 (1980).

---

[1] Unless otherwise stated, all internal citations are omitted from quoted authorities in this order.

3

*Wainwright v. Witt*, 469 U.S. 412, 424 (1985), however, broadened the standard for removal for cause, explaining that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." While the language of *Witt* is permissive, the Supreme Court later explained that "[u]nder this standard, it is clear . . . that a juror who in no case would vote for capital punishment regardless of his or her instructions, is not an impartial juror and *must* be removed for cause." *Morgan*, 504 U.S. at 728 (emphasis added). Moreover, in *Lockhart v. McCree*, 476 U.S. 162, 165 (1986), the Supreme Court held that the Constitution does not "prohibit the removal for cause, *prior to the guilt phase* of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or
substantially impair the performance of their duties as jurors at the sentencing phase of the trial" (emphasis added).

### A.     Motion to Preclude Punishment-Related Questions.

Diaz and Fort move to preclude punishment-related questions. They concede that death qualification is constitutionally permissible. They then, however, attempt to qualify this permissibility — stating that death qualification is permissible *if* provided for by state law, but is *not* permitted under the federal death scheme — and argue that death qualification is *not* required. Defendants' position is not tenable.

Defendants quote the language of the Federal Death Penalty Act in an attempt to demonstrate that death qualification is not permissible under the federal death scheme. The statute instructs that, "in determining whether a sentence of death is to be imposed on a defendant, [the jury] shall consider any mitigating factor." 18 U.S.C. 3592(a). It then offers a list of examples.

What defendants call, "reverence for life" is nowhere to be found. As stated above, death qualification removes for cause prospective jurors who would *never* vote for capital punishment. In arguing that this procedure should be prohibited, the "reverence-for-life"

4

mitigating factor that defendants say is permissible would be more accurately described as an "absolute bias against the death penalty." It is hard to imagine that Congress would intend as much. Indeed, by virtue of being *absolute*, such bias could not be *mitigating* at all. "[S]tatutory interpretations which would produce absurd results are to be avoided." *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004).

As defendants point out, the statute does include an example entitled "other factors." The other mitigating factors to be considered, however, lie "*in the defendant's background, record, or character or any other circumstance of the offense*." 18 U.S.C. 3592(a)(8) (emphasis added). The notion that an absolute bias against the death penalty can be a mitigating factor — and cannot be a reason for removal for cause — is *not* supported by the language of the FDPA and is directly counter to Supreme Court decisions.

In his reply, Diaz cites two district court decisions (both of which were later reversed) supposedly prohibiting death qualification. *United States v. Green (Green I)*, 343 F. Supp. 2d 23, 27 (D. Mass. 2004), however, did *not* hold that death qualification is impermissible. Rather, it adopted a bifurcated jury system where the guilt phase and sentencing phase were to be heard before two separate juries. *Id.* at 25–26. *Green I* noted that "[s]hould a penalty phase be necessary, there is no question that the government is entitled to death-qualify the punishment jury." *Id.* at 27 (emphasis omitted). *Green I* did state that the practice of death-qualifying a single jury charged with hearing both liability and sentencing is not required. Under circumstances where the jury was not death-qualified prior to the guilt phase, it prescribed a method *after* a guilty verdict where measures would be taken to ensure that the sentencing-phase jury *was* death-qualified. *Id.* at 27 n.3. The First Circuit ultimately overturned the district court's decision, holding that a defendant could not waive the FDPA requirement that a unitary jury must hear both the guilt and penalty phase of a case where the death penalty was imposed. *United States v. Green (Green II)*, 407 F.3d 434, 443 (1st Cir. 2005). *United States v. Young (Young I)*, 376 F. Supp. 2d 787, 792 (M.D. Tenn. 2005), arrived at a similar holding, and was reversed by the Sixth Circuit. *See United States v. Young, (Young II)*, 424 F.3d 499, 506–07 (6th Cir. 2005). *See also United States v. Brown*, 441 F.3d

5

1330, 1353–54 (11th Cir. 2006) (rejecting a motion to prohibit death-qualification pursuant to the Supreme Court's holding in *Lockhart*).

### B. Motion to Defer Death Qualification.

While Diaz and Fort seek to preclude death qualification altogether, defendant Milburn moves to defer death-qualifying questions until after the guilt phase of the trial has concluded. He argues that jury-selection procedures should be implemented that would mirror those discussed in *Green I* — namely, that a sufficient number of alternate jurors should be empaneled to allow for death qualification following the guilt phase while at the same time retaining a unitary jury. In the alternative, Milburn argues that a two-jury approach should be adopted.

In examining the propriety of Milburn's proposed jury-selection procedures, the applicable provision of the FDPA is 18 U.S.C. 3593(b). The FDPA requires, except in four circumstances, that the sentencing hearing "shall be conducted before the jury that determines the defendant's guilt." Those four exceptions are 18 U.S.C. 3593(b)(A)–(D):

> (A) the defendant was convicted upon a plea of guilty;
>
> (B) the defendant was convicted after a trial before the court sitting without a jury;
>
> (C) the jury that determined the defendant's guilt was discharged for good cause; and
>
> (D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary.

As stated above, the two district-court decisions that implemented a two-jury approach were reversed on the ground that such a procedure is *not* allowed for by the FDPA. The Ninth Circuit has not yet addressed this issue. The circuits that have confronted this issue have held that the procedures advocated by Milburn are impermissible.[2]

With respect to Milburn's primary option, the Eleventh Circuit held that bifurcated *voir dire* is *not* permissible under Section 3593(b). *Brown*, 441 F.3d at 1353–54.

---

[2] Milburn's current standing as a non-capital defendant does not impact this analysis. The Supreme Court has held that death qualification of a jury does not violate a jointly-tried, non-capital defendant's rights under the Sixth and Fourteenth Amendments to an impartial jury selected from a representative cross section of the community. *Buchanan v. Kentucky*, 483 U.S. 402, 414–15 (1987).

6

1  Because members of the guilt-phase jury may not be death-qualified under a bifurcated *voir*
2  *dire* scheme, the natural consequence is that the jury determining guilt might not be the same
3  one determining the sentence. *Id.* at 1353. *Brown* found that none of the exceptions in Section
4  3593(b) were relevant, and that it would have been statutorily impermissible for the district
5  judge to use one set of jurors for the guilt phase and a second for the sentencing phase. The
6  only exception that could *conceivably* apply in this instance is subparagraph (C), as the other
7  exceptions deal with scenarios that are either post-conviction or post-sentencing. The statutory
8  language of Section 3593(b)(2)(C) seems to indicate that "good cause" can only be found after
9  the rendering of a guilty verdict.

10  Indeed, *Green II* came to precisely this conclusion after conducting an in-depth statutory
11  analysis. In *Green I*, the district court had held that Section 3593(b) permitted it to determine,
12  *before* trial had commenced, that good cause existed to discharge the original jury and once it
13  had adjudicated the defendant's guilt and empanel a new jury for the sentencing phase.
14  *Green II*, 407 F.3d at 440. In disagreement, the First Circuit focused on the text of Section
15  3593(b)(2)(C):

> The use of the word "determined," in the past tense, makes clear that the phrase "discharged for good cause" refers to discharge for events arising *after* the guilt phase has been concluded. *See Jones v. United States*, 527 U.S. 373 (1999) (Ginsburg, J., dissenting) (opining that "[d]ischarge for 'good cause' under [Section] 3593(b)(2)(C) . . . is most reasonably read to cover guilt-phase . . . juror disqualification due to, *e.g.,* exposure to prejudicial extrinsic information or illness"). This makes perfect sense: jurors who originally were qualified to sit may, by some untoward exposure or affliction, become incapacitated after the guilt phase ends but before the penalty phase ends so that a properly empaneled jury that has determined guilt will not be able to continue to serve. *Id.* at 441.

23  The First Circuit also examined the structure of the statute. It noted that the default rule
24  in subsection (b)(1) — that the jury that determines the guilt phase of a capital trial *shall* be the
25  same jury that determines the sentencing phase — is set forth first in mandatory language and
26  without condition. Subsection (b)(2), which is conditional, spells out four exceptions to the
27  default rule:

> The common denominator among these four exceptions is that they all appear to represent situations in which it is either

7

> impossible or impracticable to apply the default rule of a unitary jury. This is unarguably true of subparagraphs (A) and (B); each of those subparagraphs deals with a situation in which guilt is not determined by a jury at all. That is also readily apparent with respect to subparagraph (D). The vast majority — if not all — of situations requiring the reconsideration of an imposed sentence will be those that occur when direct or collateral review has identified, months or years later, some defect in the original sentencing proceeding. Assuming that a jury participated in the original proceeding, it would have been long since discharged and recalling it would, for a variety of reasons, be infeasible.
>
> Structurally, this leads to the conclusion that subparagraph (C) should be read as referring to those situations in which empaneling a fresh penalty phase jury is unavoidable because of some exigency associated with, or arising *after,* the determination of the defendant's guilt. This is the most natural (and, therefore, the favored) reading of the statute. So construed, subsection (b) presents a coherent, unified theme: a single, properly constituted jury will hear both phases of a federal capital trial unless circumstances definitively rule out that option. *Id.* at 441–42.

The Sixth Circuit reached the same conclusion in *Young II* as did the Fifth Circuit in *United States v. Williams*, 400 F.3d 277, 281–83 (5th Cir. 2005). In short, defendants cite no valid case law that supports their position.[3] Diaz and Fort do cite numerous social science studies for the proposition that death qualification of potential jurors prior to the guilt phase of a capital case results in conviction-prone juries. The Supreme Court, however, considered and rejected a similar argument, also supported by various social science studies, in both *Witherspoon* and *Lockhart*:

> The data adduced by the petitioner . . . are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude . . . that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. *Witherspoon*, 391 U.S. at 517–18.

The Ninth Circuit arrived at the same conclusion in *Harris v. Pulley*, 885 F.2d 1354, 1371 (9th Cir. 1988). Moreover, our Eastern District recently considered the argument that more recent studies have undermined the Supreme Court's holding in *Lockhart*. *Proctor v. Ayers*,

---

[3] *Green II* further evaluated the structure of the statute and concluded that the unitary-jury requirement of Section 3593(b) is non-waivable. *Green II*, 407 F.3d at 443. Young II and *Williams* held likewise. *Young II*, 424 F.3d at 509; *Williams*, 400 F.3d at 281–83. Because defendants have not raised this argument, it is not necessary for this order to explore this issue further.

8

2007 WL 1449720, *15 (E.D. Cal. 2007) (Kellison, Mag.). In that decision, it was correctly noted that *Lockhart* "did not depend on studies at all," as the Supreme Court assumed that the studies presented were methodologically valid and adequate to establish that death-qualified juries are slightly more conviction-prone than non-death-qualified juries and still held that death qualification is constitutionally permissible. *Id.* at *17.

In sum, the Supreme Court has clearly held that death qualification is permissible and may be conducted prior to the guilt phase of trial. *Lockhart*, 476 U.S. at 165. Without deciding whether the jury-selection procedures proposed by defendants would *ever* be permissible under the FDPA, this order will refrain from implementing them here for the sake of practicality and fairness. The language of the FDPA clearly favors a unitary jury, which, having heard the entire case, is best equipped to consider both the conduct in question and other sentencing factors in reaching a just sentence.

**CONCLUSION**

For the foregoing reasons, the motion filed by Diaz and Fort to preclude punishment-related questions is **DENIED**. Milburn's motion to defer punishment-related questions, or in the alternative, to seat a bifurcated jury, is also **DENIED**.

Defendants' other requests regarding *voir dire* and the form of the jury questionnaire are addressed in a separate order. Furthermore, this order agrees with the parties that it is too premature to formulate preliminary jury instructions.

**IT IS SO ORDERED.**

Dated: August 20, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9